IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2017 Session

**STATE OF TENNESSEE v. JOSHUA HUNTER BARGERY**

**Appeal from the Circuit Court for Lake County**
**No. 11-CR-9586     R. Lee Moore, Jr., Judge**

_____

**No. W2016-00893-CCA-R3-CD**

_____

Joshua Hunter Bargery ("the Defendant") appeals his Lake County Circuit Court convictions for two counts of first degree felony murder and two counts of especially aggravated robbery, for which he received a total effective sentence of two consecutive life sentences.  On appeal, the Defendant contends that: (1) his rights under the Fourth Amendment of the United States Constitution and Article I, section 7 of the Tennessee Constitution were violated by the trial court's denial of his motions to suppress evidence obtained during the search of the Defendant and his automobile; (2) the trial court erroneously excluded as hearsay the Defendant's testimony regarding statements made by Mr. Hill, Mr. Hernandez, and "the three Mexicans"; (3) the trial court erred in excluding relevant and material testimony from the Defendant's crime scene expert; (4) the Defendant is entitled to a new trial based on prosecutorial misconduct; (5) the trial court erred in denying the Defendant's motion to dismiss the indictment based on law enforcement's intentional destruction of exculpatory evidence; (6) the Defendant's due process rights were violated by the State's failure to disclose Mr. Hernandez's complete criminal record and the State's agreement not to treat him as a "suspect"; (7) the trial court erred by admitting a copy of a letter written by the Defendant, which was not produced by the State during discovery; (8) the trial court erred in its instructions to the jury; (9) the evidence was insufficient to support his convictions; (10) the trial court erred when it imposed consecutive sentences; (11) the trial court erred in denying the Defendant's motion for recusal; (12) the Defendant is entitled to a new trial based on violations of the trial court's order of sequestration; and (13) cumulative error deprived the Defendant of due process and a fair trial.  Following a thorough review of the record and applicable law, we reverse the judgments of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed**
**and Remanded for a New Trial**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

J. Houston Gordon (on appeal and at trial); Lyle Reid (on appeal and at trial); Amber Griffin Shaw (on appeal and at trial); Charles Brasfield (at trial); and Samuel L. Ivy (at trial), Covington, Tennessee; and Curtis F. Hopper (at trial), Savannah, Tennessee for the appellant, Joshua Hunter Bargery.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; C. Phillip Bivens, District Attorney General; and Lance E. Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

In July 2011, the Lake County Grand Jury indicted the Defendant on two counts each of first degree premeditated murder, first degree felony murder in the perpetration of a robbery or theft, and especially aggravated robbery, all in connection with the killing of Clarence and Sue Shell ("Mr. and Mrs. Shell" or "the victims"). The State subsequently filed a Notice of Intention to Seek the Death Penalty and of Aggravating Circumstances.

### State's Case-in-Chief

At a trial conducted April 20, 2015, to May 9, 2015, Ashleigh Shell, the victims' granddaughter, testified that she last saw the victims at their home on Owl Hoot Road on the evening of March 3, 2011. She was there with her boyfriend for an hour, and they left at 9:18 p.m. At the time they left, the victims were still in their "day clothes" and were not dressed for bed.

Will Shell, the victims' grandson, testified that he went to the victims' residence the following morning—March 4, 2011. When he arrived, he found that the blinds were drawn, both the front and back doors were locked, and there was blood on the front door. He looked into a window and saw Mr. Shell lying on the floor. When his father, Paul Shell, arrived at the residence, Will[1] kicked in the front door. He went about three steps inside the front door but then exited the house and waited for police to arrive. Will

---

[1] Because several witnesses share the same surname, we will refer to some witnesses by their first name. We intend no disrespect.

testified that the victims usually went to bed around 9:30 or 10:00 p.m. He stated that Mr. Shell was seventy years old at the time of his death and had open heart surgery several years before the murder. He agreed, however, that Mr. Shell had been a strong man for his age.

Paul Shell, the victims' son, testified that family members had asked the victims to move into the residence on Owl Hoot Road in October 2010 to "watch over the place," after Paul's aunt, who had been living in the residence, went to live in a nursing home. Paul stated that the victims' residence was located on the same tract of land as the house where the Defendant's great-grandmother, Carlene Smith, used to live. He explained that Mrs. Smith had been married to Paul's great-uncle, before he passed away in September 2010.

Paul testified that the victims normally went to bed around 10:00 or 10:30 p.m. He went to the victims' residence on the morning of March 4, 2011, after learning that Will was at the residence and could not get inside. After trying unsuccessfully to pry open the back door, Will kicked in the front door. When they walked inside the residence, Paul saw Mr. Shell lying on the floor in the living room in front of a chair. He then walked into the kitchen where he found Mrs. Shell. He exited the house and called 911.

Robin Surratt, the victims' daughter, testified that Mrs. Shell was sixty-eight years old and Mr. Shell was seventy years old at the time of their deaths. Both were retired. Mr. Shell had "heart issues" and had undergone bypass surgery, and Mrs. Shell retired just before her death because of her declining health. Ms. Surratt testified that Mrs. Shell had undergone one knee replacement surgery and was "a month away from having a second knee replacement," and she used a walker to assist her mobility.

Jason Allison testified that he was Chief Deputy at the Lake County Sheriff's Department in 2011. On the morning of March 4, he responded to the victims' residence with two other officers. When he arrived, Paul and Will Shell were in the driveway, "sobbing" and becoming "physically ill." Paul told him, "They're dead. They're both dead." When he entered the front door of the residence, Deputy Allison saw Mr. Shell's body, but he could not initially see Mrs. Shell. During a sweep of the residence, Deputy Allison noticed that the house had been "ransacked." Inside the victims' bedroom, he saw that "there was stuff just thrown on the bed, looked like jewelry and maybe drawers[.]" There was a wallet in the floor of the bedroom and another in the floor of the master bathroom. After securing the residence, Deputy Allison called the Tennessee Bureau of Investigation (TBI) to the scene.

- 3 -

Deputy Allison testified that, after the discovery of the victims' bodies, he received a phone call from Assistant Chief Kenny Lee with the Ridgely Police Department, who stated that he had received a tip that the Defendant was "selling some guns." Because he knew from the victims' family members that there were guns missing from the victims' residence, Deputy Allison instructed his deputies that if they saw the Defendant while out on patrol they should "ask him if he was selling any guns[.]"

Later that evening, Deputy Allison responded to the residence of Dennis Chisholm after a deputy located the Defendant at the residence. The Defendant was standing in the driveway with deputies when he arrived. Deputy Allison read the Defendant his *Miranda* rights and asked the Defendant if he had been selling guns. When the Defendant indicated that he had not, Deputy Allison asked for consent to search the Defendant's vehicle. The Defendant responded, "Go ahead, it's fine. There's nothing in there." The Defendant also asked, "[I]s this about the murders on . . . Owl Hoot Road[?]" During the search of the vehicle, Deputy Allison found a knife that appeared to have blood on it in the area of the console, and another deputy discovered costume jewelry in the trunk. Deputy Allison knew that the victims had likely been stabbed and that costume jewelry had been taken from the scene. Deputy Allison arrested the Defendant and placed him in the back of a patrol car. The Defendant was later interviewed at the Lake County Jail by TBI agents. The following morning, the Defendant's mother came to the jail to visit him. However, when Deputy Allison informed the Defendant that his mother was there, the Defendant said that he did not want to see her. The Defendant said, "Just tell her I'm sorry for everything."

On cross-examination, Deputy Allison testified that he was given the Defendant's cell phone after the Defendant's arrest but that, after leaving the Chisholm residence, he turned the phone over to Investigator Joseph Vernon of the Lake County Sheriff's Department. Deputy Allison acknowledged that he had known the Defendant since the Defendant was approximately nine years old and stated that he had not known the Defendant to be violent. The Defendant had no prior criminal record, but Deputy Allison had heard that the Defendant smoked marijuana and dealt drugs. Deputy Allison acknowledged that Shondell Hill was a known drug dealer in Lake County.

Investigator Joseph Vernon testified that he responded to the victims' residence on the morning of March 4, with Deputy Allison. He and Deputy Allison cleared the home, where the victims were "obviously deceased." Investigator Vernon began taking photographs of the scene. In the kitchen, he saw blood on the floor and several shoeprints in the blood.

Investigator Vernon stated that he did not go to the Chisholm residence but stayed at the crime scene until the TBI technicians finished processing the scene. He later took

possession of the Defendant's cell phone from Deputy Allison. Investigator Vernon testified that, in his experience, drugs dealers often communicate through text messages but that they "usually delete [the text messages] after they follow through with the deal or make arrangements for the deal." Investigator Vernon testified that he allowed defense counsel access to the cell phone on two occasions at the TBI office in Jackson. The Defendant's cell phone was also sent to the TBI crime lab in Nashville for forensic testing, where the TBI conducted a "phone dump" and pulled "all the information off the phone." The information from the "phone dump" was later provided to the Defendant. Investigator Vernon recalled that, a few days after the Defendant's arrest, Mr. Chisholm contacted him about a laptop computer that Mr. Chisholm found in his son's bedroom. Investigator Vernon took possession of the laptop, which was identified as belonging to Mrs. Shell. Investigator Vernon also recovered a digital camera belonging to the victims, which the Defendant sold after the murders.

On cross-examination, Investigator Vernon recalled that the television was on when he entered the victims' residence, but the screen was blue. He testified that a gun cabinet in the master bedroom had "a red liquid smeared" on the handle and that the cabinet was "ajar." He took photographs of several areas of blood. There were blood smears on the front door and storm door. Investigator Vernon stated that, several weeks after the Defendant's arrest, he learned that Lake County Sheriff Bryan Avery had gone to Boyette's Resort on Reelfoot Lake ("Boyette's") as part of the investigation. Investigator Vernon went to Boyette's and spoke to people there, including the housekeepers. Investigator Vernon learned that, in the days leading up to the victims' murders, there had been "an unknown male . . . either a mixed or Mexican with short hair" staying in a cabin rented by the Defendant. The housekeepers stated that they found a bloody towel in the bathroom of the cabin when they cleaned up the room on the morning of March 4. They also found "marijuana shake," fruit juice cans, and potato chips in the cabin. On redirect examination, Investigator Vernon explained that by the time he spoke to the housekeepers, they did not have the bloody towel, and the cabin had been cleaned.

Susan Lee testified that on March 4 the Defendant came by her residence to talk to her husband, Andy Lee, at about 3:00 p.m., and Mr. Lee went outside to meet the Defendant. After this meeting, Mrs. Lee called her father-in-law, who was Assistant Chief of the Ridgley Police Department, and told him that the Defendant had "some guns and stuff that he was trying to sell." Mrs. Lee agreed that the Defendant was laid back, quiet, and had a passive personality. She never saw him violent or angry.

Andy Lee testified that the Defendant came to his house on the afternoon of March 4, 2011. He went outside and got inside the Defendant's vehicle because it was raining. Mr. Lee and the Defendant smoked marijuana together, and the Defendant showed him

several items of property, including some jewelry in a Crown Royal bag and a digital camera. The Defendant also had four or five "long barrel guns, rifles, shotguns" in the trunk of his car, which the Defendant was trying to sell. Mr. Lee was not interested in purchasing the guns, so the Defendant left. Mr. Lee then told his wife about the conversation with the Defendant.

Mr. Lee testified that he had purchased marijuana from Mr. Hill in the past. He testified that the Defendant was not a violent person and that he had never seen the Defendant angry or agitated. He agreed that the Defendant was not very strong or tough and generally avoided conflict. He testified that, when he spoke with the Defendant that afternoon, he never discussed the details of the crime scene with the Defendant.

Kenneth Lee testified that he was the Assistant Chief of the Ridgely Police Department in March 2011. He stated that Mr. Hill lived on North Main Street in Ridgely, about a block from the police department, and that Mr. Hill was known for selling drugs. He testified that he had no idea if his son, Andy Lee, had a relationship with Mr. Hill. He did not know who his son bought drugs from but agreed that his son "used to" use drugs. He stated that he did not learn until March 2015 that his daughter-in-law had called in the anonymous tip regarding the Defendant's attempting to sell guns.

Laquisha Tyler testified that she purchased a digital camera from the Defendant on March 4, 2011, for $35. She recalled that the Defendant was also attempting to sell a laptop. She later turned the camera over to the Lake County Sheriff's Department. Ms. Tyler stated that she had not known the Defendant to be a violent person and agreed that he was "a laid[-]back kind of person."

Curt Chisholm testified that the Defendant was his best friend and that the Defendant often stayed at his home. He stated that the Defendant was "never the type to argue" and that the Defendant had never been violent. On the evening of March 4, the Defendant came to his home with a laptop. The Defendant was "bagging marijuana" in Curt's bedroom when a deputy knocked on the door to the residence. At that time, the Defendant walked out the back door of the residence with the marijuana in his pockets.

Deputy Patrick Leake from the Lake County Sheriff's Department testified that on March 4, 2011, he was instructed by Deputy Allison to try to locate the Defendant because the Defendant had attempted to "sell some guns." That evening, he saw the Defendant's vehicle at the Chisholm residence. Deputy Leake knocked on the side door under the carport and was greeted by Dennis Chisholm. Deputy Leake asked if the Defendant was there, and Mr. Chisholm responded, "Yeah, he's in." Deputy Leake then asked for permission to enter the residence, and Mr. Chisholm stated, "Yeah, come on in." Deputy Leake saw Curt Chisholm inside the residence and asked him about the

Defendant's location. Curt responded, "He just ran out the back door." Deputy Leake went to the back door, which was standing wide open. He looked out the door and saw the Defendant standing by a shed in the backyard with his hands in his pockets. Deputy Leake said, "Hunter, come here," and the Defendant "walked right to [him]." He told the Defendant that he wanted to talk to him and asked the Defendant to "come out front." He and the Defendant walked back through the residence and out the door and then stood in the driveway in front of the house. Deputy Leake stated that the Defendant did not appear intoxicated. He asked for permission to pat down the Defendant for weapons, and the Defendant consented. During the pat down, Deputy Leake found a digital scale with marijuana residue on it and a cell phone, which Deputy Allison took into his possession. While other officers searched the Defendant's car, Deputy Leake obtained permission from Mr. Chisholm to search his backyard where he found numerous baggies of marijuana.

Deputy Jason Tubbs testified that he responded to the Chisholm residence after hearing Deputy Leake's radio transmission that the Defendant's vehicle was in the driveway of the residence. A few seconds after the initial report, Deputy Leake announced that the Defendant was "running out the back door" of the residence. Deputy Tubbs arrived at the residence a few minutes later as Deputy Leake and the Defendant were walking out the front door. Deputy Tubbs asked the Defendant for consent to search his vehicle, and the Defendant said, "Go ahead." However, Deputy Tubbs waited for Deputy Allison to arrive before beginning a search. After Deputy Allison obtained additional consent from the Defendant, Deputy Tubbs assisted in the search of the vehicle. Inside the trunk, Deputy Tubbs found a Crown Royal bag containing jewelry. When he informed Deputy Allison what he found inside the trunk, Deputy Allison instructed Deputy Tubbs to stop the search. In his interactions with the Defendant, the Defendant did not appear to be intoxicated.

Dennis Chisholm testified that he was at home on March 4, when deputies arrived. He recalled that deputies asked for his consent to search his backyard, and he provided a lantern to help in the search. There, they found baggies containing marijuana. After the Defendant's arrest, Sheriff Avery instructed Mr. Chisholm to look through his house and "see if there's anything there that didn't belong[.]" Mr. Chisholm found a pistol "right outside the back door" that did not belong to him and gave it to Sheriff Avery. Several days later, Mr. Chisholm contacted Investigator Vernon and turned over a laptop that he had found in his son's bedroom. Mr. Chisholm stated that he knew the Defendant well and that the Defendant came to his house "[a]bout every day." He stated that the Defendant was "[m]ild mannered. Nice. Courteous." He never saw the Defendant angry or acting in a violent manner.

Lake County Sheriff Bryan Avery testified that he responded to the crime scene on March 4 with Investigator Vernon and Deputy Allison, where he was advised that several items of property were missing from the residence, including a camera, laptop, and guns. Sheriff Avery also responded to the Chisholm residence that evening. The Defendant was standing in the driveway with several deputies "standing around." After Deputy Allison obtained permission from the Defendant to search the Defendant's vehicle, Sheriff Avery opened the driver's side door of the car and noticed a knife in the front console. He took the knife out of its sheath and noticed that the knife had what appeared to be a dry, red substance where the handle met the blade. Sheriff Avery recalled that he collected a .22 caliber pistol with white paint on it from Mr. Chisholm, which was later identified as belonging to the victims.

On cross-examination, Sheriff Avery stated that between September and March of 2011, he was not aware of any Mexican gangs, cartels, or the Mexican Mafia operating in rural West Tennessee. Sheriff Avery testified that, on March 5 or 6, he received a phone call from Judy Capps, who informed him that the Defendant "had rented a room from her" at Boyette's. Sheriff Avery went to the resort and spoke to Ms. Capps and two housekeepers. The housekeepers said that a "Hispanic person, maybe Puerto Rican" had stayed in Cabin 9—the cabin rented by the Defendant. Sheriff Avery went inside Cabin 9 and saw that it had been cleaned. Although he did not preserve the cabin, take photographs, or take a formal statement from the housekeepers, Sheriff Avery informed the TBI about Cabin 9. Sheriff Avery acknowledged that he did not file a written report about having been to Boyette's until October 2013, after the defense asked about Cabin 9. He stated that, when he wrote the report, he was aware that there had been the "largest single marijuana farm in the history of Tennessee" located on a bluff above Reelfoot Lake in Obion County. Sheriff Avery testified that the marijuana had been found on a farm leased for hunting purposes by a trooper with the Tennessee Highway Patrol, Brian Wright. Sheriff Avery stated that Trooper Wright was being investigated but had not been charged with anything related to the marijuana grow.

Special Agent Julian Conyers testified that he was a forensic scientist with the TBI and was a member of the Violent Crime Response Team ("the Response Team"). He testified that the Response Team arrived at the victims' residence at 2:54 p.m. on March 4. Agent Conyers videotaped the crime scene and collected evidence. He collected a bloody shoeprint on the linoleum floor in the kitchen by cutting out the piece of linoleum. He also collected evidence from the Defendant's vehicle, including a knife in a sheath from the gear shift area of the vehicle. The Response Team released the crime scene to the TBI agents in charge of the investigation at 8:40 p.m.

Special Agent Lawrence James testified that he was a forensic scientist, who supervised about twenty other forensic scientists at the TBI crime lab in Memphis. Agent

James responded to the crime scene with the Response Team on March 4. He testified that his job at the scene was to perform screening tests for potential blood stains. He recalled that the victims appeared to have "had their throats cut" and that there were large amounts of blood at the scene. He collected a bloody washcloth found in the master bathroom. Agent James also took swabs of what appeared to be blood stains from the inside of the front door and door knob, the exterior screen door, the handle to a gun cabinet in the master bedroom, and off of the surface of Mr. Shell's body. He explained that Mr. Shell was lying face down, and there were what appeared to be "essentially vertical blood drops . . . on his skin[.]" Agent James cut out a stained area from a sheet on the bed in the master bedroom and took a cutting from the love seat in the living room because it contained a blood stain that "was a little bit suspicious" because it was "removed . . . by ten feet or so from . . . the rest of the activity[.]"

Dr. Marco Ross, the Deputy Chief Medical Examiner for Shelby County, testified that he conducted the victims' autopsies. Mrs. Shell had multiple "sharp force[] injuries" that were the result of stabbing or cutting motions with a sharp instrument. He identified seven sharp force injuries to her head and neck area, a stab wound just above her breast bone, and another stab wound in her right upper arm. Additionally, Mrs. Shell suffered stab wounds to her left temple and left upper cheek and a "v-shaped wound" "right behind the angle of the jaw." He noted that there was an "incised wound" to the lower front part of Mrs. Shell's neck which was a "zigzag wound" that penetrated three inches and completely transected the larynx. Dr. Ross explained that this wound "completely cut across the right carotid artery on the right side of the neck," and it cut across the left jugular vein, esophagus, and into the "spine itself." He testified that the cutting of the jugular vein and carotid artery would result in a "tremendous amount of blood loss." He stated that this wound would have caused death quickly. Dr. Ross identified an area of hemorrhage in the scalp on the back of Mrs. Shell's head which was likely the result of "blunt force[] impact" and was consistent with Mrs. Shell hitting her head on the linoleum floor. He noted scratches on the underside of her left wrist that could have been defensive wounds.

Regarding Mr. Shell, Dr. Ross testified that he had "multiple sharp force[] injuries." Mr. Shell suffered multiple stab wounds in the head, neck, left chest, and back, and he had an incise wound to his right hand. Dr. Ross described the injuries to Mr. Shell's neck as four sharp force injuries on the right side that combined features of stab and incise wounds and another stab wound towards the front of the neck that penetrated three inches and cut across the carotid artery. Dr. Ross stated that this injury alone was sufficient to cause Mr. Shell's death. However, Dr. Ross found additional stab wounds behind Mr. Shell's left ear and on the back of his neck which penetrated four inches; two stab wounds at the base of the neck; a stab wound to the left upper chest area that went into the upper part of the left lung and was sufficient to cause death; a stab wound to the

left upper back; and another stab wound to the right upper back. Dr. Ross also found an incise wound on Mr. Shell's right hand, which was "potentially a defensive wound." He stated that, in both victims, he found that the hyoid bone had been cut.

Special Agent Donna Nelson, a forensic scientist with the TBI, testified that she responded to the crime scene on March 4, 2011, as the leader of the Response Team. In that role, she directed other team members in their collection of items of evidence. Agent Nelson stated that sixteen pieces of evidence were collected at the crime scene and that twenty-seven items of evidence were collected in total. Agent Nelson explained that subsequent testing showed that the blood stains from inside the front door, on the gun cabinet handle, the washcloth in the bathroom, and on the sheet in the master bedroom were a mixture of DNA from both victims. The swab of the front door knob failed to indicate the presence of human DNA, and no DNA profile was obtained from the stain on the exterior screen door due to insufficient or degraded DNA. Agent Nelson explained that the testing of the items collected did not reveal the presence of DNA from someone other than the victims.

Agent Nelson also tested the Defendant's boots and bib overalls, but a presumptive test failed to indicate the presence of blood. However, a presumptive test did indicate blood on the Defendant's sweatshirt. Further DNA testing on two areas of the sweatshirt revealed a mixture of genetic material, in which Mr. Shell was the major contributor. She stated that she tested the sleeve and the chest area of the sweatshirt and found Mr. Shell's DNA profile. Additionally, the knife from the console of the Defendant's vehicle was tested, and Agent Nelson found a DNA profile consistent with a mixture of both victims' DNA. Agent Nelson testified on cross-examination that the knife from the Defendant's vehicle was not checked for fingerprints, and the Response Team did not have a blood spatter expert. Agent Nelson agreed that what appeared to be a fingerprint in blood on Mrs. Shell's walker was not collected or swabbed. However, she stated that the crime scene documentation and analysis, photographs, and narrative descriptions complied "with the standards that we have." On redirect, the following exchange took place:

> Q. In your experience as a crime scene technician was there any evidence with any apparent evidentiary value that was not collected at the Shell residence?
>
> A. Not to my knowledge.

Special Agent Suzann Lafferty, a forensic scientist with the TBI and expert in fingerprint analysis, testified that she received a glass light cover from the front porch of the victims' residence, two wallets, a jewelry box, and jewelry from the Defendant's

trunk; she tried to lift latent prints from the items but found none. She also attempted to lift and identify latent prints from the .22 pistol but was unable to identify any latent prints. Agent Lafferty stated that the following items were not tested for latent prints: the victims' gun cabinet, front door and doorknob, exterior storm door, the knife from the Defendant's car, and the victims' laptop.

TBI Special Agent Linda Littlejohn testified that she compared the tread designs of the boots the Defendant was wearing at the time of his arrest to the linoleum cuttings of the bloody shoeprints taken from the crime scene. The tread design appeared to be similar, so she made a test impression. She found that three of the four partial impressions from the crime scene were "consistent with the right boot . . . with size, shape and tread design; and, therefore, that right boot or another right boot with those same class characteristics could have made that impression."

Alaina Kring testified that, in March 2011, she worked as a special agent with the TBI in the Medicaid Fraud Control Unit. On March 4, she responded to the crime scene with the lead investigator, Special Agent Nathan Bishop. She later assisted Agent Bishop during his interview with the Defendant. The Defendant said that he had been drinking beer and had taken Xanax earlier that day, but Agent Kring saw no signs that the Defendant was intoxicated at that time. The Defendant indicated that he understood his *Miranda* rights and was willing to answer questions. Agent Kring took four pages of notes of the interview. She reviewed the notes with the Defendant, and he initialed each page, and signed and dated the notes. She recalled that the Defendant was "very calm" during the interview and that Agent Bishop only asked him a few questions. She stated that the Defendant never indicated that anyone else was involved in the murders.

TBI Special Agent Cathy Ferguson testified that she also responded to the crime scene to assist Agent Bishop and participated in the Defendant's interview. The Defendant told the agents that he "knew what happened out on Owl Hoot Road, but [the agents] didn't know if he was involved unless he told us." The Defendant said that "he thought it happened during a black-out, and then went on to say that maybe it was during a dream." The Defendant "gave specific details about the crime scene[.]" Agent Ferguson stated that no one told the Defendant about the positioning of the victims' bodies inside the residence, and no one told him that the victims had been killed with a knife. However, the Defendant said that "it must have been a knife," and he mentioned that Mr. Shell was "lying in the living room or near the kitchen." The Defendant correctly described the linoleum kitchen floor, which he said "look[ed] like tile." When Agent Bishop specifically asked the Defendant if anyone else was involved, the Defendant stated that "he was alone." On cross-examination, Agent Ferguson stated that Agent Bishop never specifically asked the Defendant if he had killed the victims.

- 11 -

Special Agent Nathan Bishop of the TBI testified that, after learning of the tip that the Defendant was attempting to sell weapons, he instructed officers to find the Defendant and ask him about the information. Agent Bishop responded to the Chisholm residence after the Defendant was located there. Agent Bishop informed the Defendant, who was in the back of a patrol car, that he was being arrested on drug-related charges and that deputies had found a knife while searching his vehicle. Agent Bishop asked the Defendant if he would be willing to talk to him, and the Defendant agreed. The Defendant did not appear to be intoxicated.

While at the sheriff's office, the Defendant executed a written waiver of his *Miranda* rights. At the beginning of the interview, the Defendant said to Agent Bishop, "Look, I know you know what happened, but you don't know I was involved unless I tell you." According to Agent Bishop, the Defendant then acknowledged involvement in the murders. He did not seem to be afraid, and he never mentioned that other people were involved in the murders.

A few days after the murders, Agent Bishop learned that the Defendant had rented a cabin at Boyette's and that "a Puerto Rican[] had been there with him." Although he considered that it was potentially a secondary crime scene, Agent Bishop stated that he did not have the scene processed because it was "two or three days after the homicide[s], and . . . it was already cleaned." On cross-examination, Agent Bishop explained that no one from the Response Team dusted for fingerprints at the victims' residence. He stated that the crime scene was "released" to the victims' family at 8:45 p.m. on March 4. He said that, in looking at the kitchen and living room of the victims' residence, he did not see any indication of a violent struggle between multiple people. He explained, "[T]he furniture was not overturned or anything like that." Agent Bishop opined that the crime scene appeared to be a drug-related robbery and murder. He acknowledged, however, that there was still a one hundred dollar bill in Mr. Shell's wallet at the crime scene.

*Defendant's Proof*

David Eddlemon testified that in the late afternoon of March 2 or March 3, 2011, he was at a store near Boyette's when he was approached by a Hispanic man, who asked Mr. Eddlemon if he knew the Defendant, if he could "get in touch" with the Defendant, and where the Defendant lived. Mr. Eddlemon stated that the Hispanic man got out of a gold or tan Jeep Grand Cherokee, and there were two other people in the vehicle.

Judy Capps testified that she was the owner and operator of Boyette's, located on Reelfoot Lake. Ms. Capps recalled that on March 1, 2011, the Defendant came to the resort to ask about the cost of renting a cabin for three nights. Ms. Capps provided the Defendant a total, and the Defendant said, "[L]et me go talk to my buddy to see if that

was okay with him." The Defendant went outside, but Ms. Capps did not see the individual mentioned by the Defendant. The Defendant came back in and rented Cabin 9 for three nights, paying in cash. Ms. Capps explained that Friday, March 4 would have been the day that the Defendant was expected to check out of the cabin. She stated that she did not see the Defendant the rest of the week, and she did not know who stayed in Cabin 9 between March 1 and March 4. Ms. Capps stated that, when a cabin was cleaned, housekeepers collected the trash, towels, and sheets from the cabins. The trash was placed in a dumpster at the end of the row of cabins, and the dumpster would not have been emptied until it was full. When housekeeping collected the towels and sheets, the items would be "[a]ll lumped together" in a large bag and stored at a laundry shed until the laundry service collected them every Thursday. She stated that there was not a separate laundry bag for each cabin but that all of the resort's sheets and towels went into the same large bag. Ms. Capps explained that it was not unusual for housekeeping to remove bloody towels from the cabins because guests would use the cabins to clean fish. She recalled that, at the time the Defendant rented Cabin 9, a fishing tournament was being held at Reelfoot Lake. Ms. Capps recalled that she spoke to Sheriff Avery several days after she learned of the Defendant's arrest. Ms. Capps stated that Cabin 9 was next rented on Monday, March 7, 2011.

Dorothy Patterson testified that in March 2011, she and her daughter, Connie Nugent, worked as housekeepers at Boyette's. She recalled that from March 1 to March 4, Cabin 9 was rented. During that week, she knocked on the door to the cabin to ask if the occupants needed any towels. A man opened the door just far enough that she could see his face. Ms. Patterson described the man as "maybe Mexican or part Mexican" with a "real full face and black hair." She stated, however, that this man did not have "much of an accent." Ms. Patterson also recalled seeing a "tannish-gray" car parked between Cabin 9 and Cabin 8, but Cabin 8 was not rented at the time. Ms. Patterson testified that on Friday, March 4, two men exited Cabin 9 and got into the tannish-gray car. She only saw the men from the back but described the driver as heavy-set man wearing tan pants and a striped shirt and the passenger as a taller, white man, wearing a light blue shirt and tan pants.

When Ms. Patterson and Ms. Nugent entered Cabin 9 to clean it later that day, it appeared that two of the three beds had been used. They also found about "a cup-full" of "marijuana seed" all over the floor of the cabin and three half-gallon containers of fruit punch, one of which had not been opened. Inside the bathroom, Ms. Patterson saw a towel laying in the floor that had "a little blood on it." She rolled all the towels up and put them into a large laundry bag along with the sheets. Ms. Patterson recalled that Sheriff Avery came out to Boyette's to interview her the day after she learned of the Defendant's arrest. She told Sheriff Avery that she had not seen the Defendant at Cabin 9 the whole week. On cross-examination, Ms. Patterson agreed that she had not been

suspicious of anything she found while cleaning Cabin 9. She stated that finding a towel with a small amount of blood on it was not unusual.

Connie Nugent testified that she worked as a housekeeper at Boyette's. Ms. Nugent recalled that Cabin 9 was rented for the week of March 1, 2011. She recalled that, during that week, she knocked on the door to Cabin 9 to ask the occupants if they needed any towels. A "black-Mexican" man with a "round face" answered the door and said that they did not need anything. During the week, a "golden-champagne color" Ford car with a Texas license plate was parked between Cabin 8 and Cabin 9. Ms. Nugent testified that after the occupants checked out of Cabin 9 on Friday, March 4, she cleaned the cabin. Inside the cabin, Ms. Nugent found marijuana seeds all over the floor, along with two "big jugs" of fruit punch. On Saturday, Sheriff Avery came to Boyette's and asked Ms. Nugent if she had seen any blood in Cabin 9. Sheriff Avery then went into the cabin and looked around.

Cousins, Brandon and Brian Jines, testified that in March 2011, they participated in the Crappie Masters Tournament on Reelfoot Lake and stayed at Boyette's during the fishing tournament. On Saturday morning, March 5, they saw a Jeep Cherokee enter a grassy area next to Brandon's truck and boat with its headlights turned off at about 4:45 a.m. The jeep went through the grass and back onto the road and then moved behind a boat shed. The jeep stayed behind the boat shed for five or ten minutes. It then pulled out in reverse and with its headlights on and drove down the road, in reverse, at a high rate of speed. Brandon saw two people in the jeep but could not tell what they looked like. He thought that the driver was "shorter" and that passenger was "a little bit taller." He also noticed that the passenger wore a beanie or sock cap on his head. Brian testified that he saw two occupants in the vehicle but that he could not identify them.

Callie Hinson testified that she was the Defendant's friend and had known him for fifteen years. She testified that she would occasionally go with the Defendant to Mr. Hill's residence to buy marijuana. Ms. Hinson stated that Mr. Hill had the reputation as a drug dealer in the community. Ms. Hinson recalled that on March 3, 2011, the Defendant picked her up in Tiptonville at Decker's gas station around 6:00 p.m., and the Defendant eventually picked up two other friends, Matt Corum and Chelsey Windsor. Ms. Hinson explained that they rode around, smoking marijuana and drinking beer, for about four and a half hours. She recalled that they went to the fire department so that the Defendant could look at a four-wheeler. They then went to Ridgely to get gas for the Defendant's vehicle sometime before 9:00 p.m. and then went to Tobacco Dock, a tobacco store. They also went to Denver Harris' house to pick up a CD. They rode "out by the river, in the country[.]" Ms. Hinson stated that the Defendant did not seem angry or disturbed when he dropped her off at Decker's gas station around 10:15 p.m. to 10:30 p.m. She stated that she had never seen the Defendant become violent or lose his temper, even

when he was drinking and using marijuana and Xanax. She recalled that the Defendant was wearing a pair of camouflage bib overalls, blue jeans with torn ends that dragged on the ground, a black shirt, a white hat, and boots.

On cross-examination, Ms. Hinson agreed that she had previously signed two affidavits in which she stated that the Defendant dropped her off at Decker's gas station sometime between 9:00 p.m. and 10:00 p.m. She agreed that the Defendant was using his phone while in his vehicle and recalled that he was "texting." Ms. Hinson acknowledged that they also went to Mr. Hill's residence that night, where the Defendant purchased marijuana.

Matthew Corum, the Defendant's friend, testified that he had known the Defendant his entire life and that he had never seen the Defendant lose his temper or act in anger. On the evening of March 3, 2011, the Defendant picked up Mr. Corum at his residence sometime between 6:00 p.m. and 7:30 p.m. Mr. Corum recalled that the Defendant was wearing "[h]unting bibs," which the Defendant wore often. After picking up Ms. Windsor, they rode around smoking marijuana, drinking beer, and taking pills. They went to the river, Pat's service station, Tobacco Dock, to Andy Lee's residence, to Denver Harris' house, and stopped by the fire station. Mr. Corum recalled that they also stopped at a bank. Mr. Corum testified that the Defendant dropped him off at his residence about 10:00 p.m. or 10:30 p.m. He stated that the Defendant did not act unusual that night and did not appear angry about anything.

Joseph Jones and Sherry Price testified that they were working at the Tobacco Dock on the night of March 3 when they received a phone call from the Defendant about 9:00 p.m. The Defendant said that he would be at the store in two minutes and asked that Mr. Jones not close the store. When the Defendant arrived, Mr. Jones and Ms. Price unlocked the front door and let him in. Mr. Jones noted that Mr. Corum, Ms. Hinson, and Ms. Windsor were with the Defendant. The Defendant wore "some bibs and a long sleeve dark shirt." The following day, March 4, the Defendant came into the store between 6:00 p.m. and 7:00 p.m. when Mr. Jones and Ms. Price were working. The store was full of people, and Mr. Jones and Ms. Price were talking about the victims' murders at the time the Defendant entered the store. Mr. Jones said that "a lot of rumors [were] going around" and that he had heard that the victims had been shot. Ms. Price said that she had heard that the victims had been "murdered, and stabbed, and Mr. Shell was by the recliner and Ms. Shell was in the kitchen . . . ." Mr. Jones testified that the Defendant had on what appeared to be the same clothing from the previous night.

Denver Harris testified that he lived in Ridgely on Poplar Street with his parents. On the evening of March 3, the Defendant's brother, Caylan Bargery, was spending the night with Mr. Harris when Caylan received a phone call from the Defendant. Caylan

- 15 -

then went outside and placed the keys to his truck in the mailbox between 9:30 p.m. and 10:00 p.m.

Michael Reynolds and Katherine Jones testified that on the evening of March 3, 2011, they saw the Defendant and his "gold-ish . . . tannish" colored Nissan Altima at the Regions Bank ATM in Tiptonville at about 10:00 p.m. They recalled that the Defendant obtained money from the ATM machine and then got back into his vehicle, which contained two or three other people.

Caylan Bargery, the Defendant's youngest brother, testified that on the morning of March 3, 2011, the Defendant drove him to school. That morning, the Defendant was wearing his bib overalls and boots. Caylan recalled that the Defendant owned only one pair of bib overalls and one pair of boots. Later that night, the Defendant retrieved a CD from Caylan's truck after he called Caylan from Ms. Hinson's cell phone around 9:30 p.m. or 10:00 p.m. The following morning, Caylan went into the Defendant's bedroom and asked for the keys to his truck back. The Defendant appeared to have been sleeping but told Caylan that the keys were either in his bib overalls or pants. The Defendant did not get up, and Caylan pulled the keys out of the pants. Caylan acknowledged that he had previously smoked marijuana with the Defendant and that he had gone with the Defendant to Mr. Hill's residence to purchase marijuana. Caylan explained that Mr. Hill was a known drug dealer in Lake County. He testified that he had never seen the Defendant lose his temper or get angry at anyone and stated that the Defendant was always "laid back."

Rhonda Strube testified that she worked as an adjunct instructor at Dyersburg State Community College and that the Defendant had been one of her students. She recalled that, on the morning of March 4, the Defendant took a make-up test, which he finished in about fifteen or twenty minutes. After taking the test, the Defendant asked to leave class early.

Matthew Knox, the Defendant's cousin, testified that he met the Defendant around lunchtime on March 4 at the levee. Mr. Knox explained that he and the Defendant had previously decided to take a boat ride on the river. He recalled that, when he pulled up at the levee, the Defendant and his car were on top of the levee. There was a small fire that looked like the Defendant may have been "burning some trash out of his car, like bottles and paper, stuff like that." Mr. Knox said that, while he put the boat into the water, the Defendant met with someone at the bottom of the levee, but he did not see the individual. Mr. Knox testified that he and the Defendant were in the boat on the river for about an hour or hour and a half. While on the water, the Defendant drank beer and smoked marijuana. Mr. Knox thought that the Defendant "seemed a little stressed about money" because the Defendant "kept counting his money[.]" Mr. Knox stated that, later that day,

- 16 -

the Defendant stopped by his home. Mr. Knox got into the Defendant's vehicle, and they went to a carwash in Tiptonville, where they met Tony Hayes, and the Defendant sold Mr. Hayes a gun. After this meeting, the Defendant and Mr. Knox went to their grandfather's[2] shop where the Defendant "put a couple of other guns out there in an old trailer." He recalled that he had previously seen the Defendant put a push mower and a couple of chain saws in the trailer. He testified that he thought the Defendant had obtained the items from "crack heads." Mr. Knox said that, by this time, he had heard about the murders but did not know that there were guns missing from the crime scene. He stated that, when he went back out to the trailer three weeks later, the guns were gone. Mr. Knox testified that he had never seen the Defendant angry or lose his temper.

Regina Bargery, the Defendant's mother, testified that the Owl Hoot area where the murders occurred was a "little community" close to the Dyer County line. She explained that the Defendant's great-grandmother, Mrs. Smith, lived in a house in the Owl Hoot community until the "first part of 2010." Mrs. Bargery explained that Mrs. Smith's home was located across a field from the victims' residence. Mrs. Bargery explained that the Defendant was twenty years old in March 2011. She described the Defendant's personality as "[f]un-loving, outgoing, laid back" and "[v]ery compassionate." The Defendant showed no tendency toward violence. She recalled that the Defendant was living at home in March 2011. She saw the Defendant on the mornings of March 3 and 4, and on both mornings, the Defendant was wearing a pair of camouflage bib overalls, jeans, a pair of boots, and a black long-sleeve, insulated shirt. On the morning of March 4, the Defendant spoke to Mrs. Bargery in her hair salon, located at the back of their residence before he went to school at Dyersburg State Community College.

Around 11:00 a.m. on March 4, Mrs. Bargery called the Defendant and told him that she had heard that the victims had been shot and killed. Sometime before midnight on March 4, she received a phone call from someone saying that the Defendant had been arrested. When she arrived at the jail, she learned that the Defendant had been arrested for marijuana possession. She went back home without seeing the Defendant. Minutes later, several deputies arrived at her home. Deputy Allison told her that the Defendant had been arrested for the victims' murders. She gave them permission to search the home, and deputies seized various items belonging to the Defendant. Mrs. Bargery testified that the Defendant did not need money. He worked and had access to additional money from his grandparents if he needed it. Mrs. Bargery recalled that the Defendant called her from jail the day after his arrest and told her that he was sorry. The Defendant was crying and upset. During the call, the Defendant spoke to his brother and said, "Caylan, I'm sorry, I F'd up[.]"

---

[2] Mr. Knox testified that he and the Defendant had the same grandfather.

Rachelle Chisholm testified that she lived on Headden Drive in Tiptonville in 2011 with her husband and son, Curt. Mrs. Chisholm explained that Curt and the Defendant were best friends and that the Defendant spent time at their residence most days. Mrs. Chisholm described the Defendant as a "tender-hearted, kind, [and] considerate[.]" She recalled that she saw the Defendant twice on March 3, 2011, and that the Defendant was wearing bib overalls, a long sleeved black shirt, blue jeans, and boots. The Defendant was also at her residence on March 4, the evening of his arrest. She testified that the Defendant "didn't seem himself" that evening. She stated, "I didn't smell any alcohol on him, but he seemed like he had taken something." Mrs. Chisholm recalled that the Defendant bumped into a cart in their kitchen twice, knocking items to the floor. She further recalled that the Defendant was wearing the same clothing as the previous day.

Ryan Bargery, the Defendant's younger brother, testified that in March 2011, the Defendant owned one pair of camouflage bib overalls and one pair of boots. Ryan admitted that he used to smoke marijuana with the Defendant. He further stated that he knew Mr. Hill and that Mr. Hill was a drug dealer in the community. Ryan explained that he had never seen the Defendant in a fight, get angry, or lose his temper.

The Defendant testified that he graduated from high school in 2008. He explained that he began using marijuana and "experimenting with pills" while in high school. After graduation, the Defendant worked at a boat dock, Cypress Point Resort, until the time of his arrest in March 2011 when he was twenty years old. The Defendant testified that, at that time, he was enrolled in Dyersburg State Community College and needed two additional classes for his degree. The Defendant testified that by the time of his arrest he was using marijuana "several times a day, every day[,]" and he took Xanax. He explained that the marijuana and Xanax made him "real mellow" and calm. The Defendant said that he smoked marijuana with several friends, including Andy Lee. He stated that he met Shondell Hill, "[t]he drug dealer there in Ridgely," through Mr. Lee in 2007 or 2008 when the Defendant was seventeen or eighteen years old. The Defendant recalled that he would buy marijuana from Mr. Hill "almost every day." The Defendant often went to Mr. Hill's residence in Ridgely, where he would "hang out" and play video games with Mr. Hill. The Defendant stated that he believed that he and Mr. Hill were "good friends." They would "ride around and smoke" in the Defendant's vehicle because Mr. Hill did not have a driver's license and did not want to drive. The Defendant explained that he eventually began taking Mr. Hill to various locations in Lake County for Mr. Hill to sell drugs and deliver marijuana. The Defendant stated that he knew that Mr. Hill was affiliated with a gang, but he never asked Mr. Hill which gang. He stated that he benefitted from driving Mr. Hill around to sell marijuana because the Defendant "was basically getting free marijuana from [Mr. Hill]" for driving. Regarding Mr. Hill's

client base, the Defendant stated that it was "[a]nywhere from Dyersburg to Union City and Lake County."

The Defendant recalled that, by 2010, he was at Mr. Hill's residence playing video games and using marijuana "close to every other day[.]"  The Defendant recalled a time in 2010 when he and Mr. Hill were out riding on Owl Hoot Road when he pointed out his great-grandmother's house.  The Defendant stated, "When we passed by my great-granny's house I just off-hand said that's where my great-grandmother lived.  That's where she lives, just pointing it out."  The Defendant explained that the Owl Hoot community consisted of five or six houses and that only two houses were close to one another—the victims' residence and the house where his great-grandmother had lived before she moved closer to town.  However, the Defendant testified that he had not known the victims and had been unaware that they lived in the residence.  He believed that Doris Spence, his great-grandmother's sister-in-law, lived in the home.

The Defendant explained that he occasionally sold items for Mr. Hill, such as electronics, phones, and guns, and that Mr. Hill would split the proceeds from such sales with him or pay him in marijuana.  The Defendant explained that he would smoke some of the marijuana and also bag some of it to sell to friends.  The Defendant stated that Mr. Hill would sometimes place items in his vehicle for the Defendant to sell.

The Defendant testified that the first time he saw Joel Hernandez was at the Greyhound bus station in Memphis in 2010.  He explained that Mr. Hill had asked him to drive to Memphis and pick up Mr. Hernandez and Mr. Hernandez's girlfriend and bring them to Lake County.  When he and Mr. Hill picked up Mr. Hernandez, Mr. Hernandez had two suitcases with him.  Mr. Hill did not introduce the Defendant to Mr. Hernandez at that time.

The Defendant recalled that he picked up Mr. Hernandez from the Greyhound bus station in Memphis a second time on March 1, 2011.  He explained that he had rented Cabin 9 at Boyette's the day before.  He explained that he rented the cabin in his name because Mr. Hill "didn't want the cabin to be in his name."  Mr. Hill told the Defendant that he would give the Defendant marijuana and cash for picking up Mr. Hernandez and renting the cabin.  According to the Defendant, Mr. Hernandez was supposed to be at Cabin 9 from Tuesday, March 1 through Friday, March 4.  Mr. Hill rode to Memphis with the Defendant to pick up Mr. Hernandez.  When they arrived, the Defendant went into the bus station to get Mr. Hernandez.  Mr. Hernandez had two suitcases and a duffle bag.  He helped Mr. Hernandez with the luggage and stated that they each weighed about forty to fifty pounds.  The Defendant drove to Cabin 9 to drop off Mr. Hernandez, but he did not go inside with Mr. Hernandez and Mr. Hill.  The Defendant recalled that, when Mr. Hill exited the cabin, he had a tote bag full of marijuana.

The Defendant and Mr. Hill then drove to the Kentucky state line where Mr. Hill met with some men in a car around midnight to sell marijuana. The Defendant recalled that Mr. Hill initially approached the other car and spoke to the occupants. He then took out one of the bricks of marijuana from the tote bag and showed it to the occupants. A few minutes later, Mr. Hill called Mr. Hernandez. During the call, Mr. Hill was "vehemently explaining to [Mr. Hernandez] what he was trying to tell him in the phone call." After speaking to Mr. Hernandez, Mr. Hill grabbed the tote bag and handed it to the people from Kentucky. When Mr. Hill returned to the Defendant's vehicle with the tote bag, the bag was empty. The Defendant then drove Mr. Hill to Cabin 9.

The Defendant testified that on the morning of March 2, he put on a black shirt, camouflage bib overalls, a pair of blue jeans, white hat, and boots before going to school. He stated that he owned only one pair of bib overalls and that the cuffs of his blue jeans dragged the ground when he walked. He testified that he wore the same clothing the rest of the week. After class, the Defendant picked up Mr. Hill, and they drove back to Cabin 9. Mr. Hill went inside the cabin and came out with Mr. Hernandez's duffle bag, which was full of marijuana. The Defendant then drove Mr. Hill to several locations where Mr. Hill sold the marijuana to various individuals. At one location, Mr. Hill delivered anywhere from five to nine bricks of marijuana. When Mr. Hill returned to the car, he pulled out "an amount of money folded over." The Defendant stated that it was "a lot of . . . bills." He then drove Mr. Hill to Peach Tree Apartments where Mr. Hill again delivered a quantity of marijuana in exchange for cash. They drove from Dyersburg to Union City, and Mr. Hill delivered more marijuana. After leaving Union City, the Defendant heard a phone call between Mr. Hill and Mr. Hernandez. He then drove Mr. Hill back to Cabin 9, and they both went inside. The Defendant testified that there was "an intense discussion" between Mr. Hill and Mr. Hernandez at that time and that it looked like the men were going to fight. Mr. Hernandez was angry and scared and "wasn't happy with the way things were going." The Defendant explained that, although the agreed-upon sale price for the marijuana had been between $1100 and $1300 per pound, Mr. Hernandez was "getting considerably less" from Mr. Hill—around $700 to $800 per pound. The Defendant testified that Mr. Hernandez got his marijuana from Texas "[f]rom the people that sent him down." The Defendant stated that he was only in Cabin 9 on March 2.

The Defendant recalled that he went to school early the next day to take an exam. About thirty minutes before the exam, Mr. Hill called the Defendant and told him that Mr. Hernandez was going to be leaving that day. Mr. Hill wanted the Defendant to drive Mr. Hernandez to a different Greyhound bus station in Jackson. Mr. Hernandez left his duffle bag with Mr. Hill for Mr. Hill to finish selling the marijuana. Mr. Hill was

"supposed to get the money and send it on to [Mr. Hernandez] after he got through selling it."

The Defendant drove Mr. Hernandez alone to Jackson, and they smoked marijuana on the way there. The Defendant recalled that, during the drive, Mr. Hernandez began shaking, rubbing his face, and mumbling to himself. Mr. Hernandez seemed "real stressed out." Mr. Hernandez told the Defendant that, "from now on," the Defendant would be picking up him and the marijuana in Texas instead of Mr. Hernandez's taking a bus. Mr. Hernandez also stated that the Defendant was "gonna be selling more marijuana, a lot of . . . large amounts of marijuana." The Defendant testified that this was when he "realized [he] was in way over [his] head," and he explained to Mr. Hernandez that he could not do that. However, Mr. Hernandez did not accept the Defendant's refusal. Mr. Hernandez asked the Defendant for his phone number because he wanted to be able to contact the Defendant. Mr. Hernandez then stored his phone number in the Defendant's cell phone under the name "Lobo." The Defendant stated that, rather than arguing with Mr. Hernandez, he decided to talk to Mr. Hill about the plan. He believed that Mr. Hill would "be reasonable" about the situation because Mr. Hill knew that the Defendant lived at home with his mother. The Defendant recalled that Mr. Hernandez made several phone calls during the drive and that he spoke in Spanish during the calls. At one point, he heard Mr. Hernandez say, "Mi cholos," but he did not know what that meant.

The Defendant stated that he called Mr. Hill as soon as he dropped off Mr. Hernandez in Jackson. The Defendant explained that, when he called Mr. Hill about his conversation with Mr. Hernandez, Mr. Hill initially told him to "calm down" and that "[i]t's not gonna be that often[.]" During a second phone call with Mr. Hill, Mr. Hill was angry and would not listen to the Defendant. Mr. Hill was mad at Mr. Hernandez "for approaching [the Defendant] to sell marijuana." The Defendant drove to Mr. Hill's residence to further discuss the situation. When he arrived, Mr. Hill was "very mad" at the Defendant and began "grilling" him about what the Defendant had said to Mr. Hernandez. The Defendant assured Mr. Hill that he had "take[n] up" for Mr. Hill and told Mr. Hernandez that he could not sell marijuana or drive for Mr. Hernandez. However, Mr. Hill did not believe the Defendant. The Defendant stated, "I thought at any moment [Mr. Hill] was just gonna rear back and . . . smack me." He said that he was scared of what Mr. Hill was accusing him of and felt threatened by Mr. Hill. The Defendant testified:

> Because what we were talking involved way, way, way more than what I was prepared to do and it was on so many levels on top of what I was, what I could ever be. And I knew that there was [sic] some serious people involved and I couldn't -- I didn't want to be involved in this. And they

were -- they were telling me that I was involved, that I was gonna be involved, that I didn't have any choice about it.

The Defendant attempted to talk to Mr. Hill about driving back and forth to Texas. He explained why he could not do it, but Mr. Hill did not accept his explanation. Mr. Hill said that the Defendant did not have any choice about whether to drive Mr. Hernandez. The Defendant testified that, when he left Mr. Hill's residence around 5:30 p.m., he intended to "cut[] ties as best as [he] could[.]"

The Defendant recalled that he picked up Ms. Hinson at Decker's gas station around 6:00 p.m. and then picked up Ms. Windsor. They "rode around for a little while" until Mr. Coram got off work, and then the Defendant picked up Mr. Coram. The Defendant recalled that he drove to the fire station and several other places, like the Tobacco Dock and the bank. The Defendant testified that he was smoking marijuana, taking Xanax, and drinking beer that night. He dropped Ms. Hinson off around 10:30 p.m. and then took Ms. Windsor and Mr. Coram to Mr. Coram's house. The Defendant then went home and got in bed. He was watching television and was about to go to sleep when Mr. Hill called him at 11:42 p.m. After the call, the Defendant put the same clothes back on and went to Mr. Hill's residence because he did not want Mr. Hill to continue to be angry with him.

When he arrived at Mr. Hill's residence, there was a gold-colored car already parked in the driveway. Mr. Hill was standing by the vehicle talking to two other people and one man was sitting in the driver's seat of the car. Mr. Hill walked over to the Defendant's vehicle and got in the passenger seat. As a result of what Mr. Hill told him, the Defendant drove up to Highway 78 headed towards Dyersburg and turned onto Highway 79. When the Defendant asked Mr. Hill "why [they] were going up there," Mr. Hill did not have a friendly response. When he got to Owl Hoot Road, the Defendant drove towards his great-grandmother's old house. When he pulled into the driveway, no one was there. The Defendant told Mr. Hill that his great-grandmother no longer lived at the residence and "had been gone for a[]while." However, Mr. Hill did not believe the Defendant. Mr. Hill cursed at the Defendant and was angry.[3] The Defendant testified that he was scared and that he did not know what Mr. Hill intended to do. Mr. Hill then told the Defendant to do something else, and as a result, the Defendant pulled back out onto the road and stopped in front of the driveway to the victims' residence. The gold-

---

[3] During a defense proffer, the Defendant testified that when he questioned Mr. Hill about where they were going, Mr. Hill responded, "Just drive man! Just go!" The Defendant said that Mr. Hill was not "talking in a normal voice." The Defendant further testified that Mr. Hill instructed him to pull into the victims' driveway, saying, "Just pull in the f***ing driveway. Just get in the driveway." When Mr. Hill told the Defendant to turn off his headlights, Mr. Hill said, "You dumb a**, turn the g** d**n lights off."

colored car pulled into the driveway, and the Defendant followed the vehicle. The Defendant recalled that, as he was pulling in behind the gold-colored car, he saw that the car was a Ford with Texas plates. Three "Mexican men" stepped out of the car wearing gloves on their hands. The "short one" that had been sitting in the back of the gold-colored car signaled for the Defendant to turn off his headlights, and Mr. Hill cussed at the Defendant for pulling into the driveway with the headlights on. Mr. Hill then said something to the Defendant, and as a result, the Defendant got out of the car. The Defendant testified that, based on Mr. Hill's tone of voice, he did not believe that he had a choice but to get out of the vehicle. He stated that he was afraid of Mr. Hill. When Mr. Hill exited his vehicle, Mr. Hill pulled a pair of gloves out of the pocket of his hoodie. The Defendant continued to ask Mr. Hill why they were there, but Mr. Hill did not respond.

The Defendant recalled that the front porchlight of the victims' residence was on. He noticed that, when "the three Mexicans" stepped onto the porch, they "all three had knives in their hands." The "tall Mexican" then opened the front door and walked inside the residence. The Defendant explained that he was "rooted to the spot" as soon as he saw the knives, and he started crying. Mr. Hill walked up onto the porch and opened the storm door. He motioned for the Defendant to follow, but the Defendant shook his head at him. The Defendant stated that, as Mr. Hill was motioning for him, he heard "a really loud sound" coming from inside and then the sound of "gurgling." When Mr. Hill entered the residence, the Defendant heard a woman screaming. The Defendant testified that he "couldn't move." He recalled that the "tall Mexican" came back outside and said, "Come on, white boy." However, he turned away from the "tall Mexican" and continued to stand in the driveway. The "tall Mexican" then walked over to the Defendant, grabbed his shoulder, turned him around, and slapped the Defendant on the side of the head. The "tall Mexican" told him, "Quit crying like a little bitch." He told the Defendant they were "going into the house," and he grabbed the back of the Defendant's neck and right arm and directed him into the residence. When he entered the residence, the Defendant saw a body lying across the room, and he turned and ran back out the front door and into the yard. The "tall Mexican" and Mr. Hill followed the Defendant out of the house. The "tall Mexican" asked him, "What's wrong, white boy, you can't handle a little blood?" The "tall Mexican" then said, "This is what happens to people who think that they can f*** with us." He told the Defendant, "You are going to do every[thing] and anything that you're told to do or this s*** [will] happen again." The "tall Mexican" told the Defendant to come inside the house.

When he entered the residence, the Defendant went into the master bedroom where Mr. Hill was going through a drawer. The "fat Mexican" had two guns in his hands, and he pointed a gun at the Defendant and said, "Bang, bang." The "short Mexican" then walked out of the bathroom, wiping his hands off on a towel. The

Defendant testified that they were no longer wearing gloves. Mr. Hill grabbed a laptop off the floor and handed it to the Defendant and told him to take it to his car and then come back in and "grab some more stuff." When the Defendant returned, the "tall Mexican" was coming out of the kitchen. He had blood on his shirt, on both of his hands, and on a knife that he held in his hand. The "tall Mexican" approached the Defendant, pointed the knife at his chest, and said, "Take it. Take it. Take it. Take it." The Defendant took the knife, and the "tall Mexican" wiped both of his hands on the Defendant's. The "tall Mexican" said, "Now their blood is really on your hands." The "tall Mexican" then took the knife back from the Defendant, and the Defendant "broke down" again.

Mr. Hill told the Defendant to wash his hands in the bathroom. He then instructed the Defendant to grab the guns and put them in his car. Once outside, the "tall Mexican" put the gloves inside a McDonald's bag and tossed the bag to Mr. Hill. Mr. Hill then got into the passenger seat of the Defendant's car with a knife in his hand. Mr. Hill took a camera and pistol out of his pocket and put them in the glove box. The Defendant testified that he never saw the knife that Mr. Hill had again. The Defendant stated that he did not know if he ever handled the knife found in his car and that he did not know if it was the same knife the "tall Mexican" handed him. The "tall Mexican" approached the Defendant, put his hands on the Defendant's shoulders, and said, "You gonna be okay, white boy? This is good fun, huh? Just remember, you do everything you're . . . told or this - this will happen again." The Defendant testified, "They thought that they had just killed my great-granny and [Mr. Hill] knew where my mama lived, where my brothers lived." He stated that he "wasn't gonna let that happen to [his] family."

After leaving the crime scene, Mr. Hill turned on the victims' laptop but could not get into it. As they pulled into the driveway of Mr. Hill's home, the Defendant asked what to do with the victims' property. Mr. Hill stated that the victims' property was to be left in the Defendant's car for the night. Mr. Hill told the Defendant that he needed to return the following morning and that he needed to "find a way to get into the laptop." The Defendant returned home and went to bed, but he did not sleep. He stated that he felt that he "couldn't tell what happened because [he] didn't want what happened to the [victims] to happen to [his] family." The Defendant explained that he did not call the police because he "wasn't gonna do anything to get [his] family killed." He stated that he first told his attorneys what happened the night the victims were murdered about a month and a half before trial.

The Defendant stated that he went to school to take a make-up mid-term exam at 10:00 a.m. and that he was dressed in the same clothing that he had worn the previous night. After class, the Defendant called several people about accessing the laptop and then drove to Mr. Hill's residence where Mr. Hill gave the Defendant "the rest of the

marijuana that he [] owed [the Defendant] from the week and some cash[.]" The Defendant asked Mr. Hill about the previous night, but Mr. Hill did not answer his questions. The Defendant asked Mr. Hill what he wanted to do with the victims' property, which was still in the Defendant's car. Mr. Hill gave the Defendant directions in a "forceful" demeanor. The Defendant explained that, as a result of Mr. Hill's response, he understood that he had to "sell all the stuff off quick[.]"[4]

The Defendant recalled that he went on a boat ride with his cousin, Mr. Knox, later that day. When he got to the boat dock, the Defendant took the McDonalds bag containing the gloves out of his car. He stated that he burned the bag and its contents because of his conversation with Mr. Hill. While on the boat with Mr. Knox, the Defendant smoked marijuana, took Xanax, and drank beer. The Defendant testified that he pulled out his money and "started trying to calculate for the [victims'] guns and the cameras and stuff how much [he] could just give to [Mr. Hill] and just tell [Mr. Hill] that he sold all the stuff and not sell it." While on the boat, the Defendant received several text messages from Mr. Hill about the Defendant "selling the stuff." The Defendant denied that he deleted any text messages from his phone that day. The Defendant testified that he later sold the victims' camera, and then he called Mr. Lee. He asked Mr. Lee what he had heard about the murders and told Mr. Lee that he had "come across some guns" and wanted to sell them. According to the Defendant, Mr. Lee told him that Mr. Shell had been found in the living room but that Mrs. Shell was in the kitchen. Mr. Lee said that "they were both cut real bad" and that "[t]heir throats had been cut." Mr. Lee told the Defendant that there was "blood everywhere" and that it "looked like a lot of people had [gone] in and just ransacked the place." The Defendant went to Mr. Lee's residence around 3:00 p.m. and showed Mr. Lee the guns; however, Mr. Lee "didn't want any." The Defendant stated that, after leaving Mr. Lee's residence, he and Mr. Knox drove out to a trailer on the Defendant's grandfather's property where the Defendant stored the victims' stolen guns. Later, the Defendant and Mr. Knox met a man at a car wash in Tiptonville, and the man bought one of the victims' guns. The Defendant testified that he had been unaware of the jewelry in his trunk.

The Defendant explained that, later that night, he went to the Tobacco Dock. When he approached the counter, there were customers and employees talking about the murders. The Defendant stated that one man was "talking about all the details" of the murders. The man said that Mrs. Shell "had the phone in her hand and she'd been trying to run out the back door and that she was on her back." He also stated that the victims' throats had been cut and that there was "[a] lot of blood." The Defendant testified that he

---

[4] During another defense proffer, the Defendant testified that Mr. Hill threatened him by saying, "Because we know where your family's at. We know where you're all at out on the highway. We know where your granddaddy lives over in the Ville. We know where your grandparents live. You know what'll happen."

- 25 -

left the Tobacco Dock and went to the Chisholm residence. He stated that he took the laptop and a pistol belonging to the victims into the home because he wanted everything out of his car. While in Curt's bedroom, the Defendant began "bag[ging] some more marijuana up." The Defendant explained that he made plans with a friend, Amber, to meet her in Dyersburg and sell her the laptop. Regarding his interaction with police while at the Chisholm residence, the Defendant explained that after he got off the phone with Amber, Curt ran into the bedroom and said, "[T]he cops are here." The Defendant had a "big stack of marijuana in [his] lap and then a bigger stack sitting [] on the bed with scales and everything." The Defendant gathered up the marijuana and went out the back door of the house. He put the bigger bag of marijuana into a cooler and then "bent down like [he] was petting the puppies" in the backyard. At that time, Deputy Leake came to the back door and yelled at the Defendant, saying he wanted to talk to the Defendant. The Defendant asked, "What's this about, Owl Hoot?" The Defendant stated that he asked the question because everyone in the community was talking about the murders, and the Defendant wanted to see what the police would say about the crime. The Defendant testified that he did not delete text messages from his cell phone before Deputy Leake removed the phone from his pocket.

The Defendant stated that, between noon and the time of his arrest that night, he smoked ten blunts of marijuana, took fifteen Xanax pills, and drank beer. Regarding his interview with Agent Bishop, the Defendant stated that Agent Bishop "wanted to know what [he'd] heard" about the murders. The Defendant told Agent Bishop what "everybody in town had been talking about[.]" They then discussed the Defendant's drug use, and the Defendant agreed with Agent Bishop that someone in a "constant state of inebriation" was "not really in reality" and everything has a "dreamlike quality." The Defendant admitted that he lied to Agent Bishop when he said he did not go to the victims' residence. He stated that he could not tell Agent Bishop the truth, explaining:

> If I told somebody [-] I wasn't gonna let that happen to my - I was keeping my family out of it. I - I was ready to go to jail. I was ready to die to keep my family out of this. I didn't want anything to happen to my mama like what happened . . . [t]o the [victims].

The Defendant testified that he was not at the victims' residence that night of his own free will and that he did not want to enter the house. He went in because the "tall Mexican" made him. The Defendant denied that he killed the victims and denied telling Agent Bishop that he had done so. The Defendant also testified that he was not acting of his own free will when he sold the items taken from the victims' residence and stated that he had not wanted to sell the items. He testified that he did not tell Agent Bishop the truth because he did not want anything to happen to his family.

On cross-examination, the Defendant stated that he had "plenty of marijuana" and Xanax on March 4, 2011, explaining that Mr. Hill had given him $500 and a quarter of a pound of marijuana. The Defendant admitted that he received $35 for the victims' camera, and he sold the victims' guns for a total of about $100.

Shondell Hill testified that he graduated from high school in 1998, and from that time until June 2011, he made money by selling marijuana and crack cocaine. He explained that he joined the Black Gangster Disciples when he was fourteen or fifteen years old and that he had two previous felony convictions for selling crack cocaine. He agreed that he beat up a man that had testified before a grand jury regarding one of the crack cocaine charges. Mr. Hill stated that, before March 2011, he had known the Defendant for about five or six months and that he met the Defendant through a mutual friend. He stated that the Defendant would call him almost every morning on the way to school, wanting to purchase "either a blunt or a dime sack." He recalled that the Defendant also sometimes called in the afternoons and sent him text messages about coming to purchase marijuana. Mr. Hill recalled that the Defendant would occasionally come over to his house where they would play video games.

Mr. Hill testified that he knew Joel Hernandez, whose nickname was "Lobo." He explained that Mr. Hernandez would bring him marijuana from Texas on a Greyhound bus. Mr. Hill stated that, in February 2011, he asked the Defendant to drive him to Memphis to the Greyhound bus station to pick up Mr. Hernandez. He stated that this was the only time that the Defendant drove for him. Once at the bus station, Mr. Hill sent the Defendant inside to find Mr. Hernandez. Mr. Hill explained that they were in the Defendant's car and that he remained in the car while the Defendant went inside the bus station. The Defendant then drove the men back to Lake County. Mr. Hill stated that Mr. Hernandez brought about ten pounds of marijuana with him from Texas and explained that a pound of marijuana could sell for $800 to $1,000 or more, depending on the quality. Mr. Hill recalled that, when Mr. Hernandez's business was completed in Lake County, the Defendant drove Mr. Hernandez back to the bus station, but Mr. Hill did not go with them. Mr. Hill explained that he paid the Defendant in marijuana; he gave the Defendant four ounces to pick up Mr. Hernandez and another four ounces to take Mr. Hernandez back to the bus station. Mr. Hill explained that, during this time, he did not have a driver's license. He stated that this was the only occasion in which the Defendant was around Mr. Hernandez.

Mr. Hill recalled that, before Mr. Hernandez's arrival, he asked the Defendant to rent a room for Mr. Hernandez at Boyette's. He explained that he paid for the cabin but that it was rented in the Defendant's name. He stated that he did not know anything about a pot farm in Obion County. Mr. Hill testified that Mr. Hernandez stayed alone at Cabin 9 during the week of March 1. Mr. Hill never saw a gold-colored car or anyone

else with Mr. Hernandez at the cabin. Mr. Hill recalled that Mr. Hernandez came to Memphis about every three weeks and that, between trips, he communicated with Mr. Hernandez "[p]robably once a week." He stated that he did not know whether Mr. Hernandez belonged to a prison gang. Mr. Hill recalled that, on the morning of March 2, the Defendant drove him to Cabin 9 to pick up the marijuana. The Defendant drove Mr. Hill around Tiptonville while he tried to sell the marijuana. Mr. Hill noticed that the marijuana was "real seedy and sticky" and smelled like dryer sheets. Around 9:00 or 10:00 a.m., Mr. Hill attempted to sell the marijuana to two African-American men at the Kentucky state line, but the men did not want the marijuana. Mr. Hill recalled that Mr. Hernandez left Cabin 9 on March 3, 2011, rather than stay until March 4 because "the weed he brought was garbage and it wasn't selling[.]" Mr. Hill told Mr. Hernandez that the marijuana was "terrible," but Mr. Hernandez responded, "Come on . . . you've got to be able to do something for me. I know you can make it happen." Mr. Hill told Mr. Hernandez that people would pay for the marijuana but not at the price Mr. Hernandez wanted. He told Mr. Hernandez to take the marijuana back to Texas with him, but Mr. Hernandez did not want to risk it so the marijuana remained with Mr. Hill. Mr. Hill admitted that he eventually sold the marijuana. He stated that he paid Mr. Hernandez $1,500 for about two pounds' worth of marijuana. He stated that, had he paid Mr. Hernandez what he was asking for it, he would have paid between $4,000 and $5,000.

Mr. Hill was unaware of the Defendant's discussions with Mr. Hernandez on the way back to Jackson. The Defendant never told Mr. Hill that Mr. Hernandez had offered him the opportunity to deal directly with him. Mr. Hill stated that he had no reason to call the Defendant at 11:42 p.m. on March 3, 2011. He stated that he was at home on the night of March 3 and the early morning hours of March 4 and that he never left his residence. He further stated that no one visited his house during that time. Mr. Hill testified that it was only after the victims were murdered that he learned that the Defendant's grandmother had lived on Owl Hoot Road. He said that it was his understanding that the victims were the Defendant's grandparents.

Mr. Hill said that, after the Defendant dropped off Mr. Hernandez at the bus station in Jackson, the Defendant called him to let him know that Mr. Hernandez made it to the bus station. Mr. Hill denied that the Defendant came by his residence that night. Mr. Hill testified that the following morning, March 4, he woke up to find that the Defendant had called him five or six times around 4:00 a.m. and sent a text message at 6:30 a.m., asking him to call the Defendant. The Defendant then came over to his residence. Mr. Hill explained:

> I opened up my back door, [the Defendant] walked in, he said, "What's up, my guy?" That's how he talked to me -- every time he enter[ed] my house and we talk[ed] on the phone, he'd say, "My guy." He

came on in. He had a laptop and he had like a jewelry bag or some type of Crown Royal bag or something. He began to pour the jewelry out in his hand. And I told him he could -- he was wasting his time with that. I told him it looked oldish. I said it looked old-timey, my exact words to him. He put that up. I told him I was interested in the laptop. He opened -- he flipped the laptop open, he proceeded to try to power it on. He powered it on, it had a lock code in it. Then, after he couldn't get through the code he made a phone call to somebody. And I don't know they [sic] name. He asked them, he said, "I got a laptop." He said, "You think you can get it open for me?" I don't know what the reply was over the phone. But he got off the phone, he said, "Hey, I think I know somebody that can open it." He put that -- he put it up. And he let -- When he first came in he also said he had a -- he said he had a trunk full. I asked him where he got that from. He said, "We hit a lick last night." He never said who we were or none of that. I didn't ever ask who "we" were. But he said, "We hit a lick last night."

Later that afternoon, when he learned about the victims' murders, he called the Defendant. Mr. Hill explained:

> Because he had just left my house with a computer and some jewelry, and I -- because when he said, "We hit a lick," like I said, when my friend came over and was telling me about, "Did you hear about the double murder," it instantly made me call [the Defendant]. I said, "That stuff you got, did that belong to them people that got killed?" His exact words, he said, "No. Them [sic] was my kin people." And I said, "Why you didn't tell me this while you was here?" He didn't reply or nothing . . . I told him, I said, "Make sure you get my fingerprints off that laptop," because I had just been looking at it.

Mr. Hill could not explain why his phone records did not show that the Defendant called him five or six times on the morning of March 4.

Mr. Hill recalled meeting a man named Luis Mendez while incarcerated at the Lake County Jail. Mr. Mendez was in jail for trafficking marijuana. About six or seven months after Mr. Hill got out of jail, Mr. Mendez called him. Mr. Mendez stayed at Mr. Hill's residence, and Mr. Hill provided him with money to return home to Texas. When Mr. Mendez later returned to Lake County on a Greyhound bus, he brought Mr. Hernandez with him.

Joel Hernandez, Jr., testified that he was born in Laredo, Texas, that he was thirty-three years old, and that he was serving a sentence in the United States Penitentiary in Allenwood, Pennsylvania for "smuggling illegal aliens." Mr. Hernandez stated that Mr. Mendez was a friend from high school in Texas. He stated that he had "no idea" if Mr. Mendez was a gang member. Mr. Hernandez denied that he was a member of the Texas Mexican Mafia or "Mexikanemi"; rather, he stated that he was a gang "associate" while in prison, which meant that he was under the gang's protection and "[j]ust hangs around" gang members. Mr. Hernandez denied that he ever worked for the Mexikanemi. He acknowledged, however, that he signed a document from the Allenwood, Pennsylvania prison, which stated that he had been a member of the gang since 2009. Mr. Hernandez identified several photographs of his tattoos but denied that the tattoos were gang insignia. He stated that they had "nothing to do with . . . the Mexican Mafia" but that they were simply art denoting "Aztec culture." Mr. Hernandez testified that the Mexikanemi was a criminal gang consisting of "[b]ig bad boys from prison." He stated that to become a member of the Mexikanemi an individual must "kill somebody." He said that he had never been asked to join the gang. He identified several photographs of himself and other prison inmates that his aunt had posted on his Facebook page and admitted that two individuals in the photographs were Mexikanemi members.

Mr. Hernandez stated that he met Mr. Hill through Mr. Mendez when he accompanied Mr. Mendez to Tennessee while Mr. Mendez was transporting marijuana on a bus. Mr. Hernandez admitted that he later came to Tennessee by bus to bring Mr. Hill marijuana three or four times. Mr. Hernandez recalled that he stayed in a cabin for two days in March 2011, while in Lake County. He stated that he never left the cabin except to go out to eat with the Defendant and Mr. Hill. He recalled that the Defendant was "driving [Mr. Hill] around." He denied that anyone in a gold or champagne-colored car with Texas tags came to see him or that he went anywhere in this car. He recalled that, when Mr. Hill and the Defendant picked him up from the bus station, he had a duffle bag and a backpack. He stated that he had about five pounds of marijuana inside the backpack, which he sold to Mr. Hill for between $800 and $900. Mr. Hernandez testified that he had "a couple" of marijuana suppliers and that he believed his marijuana came from Mexico. During the last trip to Lake County, Mr. Hill informed Mr. Hernandez that the marijuana was not selling for the price Mr. Hernandez requested. Mr. Hernandez testified that he did not have a problem with Mr. Hill not paying him the money he requested for the marijuana. He explained, "I knew it was, you know, no good like it had too much seeds. I knew it was a struggle because I got it very cheap, so I knew he was gonna have a hard time. But I just thought I could take the risk and bring it." He recalled that he told Mr. Hill to keep the marijuana because Mr. Hill "had a wedding coming."

Mr. Hernandez stated that the Defendant gave him a ride to the bus station in Jackson on March 3. Mr. Hernandez agreed that, when the Defendant drove him to

- 30 -

Jackson, he and the Defendant smoked marijuana together. He denied that he and the Defendant discussed the amount of money Mr. Hill gave him for the marijuana. Mr. Hernandez stated that he never called the Defendant, and he did not know the Defendant's phone number. Mr. Hernandez stated that, if the Defendant had his cell phone number, Mr. Hill must have provided it to the Defendant.

Mr. Hernandez testified that on March 1, 2011, the Defendant and Mr. Hill picked him up at the bus station. Once at Cabin 9, he and Mr. Hill discussed the marijuana and how much Mr. Hill would sell it for. The following day, Mr. Hill informed him that he was having trouble selling the marijuana and that it was "no good." Mr. Hernandez responded, "[C]ome on man[,] just do what you can do." At the end of the day, he told Mr. Hill, "[Y]ou know what, keep it." He stated that Mr. Hill was supposed to pay $1,300 for the drugs but that Mr. Hill gave him only $800 because Mr. Hill could not sell it. Mr. Hernandez recalled that the Defendant came inside Cabin 9 twice—when he and Mr. Hill took Mr. Hernandez to buy food and when the Defendant picked up Mr. Hernandez to take him to the bus station. On those occasions, the Defendant watched television and smoked marijuana. Mr. Hernandez said that he probably called Mr. Hill on the afternoon of March 3 to let Mr. Hill know he was on the bus. He denied that he and Mr. Hill talked about the Defendant during this call. He stated that there was no one other than Mr. Hill that he would have been calling in West Tennessee.

Regarding phone calls from Mr. Hill on March 5, Mr. Hernandez testified that the calls were likely about Mr. Hill having trouble selling the marijuana. Although he initially testified that he knew the marijuana was of poor quality, Mr. Hernandez later stated that Mr. Hill was "making up stories about [how] the weed [wa]s no good." He stated that he received a phone call from Mr. Hill after returning to Texas, during which Mr. Hill told him about the Defendant "murdering people." Mr. Hernandez denied that he and Mr. Hill ever discussed having the Defendant transport marijuana from Texas to West Tennessee. He stated that he continued communicating with Mr. Hill after leaving for Texas because Mr. Hill still owed him money. Mr. Hernandez testified that the prosecutor told him that, if he did not testify, he would "be a suspect" in the murders. He stated that he knew nothing about a bloody towel being found in Cabin 9.

Mitchell Davis testified that he was a licensed private investigator who provided forensic examination services of electronic devices, including cell phones. Mr. Davis examined the Defendant's cell phone in order to download and obtain information, such as text messages sent and received, deleted text messages, and phone calls made and received. When he received the cell phone, he placed it in a Faraday bag[5] and connected

---

[5] Mr. Davis explained that a Faraday bag was a bag made out of copper or other specialized metal that keeps an electronic device from being able to transmit out or receive a signal.

the cell phone to a computer. Mr. Davis then utilized special software, which generated an extraction report of the data on the Defendant's cell phone. Based on the data he retrieved from the Defendant's cell phone, Mr. Davis testified that the cell phone contained only ten text messages with the first message being received on March 4, 2011, at 9:11 p.m. Mr. Davis explained, however, that there had been a forty-minute delay between when the text message was sent and when the Defendant's cell phone received the message. Mr. Davis stated that the device was "either busy or shut off" and then turned back on, which would explain the delay in receiving the message. Mr. Davis opined that, based on the extraction data and the Defendant's cell phone records, text messages sent and received were missing from the cell phone. He said that "[a] missing message can come up by somebody using the delete function on the phone, and the message can be deleted if it's part of a time cycle." Mr. Davis testified that during the gap of time between when the first text message was sent and when it was received—from 9:31 p.m. to 10:11 p.m.—"there [was] a possibility that some messages were deleted from that device." He testified that text messages could not be accidently deleted from the Defendant's cell phone based on the steps required for deletion of a message.

Mr. Davis reviewed the phone calls between the Defendant and Mr. Hill and found that between February 27, 2011, and March 4, 2011, there were forty-one texts messages sent between the Defendant and Mr. Hill and sixty-two phone calls. Mr. Davis explained that he could not retrieve the substance of the text messages shown on the Defendant's cell phone records, except for the ten messages left on the phone. Mr. Davis also reviewed the cell phone records of Mr. Hernandez and located numerous text messages and phone calls between Mr. Hill and Mr. Hernandez between February 27, 2011, and March 5, 2011. Additionally, Mr. Hernandez's cell phone records showed that he called "West Tennessee numbers" fifty-one times during this time period.

On cross-examination, Mr. Davis stated that there were several possible explanations for the forty-minute time gap. He said that someone could have turned off the cell phone, or it was in an area with no reception. Mr. Davis testified that the text messages could be deleted off the phone either individually or by group. Regarding how text messages could be deleted from the cell phone, Mr. Davis stated:

> You could physically delete it by having the device in your hand; there's one. If there's a calendar built into the device that allows for messages to be deleted after a certain period of time; there's two. That's a manufacturer option. The third way would be because some type of spyware or something remote could delete those messages. And if you want to go on to number four, it could be because there's a glitch in the

system, something could have happened to the phone that caused catastrophic damage to something that was holding that text information.

He agreed that, if officers arrived at Mr. Chisholm's residence at 9:17 p.m. and the Defendant received a text message at 9:20 p.m., that the Defendant could have deleted all of his prior text messages in less than a minute. Mr. Davis agreed that some drug dealers will delete their text messages shortly after the messages are received so that no record of the text messages existed. He stated that it was "[j]ust as possible" that the Defendant deleted his messages shortly after they were received as it was that someone else deleted the messages off of the cell phone after his arrest.

Dennis Waller, an expert in police investigation policies and procedures, testified that he owned a licensed private detective agency and that he consulted and provided expert testimony on police-related litigation. He explained that he had been asked to review evidence in the Defendant's case, including the TBI lab reports and narratives, photographs of the crime scene, transcripts of testimony from prior hearings, and the tangible evidence collected by the TBI. Additionally, Mr. Waller reviewed the TBI's policy and procedures manual. He stated that there were minimum standards for investigative policies and procedures, which were accepted across the country, and that the investigation of the victims' murders had been deficient in multiple ways. Mr. Waller testified that there should have been a crime scene log created to document who went in and out of the victims' residence, but no such log existed. Additionally, he said that an attempt should have been made to collect samples from all of the different pools of blood around the residence. He stated that the large pools of blood should have been "sectioned or quartered [] off" and samples taken from different areas of the blood in order to determine if it came from the victims or a perpetrator. Mr. Waller stated that the tangible evidence collected at the crime scene did not comply with the accepted standards for investigating a double homicide. He said that the investigation was "minimal" and that it would "[a]bsolutely not" meet the minimum standards of a police investigation as expected in a double homicide case. He identified blood stains in crime scene photographs that should have been collected and explained that standard procedures would require officers to collect this evidence. He testified that a blood spatter expert should have been at the crime scene and that a technician should have dusted for fingerprints on a variety of surfaces inside the residence. Mr. Waller further testified that, upon the discovery of the "secondary crime scene" at Cabin 9, it should have been treated "the same way . . . you would [treat] the primary crime scene." He stated that investigators should have attempted to collect the bloody towel from Cabin 9 after it had been taken to the laundry shed and to collect the fruit punch cans from the dumpster.

Additionally, Mr. Waller criticized the Defendant's interview by the TBI, explaining that the recording of the notes by Agent Kring did not comply with the

- 33 -

accepted standards required of such an interview. He stated that the interview should have been recorded, and if a video camera was not available, Agent Kring's notes should have recorded the questions asked by Agent Bishop, as well as any "qualifiers," in order to "have the total context" of the Defendant's statements. He noted that Agent Bishop failed to ask the Defendant if he had killed the victims or whether the Defendant had been present at the crime scene. Mr. Waller described such questions as "basic questions that you would want answered."

Janice Johnson testified as an expert in the areas of crime scene investigation and analysis and blood spatter analysis. Ms. Johnson explained that she was a "[f]orensic specialist" and owner of the Florida-based business, Forensic Pieces, where she taught courses in forensics for law enforcement officers and crime scene investigators. Ms. Johnson testified that she reviewed the forensic evidence collected by the TBI in the Defendant's case. In reviewing the crime scene photographs taken by the TBI, Ms. Johnson noted that many of the photographs did not comply with accepted standards for crime scene documentation. She stated that it was important to measure blood spatter at a scene and that the "height of the stains and the size of the stains could be crucial." However, with the exception of a few photographs of the front door, the TBI failed to photograph blood stain patterns at the scene with a proper scale. Regarding DNA collection and analysis of blood spatter patterns, Ms. Johnson stated:

> You would want to do proper collection of these spatter patterns to determine whose blood is where. Obviously, in this case we have two people that have received injuries. So you'd want to know whose blood is where. And perspective in the violent attack[,] perhaps the perpetrator injured themselves and in doing so sometimes they will leave blood stains behind.
>
> . . . .
>
> Oftentimes again, the violent attack will result in the perpetrator injuring themselves and some of these stains may be displayed as passive stains. When you look at blood stain pattern analysis you look at the stains that are passive versus dynamic and a passive stain could be a drop of blood or a couple of drops of blood from an injury. But without proper sampling sometimes those blood stains from the perpetrator could be missed.

Ms. Johnson testified that insufficient blood samples were collected from the crime scene for a reconstruction. She said that she had been asked to determine who may have been injured first during the attack but stated that "[i]f sufficient samples had been collected and sufficient photographs taken [she] may have been able to sort that out. But

based upon four samples from that scene there's no way [she could] sort that out."  She stated that all blood patterns should have been sampled and that there were multiple areas of blood that were not sampled.  She stated that the failure to collect these samples violated the minimum standards for crime scene analysis and processing.  Ms. Johnson further testified that areas of the crime scene should have been examined for latent fingerprints, latent blood, and "touch DNA."  Ms. Johnson stated that "[t]he end result is that we perhaps had forensic evidence that was not detected, collected or preserved that could help us with the reconstruction of the case."  She identified multiple pieces of evidence and areas of the crime scene that were not properly documented, collected, and tested.  She further stated that the TBI did not conduct any analysis of the blood spatter at the crime scene.  Regarding Cabin 9, Ms. Johnson testified that the fruit punch cans and the towel with blood on it should have been collected and tested.  She also noted that tire impressions in the victims' driveway were not preserved by the TBI.

Ms. Johnson testified that she analyzed the Defendant's shirt for blood and found one blood stain on the upper right shoulder and a second blood stain on the cuff of the shirt.  She sprayed the shirt with BlueStar Forensics, "a reagent that detects blood that's invisible to the naked eye."  She stated that the blood stains were "very small stains like the size of . . . the head of a pin."  She further stated that the Defendant's shirt was not properly wrapped and packaged in butcher paper; rather, it was "just wrapped together in a ball."  She also examined the Defendant's camouflage overalls, blue jeans, and boots, as well as the Defendant's vehicle.  She used BlueStar on the Defendant's boots and found that there were no areas of the boots that tested positive for possible blood.  Additionally, she stated that she found nothing on the Defendant's boots that indicated they made the tracks in blood on the victims' kitchen floor.  She stated that the Defendant's boots appeared not to have been washed as they still had dirt embedded in the tread.  Ms. Johnson stated that she would have expected to find blood residue on the boots even if they had been washed because "when people scrub it's impossible to remove all the blood."  Ms. Johnson testified that no blood was found in the Defendant's vehicle, on his cap, camouflage overalls, or blue jeans.  Regarding the blue jeans, Ms. Johnson stated that, based on the crime scene, she would have expected blood on the cuffs because they dragged the ground when the Defendant walked.

Dr. Alfonzo Valdez testified that he was a professor at the University of California where he taught "gang classes."  He explained that he was also a retired police officer with twenty-eight years' experience, and he had a doctorate in psychology.  Dr. Valdez explained that he had previously worked as a narcotics investigator.  He explained that, as an investigator, he had "hundreds of hours of courses involving the histories, modus operandi and characteristics of all the major street gangs."  Dr. Valdez testified that he was familiar with Hispanic gangs, including the Mexikanemi out of Texas.  He explained that the Mexikanemi was an inmate-run prison gang.  He stated, "All prison gangs

operate in and outside the prison and many prison gangs have a relationship with the local street gangs that they kind of adopted." Dr. Valdez explained that "street gangs have become the primary distributors and retailers of drugs that come from our prison gangs. And the prison gangs get their drugs from the cartels." He testified that gang members can work with non-gang members to carry out the gang's business.

Dr. Valdez reviewed Mr. Hernandez's tattoos, criminal record, and prison records and determined that Mr. Hernandez was a member of the Mexikanemi. He testified that Mr. Hernandez would be killed in prison because of his tattoos if he were not a member of the Mexikanemi. He testified that Mr. Hernandez likely had a "lower ranking position" in the Mexikanemi and stated that a prison gang member "will not tell you in court that he's a prison gang member." He explained that the Mexikanemi primarily funded itself through drug sales, contract killings, extortion, and "home invasion robberies[.]" Dr. Valdez explained that the term "mi cholos" meant "[m]y home boys, my fellow gang members." Dr. Valdez testified that the Mexikanemi operated in West Tennessee at the time of the murders. He explained that the gang used the I-35 corridor from Laredo to deliver drugs to the "eastern or mid part of the United States." He stated that the Mexikanemi used "extreme forms of violence to intimidate you and to control you." Dr. Valdez testified that, based on his review of the case, he believed that the violence inflicted upon the victims was consistent with the violence of the Mexikanemi.

Dr. Valdez explained that he had also studied the Gangster Disciples, of which Mr. Hill was a member. He stated that the Gangster Disciples were "one of the country's more violent gang[s]." Dr. Valdez explained that the victims' murders were "very consistent" with the operations of both the Mexikanemi and the Gangster Disciples. He testified that the gangs use "hyper violence" for intimidation purposes. He stated, "They come in numbers. They overpower you. They will . . . do brutal things to you to send a message of fear and intimidation." Dr. Valdez opined that the victims' murders were consistent with the Mexikanemi's modus operandi. He explained that there was a lack of a major struggle in the residence; he stated, "This was a very quick overpowering attack. The [victims] had very little time to defend themselves." He testified, based on his experience, that a single person could not have committed the murders.

Dr. Richard Ofshe, an expert on police interrogations tactics and on the reliability of suspects' statements, testified that he had reviewed Agent Kring's notes of the Defendant's interview with Agent Bishop. The notes, signed by the Defendant, read:[6]

---

[6] Some words in Agent Kring's handwritten notes are indiscernible to the court. As such, we have attempted to reproduce the notes for the purposes of this opinion to the best of our ability.

Last night I was riding around drinking[.] I took drugs. Don't remember much between 10 pm-midnight. Cannot remember where I was. I was alone. I was with my buddies earlier. Made it to Owl Hoot. What happened happened. Woke up during the night seeing that thinking it was too real to be a nightmare. Literally scared me. Waking up this morning and Owl Hoot and being shot in the head. First I heard [two people] shot at Owl Hoot[.] [D]id not think about it until I got to my car and worked through it. Put two [and] two together. The nightmares were more than real. Feel that my conscience was telling me what I had done. The only thing I have been in court for is a traffic stop. I don't do things like that.

Here lately I have been taking pills. This is not me. I don't rob you know. I am well off family. I smoke weed since 13. Pills off and on hydro freshman [year of] high school. I have never been on drugs. Never done cocaine. I do drugs and I don't think I have a [] problem. The dream is realer than real. The only thing it wakes me up-jerk up in a cold sweat. I see him laying on the floor-cannot tell where on his stomach in a pool of blood. No stab wounds. When I see her it might be in the kitchen-tile floor next to a table laying on her back. It had to be a knife that I used. I could have used a gun. I didn't know I was taking one pistol when I took it. I was by myself. I don't know which knife I used. There[']s 2-a hunting knife-you might check in the middle consol[e]. There are 2 sections. I don't know maybe one in . . . the bottom. There are 2 hatchets in the back area used for chopping wood. Curt-the guy where I was. I have not told anyone about my dream. 10 pm-12 am no recollection of what happened. Started drinking at 6 pm and riding around. Got home about 12 am. Watched an episode of South Park . . . . At the house in his bed. Went to sleep about 1 am. Woke up this morning like usual and went to school at DCC. Have 1 class from 10-11 am. Taking 13 hours. The guns I might have taken [and] thrown the guns in the river. There ain't no telling where it is. If I did take pills from the house I probably did not take any. If I did take any pain medication it would be in my car. I took a shower this morning. I cannot remember if I had any blood on them. I was going to wear my Jordans this morning and I did not see anything on them. Did not remember having blood on them. I did not even know that they moved out there. Still thought [] my great grandmother's husband who passed away.

Dr. Ofshe testified stated that Agent Kring's notes of the Defendant's statement were "clearly not complete." He explained:

It doesn't tell us everything that was said. It doesn't tell us anything about what tactics may have been used in order to facilitate getting whatever it is that was written down from the suspect. These notes don't add up to anything. And even by the admission of the interrogators, they're not – they don't add up to an admission to participation in the crime.

Dr. Ofshe noted that the Defendant's statement was "couched as a dream" and was not "a statement about something that happened." He stated that, when looking at Agent Kring's notes, the context of the Defendant's statements was unknown. Dr. Ofshe testified that, if the details of the crime scene were known in the community at the time of the Defendant's statement, his statement could have been contaminated by that information. Based on his analysis of the Defendant's statement, Dr. Ofshe testified that the statement was "worthless."

*State's Rebuttal Proof*

Matt Sipes of the Tennessee Highway Patrol testified that, in January 2011, he began working with the DEA investigating large scale drug trafficking cases in northwest Tennessee. Trooper Sipes stated that drug dealers who used buses to transport marijuana would not transport more than about fifteen pounds because of the smell. He testified that, in October 2011, he investigated "a sizeable outdoor grow" of marijuana in Obion County. He explained that approximately eight Hispanic individuals were suspected for their involvement in the grow and that two Hispanic individuals were identified and arrested. Investigators found no connection between the two arrested men and Texas. Additionally, he found no connection between the marijuana grow in Obion County to anyone in Lake County.

*Defendant's Rebuttal Proof*

Dr. Valdez testified that, based on his research and experience, a member of the Mexikanemi would not travel by bus from Texas to Tennessee to sell only three to five pounds of marijuana.

At the conclusion of proof, the Defendant moved for a judgement of acquittal, arguing that no reasonable jury could find the Defendant guilty beyond a reasonable doubt. The trial court determined that the issue of the Defendant's guilt was a "question of fact for the jury" and denied the motion. Following deliberations, the jury convicted the Defendant of two counts of second degree murder, as a lesser-included offense of first degree premeditated murder; two counts of first degree felony murder; and two counts of especially aggravated robbery.

*Sentencing*

At sentencing, Paul Shell delivered a victim-impact statement on behalf of his family, requesting that the Defendant receive consecutive life sentences.

Captain Dennis Dean, the jail administrator for the Obion County Jail, testified that the Defendant was under his supervision from March 2011 through 2015. Captain Dean explained that the Defendant had been kept in "solitary" for the entire time he was in the "maximum security unit." He described the Defendant as "respectful" and stated that the Defendant followed the procedures and policies of the jail. He explained that the Defendant read two or three books a week. Captain Dean recalled that the Defendant had warned officers on more than one occasion of another inmate's plans to "do harm" to a staff member at the jail. Captain Dean testified that the Defendant gave no indication that he would be an especially dangerous prisoner and that he never saw the Defendant lose his temper when confronted by other inmates.

David Gray, the pastor at Abundant Life Fellowship, and his wife, Tammy Gray, testified that they had known the Defendant since the Defendant was about a year old. Pastor Gray described the Defendant as "very nice. Kind." He testified that he had never seen the Defendant lose his temper or act violently. Pastor Gray stated that the Defendant was not a dangerous person and that he believed that the Defendant could be rehabilitated. Mrs. Gray described the Defendant as "[s]weet" and stated that she did not believe that the Defendant was especially dangerous.

Regina Bargery, the Defendant's mother, testified that the Defendant was loving, very respectful, and had a "[b]ig heart." She stated that she had not known the extent of the Defendant's drug use until the trial. She said that there had never been any indication that the Defendant might be violent towards another.

The Defendant then made an allocution statement to the court, during which he reiterated that he did not kill the victims but expressed remorse that he involved himself with drugs and Mr. Hill and Mr. Hernandez.

The trial court merged the Defendant's second degree murder convictions into his convictions for first degree felony murder and sentenced the Defendant to consecutive life sentences. For his convictions for especially aggravated robbery, the trial court sentenced the Defendant to fifteen years on both counts and ordered the sentences to run concurrently with the life sentences. In ordering consecutive sentences, the trial court found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that the Defendant had no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4). The

trial court stated that the victims' murders were "the bloodiest, most gruesome murders" that the court had seen and recalled that the victims were "stabbed repeatedly and cut repeatedly. Mrs. Shell's throat was so violently sliced almost to the point of decapitation." The trial court found that the Defendant was "a danger to the public," citing *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). The court further noted that, although the Defendant had no prior convictions, he had a history of criminal behavior that included selling and delivering drugs. Regarding the Defendant's allocution statement, the trial court stated:

> You do state that you're sorry that the Shells were killed but, you accept no responsibility at all for what has happened other than the fact that you were present and that you - that this might not have happened had you not been using drugs. You don't, however, accept direct responsibility for the crime. This bothers me. Your statement today bothers me.

The trial court found that the Defendant's "lack of candor and . . . lack of remorse" suggested that consecutive sentencing was appropriate.

*Motion for New Trial Hearing*

The Defendant filed a timely motion for new trial. At a hearing on the motion, Officer Mason McDowell of the Dyersburg Police Department testified that he worked mainly narcotics investigations, and in those cases, he occasionally needed to recover text messages from suspects' phones. He explained that many cell phone providers, including Verizon Wireless, had preprinted preservation letters which law enforcement could use to request that the company preserve the content of text messages. Officer McDowell explained that Verizon "loosely guarantee[d] three to five days" worth of text messages prior to the date the request for preservation was made. He stated that no subpoena was needed for a preservation letter but that officers would typically obtain a subpoena after filing the letter with the cell phone company. He said that the procedure was available in March 2011.

On cross-examination, Officer McDowell stated that it was possible to delete information from a cell phone remotely and that "it would not be difficult for one of [the Defendant's] associates, a family member, anyone else that would have the same interest as him in getting rid of the messages" to delete them in this manner. Officer McDowell agreed that law enforcement could have filed a preservation letter with the Defendant's cell phone company to preserve his text messages. However, he noted that, as the account holder, the Defendant could have requested them at any time.

Sergeant Dennis McCaig, with the Dyer County Sheriff's Office, testified that he had been responsible for developing the security protocol for the sequestered jury. He stated that the officers working the security detail followed two rules—jurors were not left alone unless they were in their particular hotel room and jurors were to have no contact with anyone outside the jury. Regarding the jurors' phone calls, Sergeant McCaig stated that he instructed court officers to listen to jurors' conversations and to stay within two feet of the jurors during the calls. Sergeant McCaig explained that the guidelines for the family member visitations were "very strict," and the visits were "for a very short period of time and with immediate family members only." He stated that he could hear the conversations between jurors and their visitors, and he did not hear anyone discussing the trial. Sergeant McCaig instructed court officers to listen for "key words" like "evidence" and "trial" while listening to the conversations between jurors and visitors.

Eight deputies and two lieutenants of the Dyer County Sheriff's Office testified that they were part of the security detail for the sequestered jury during the Defendant's trial. Their testimony was consistent and generally repetitious. Court officers were on duty twenty-four hours a day at the hotel where the jury stayed. Jurors were also monitored by video surveillance, and cameras were set up on both ends of the hall of the hotel in which the jury stayed. Jurors were supervised while on smoke breaks, and jurors had no outside contact during those breaks. Jurors would occasionally use the exercise room at the hotel in groups, and court officers supervised the jurors' use of the exercise room. Two or more court officers supervised the jury during family member visits, and jurors were instructed not to discuss the case. Jurors were allowed to make one phone call a day from a specific hotel phone. The jurors' hotel rooms were not equipped with phones. A log with the juror's name, the date and time, the number called, whom the juror called, the juror's relationship to that person, and the topic of the conversation was maintained. A member of the court security detail would remain close to the juror during their phone call to insure the juror did not speak about the trial. None of the court security detail heard or saw anything to indicate that the jurors at any time discussed the case.

Several members of the jury also testified. Juror Johnson explained that the jury had been sequestered during the three week trial and that, during that time, deputies went with the jurors "everywhere [they] went." Juror Johnson stated that she never discussed the facts of the case with anyone outside of the jury. She further testified that, to her knowledge, no other jurors spoke to anyone outside the jury about the case. Juror Johnson recalled that on several occasions the jury was allowed visitation with family members. She stated that she and other jurors were made aware that, if they were caught discussing the case with family, the trial would end. Juror Johnson testified that she did not discuss the case during family member visitation and that she never heard other jurors

talking about the case at that time. Juror Johnson testified that two to three deputies supervised the family member visitation and stood "on the outside watching everybody." Juror Johnson testified that there were occasional "smoke breaks" for jurors but that a deputy was always supervising them. Juror Johnson recalled that, during deliberations, another juror discussed a letter written by the Defendant with a "very dark" poem at the bottom of it, which had been introduced at trial. The juror said that the Defendant was "highly intelligent" and had a "dark side."

On cross-examination, Juror Johnson stated that jurors were allowed to make phone calls to family members, and the calls were recorded on a call log. She recalled that a deputy was always in the room with a juror when she made a phone call, and the deputy could hear her side of the conversation. Juror Johnson recalled that during deliberations another juror said that the Defendant's "granddaddy was a big farmer who had money, and that he had been known for buying his family members out of trouble with his money." This juror also said that the Defendant's grandfather was paying his legal fees.

Juror Vestal testified that she would occasionally go on a smoke break at the hotel with other jurors and that there was always a deputy outside with them. She stated that they were not approached by anyone during the smoke breaks and that the jurors did not discuss the case while on smoke breaks. Juror Vestal stated that she went to the exercise room at the hotel a couple of times and that a deputy was in the room supervising jurors while they exercised. She recalled that, a few times, jurors gathered in their hotel rooms to watch movies, talk, and play cards. She stated that she was able to make phone calls only while supervised by a deputy, and she explained that all of her phone calls were logged by deputies. Juror Vestal said that she never had a conversation about the trial during her phone calls. Juror Vestal participated in the two family member visitations; she stated that she never discussed the trial with visitors. Juror Vestal testified that she did not recall a juror saying anything about the Defendant's grandfather. On cross-examination, Juror Vestal explained that one juror read the letter written by the Defendant to other jurors during deliberations. The juror also read the poem at the end of the letter, which Juror Vestal believed the Defendant had written. Juror Vestal did not recall any jurors "saying anything negative or positive" regarding the poem.

Juror Holland testified that he served as a juror at the Defendant's trial. He recalled that he would occasionally join other jurors during smoke breaks and that a deputy always accompanied jurors for those breaks. Juror Holland testified that the only time he was left alone was "[w]hen [he] went to sleep at night." He explained that there was not a phone in his hotel room, and jurors were not allowed to have cell phones. When he wanted to make a phone call, he had to go into a hotel room with a deputy, who monitored his conversations. Juror Holland stated that he never discussed the case during

these phone calls. He stated that, when he would go to the exercise room, a deputy would stand at the door and watch. He recalled that there were several deputies in the room during family member visitations and that he never heard other jurors discussing the case with family members during those meetings. On cross-examination, Juror Holland stated that one juror requested a magnifying glass during deliberations so that she could read the poem at the end of the Defendant's letter. Juror Holland said that he believed that the Defendant had written the poem but that the jurors did not talk about it "a whole lot," and no one attempted to interpret the poem. He stated that he did not hear any juror comment about the Defendant's grandfather.

Juror Bennett, a juror at the Defendant's trial, testified that when she went on smoke breaks or to the exercise room a deputy always accompanied her and the other jurors, and they were never left unattended. She stated that deputies maintained a call log of all of the jurors' phone calls, and a deputy was in the room while she was on the phone. Juror Bennett said that she never had a conversation about the trial during her phone calls. She stated that no one attempted to tell her anything about the case during these conversations. Juror Bennett recalled that there were several deputies watching the jurors during family member visits, and the deputies were in a position to overhear their conversations. Juror Bennett never heard anyone talking about the trial during the visits. Juror Bennett explained that she had "heard of the Bargerys most all of [her] life" because she lived nearby but that she did not know the family personally. During deliberations, she mentioned that a member of the Bargery family was "a well[-]known farmer in Lake County." She explained:

I had said that I had known his grandmother, Miss Billie, for several years, and I hated that she was having to go through what she was having to go through. And that's the only thing I remember ever saying about that.

On cross-examination, Juror Bennett said that she did not recall discussing the Defendant's father's death during deliberations nor did she recall saying that the Defendant's grandfather "always bought those boys out of trouble[.]" Regarding the poem on the Defendant's letter, Juror Bennett stated that she believed he had written it.

Juror Edwards testified that she served as a juror at the trial. She recalled that deputies escorted jurors when they wanted to use the exercise room and take smoke breaks. Juror Edwards said that deputies never left jurors unattended and that no one outside the jury attempted to talk to her about the Defendant's case. She recalled that the deputies made a call log of each juror's phone calls and that deputies were in the same room while jurors were on the phone. She said that, during the phone calls, she never had a conversation about the trial. During family member visitations, the deputies were in the same area monitoring the interaction. She stated that she never spoke to visitors about

the case and that she did not overhear any other jurors speaking about it. Juror Edwards recalled that she played cards two times with other jurors in a hotel room, but they were "very careful" not to discuss the trial. She testified that, at no point during the trial, was she provided information by anyone outside the jury. On cross-examination, Juror Edwards stated that she did not recall Juror Bennett talking about the Defendant's family. Regarding the poem on the Defendant's letter, Juror Edwards stated that she was not sure if the Defendant had written the poem.

Following a hearing, the trial court entered a written order denying the motion for new trial. This timely appeal follows.

## Analysis

### I. Motion to Suppress

Before trial, the Defendant filed a motion to suppress, requesting that the trial court suppress all evidence obtained as a result of the illegal seizure, search, and arrest of the Defendant. At an evidentiary hearing, Chief Kenny Lee of the Ridgely Police Department testified that he received a phone call on March 4, 2011, from an anonymous caller who stated that the Defendant was "trying to sell guns." Chief Lee then "passed the tip along" to the Lake County Sheriff's Department, the agency investigating the victims' murders.

Deputy Patrick Leake of the Lake County Sheriff's Department testified that, during the investigation at the crime scene, investigators determined that guns and jewelry were missing from the Shell residence. After the sheriff's department received an anonymous tip that the Defendant was "selling guns around town," Deputy Leake was tasked with locating the Defendant in order to ask him about the guns. Deputy Leake, along with Deputy Mario Montgomery, patrolled the county for several hours before seeing the Defendant's vehicle at the residence of Dennis Chisholm. Deputy Leake intended to conduct a knock and talk at the Chisholm residence. He parked his patrol car in the driveway, exited the vehicle, and knocked on the front door of the residence. When Mr. Chisholm answered the door, Deputy Leake asked Mr. Chisholm if the Defendant was at the residence, and Mr. Chisholm replied that he was there. Deputy Leake then asked for permission to enter the residence, saying that he "needed to talk to [the Defendant]." Mr. Chisholm told Deputy Leake to "come on in." Once inside, Deputy Leake saw Mr. Chisholm's son, Curt, standing in the kitchen and asked, "[W]here did [the Defendant] go?" Curt told the deputy that the Defendant "just ran out the back door." Deputy Leake went to the open back door, looked outside, and saw the Defendant standing by a shed. While standing in the doorway, Deputy Leake said to the Defendant, "Hunter, come here," and the Defendant "walked right to [him]." Deputy

Leake said, "Let's go out front. We need to talk to you." The Defendant responded, "Okay." Deputy Leake did not have his weapon drawn and did not make any threats to the Defendant. The Defendant and Deputy Leake walked back through the residence and out the front door. By the time they got to the driveway, additional officers had arrived at the residence. There were four or five police cars, but the cars did not have their blue lights activated. Deputy Leake did not place handcuffs on the Defendant or touch the Defendant, and he did not ask the Defendant any questions. Deputy Leake testified that he noticed no signs that the Defendant was under the influence of drugs or alcohol.

Deputy Jason Tubbs asked the Defendant for consent to search his car, and the Defendant gave consent. The Defendant said, "[Y]eah, search it, there's nothing in there." Moments later, Deputy Allison arrived and read the Defendant his *Miranda* rights. Deputy Allison asked the Defendant if he had sold any guns, and the Defendant said that he had not. Deputy Allison then asked for consent to search the Defendant's vehicle, and the Defendant again consented. Deputy Leake testified that deputies made no threats and did not attempt to coerce the Defendant.

Deputy Leake recalled that when they began searching the Defendant's car, he conducted a pat down of the Defendant for weapons for "officer safety." Deputy Leake first asked the Defendant, "Can I pat you down? Do you have anything on you?" The Defendant responded, "Go ahead, there's nothing on me or in my car." Upon conducting the pat down, Deputy Leake noticed a square object in the right cargo pocket of the Defendant's pants. Deputy Leake was unsure of what the object was; he thought that it could have been a small gun in a case. Deputy Leake removed the object from the Defendant's pocket and found that it was a digital scale in a leather case and that the scale had marijuana residue on it.

Deputy Leake asked Mr. Chisholm for consent to search the yard to make sure there were no "weapons or drugs or anything back there." Mr. Chisholm consented to the search. Deputy Leake found several baggies containing marijuana in the backyard "in a pretty straight line," leading to where he had seen the Defendant.

Chief Deputy Jason Allison testified that, on March 4, 2011, he responded to the crime scene at the Shell residence after the victims' bodies were discovered by family members. Deputy Allison cleared the house, "making a quick sweep of the house." He saw that the house appeared to have been ransacked; he saw a wallet laying in the floor and jewelry spread out on a bed. Investigators learned from the victims' family members that several guns and some pieces of jewelry were missing from the residence.

Deputy Allison testified that he received a call from Chief Lee, who told him that he had received a tip that the Defendant had been "selling guns in town." He also learned

that the Defendant was "kin" to the Shell family by marriage. He told Deputy Leake to talk to the Defendant and ask if he had sold any guns that day. That evening, Deputy Allison heard a radio transmission from Deputy Leake that he had located the Defendant's vehicle at Dennis Chisholm's residence. Deputy Allison then heard a second radio transmission from Deputy Leake that the Defendant "just ran out the back door." He responded to the Chisholm residence, arriving approximately two minutes after the transmission. There were four or five deputies standing outside with the Defendant and a couple of Tiptonville City officers sitting in their patrol cars on the street. The Defendant, who was standing in the driveway, was not handcuffed, officers did not have their weapons drawn, and no one was searching the Defendant's car. However, Deputy Tubbs told Deputy Allison that the Defendant had given consent to search his vehicle.

Deputy Allison read the Defendant his *Miranda* rights, and the Defendant indicated that he understood his rights. Deputy Allison testified that he was familiar with the signs of intoxication, and the Defendant did not appear to be under the influence of any intoxicant. He asked the Defendant if he had any guns or if he had sold any guns that day. When the Defendant denied having or selling guns, Deputy Allison asked for permission to search his car. The Defendant responded, "Yes, sir, go ahead, there's nothing in there." It was a "very casual conversation," and the Defendant was not threatened or coerced into giving consent. Deputy Allison searched the front passenger side door. He saw a pill bottle on the floor board, which contained pills that appeared to be Xanax, but the bottle did not contain a label. He removed the pill bottle and a cell phone. He and Sheriff Avery then saw a knife between the seats, and Sheriff Avery said, "I think there's blood on this." Deputy Tubbs was searching the trunk, and he reported, "Chief, we got costume jewelry in the back." At that time, Deputy Allison told everyone to stop searching and "back out of the vehicle." He knew that the vehicle would need to be processed because they had possibly found items from the Shell residence. Deputy Leake informed Deputy Allison of the digital scale and marijuana residue in the Defendant's pocket, and Deputy Allison arrested the Defendant for possession of drug paraphernalia.

Sheriff Bryan Avery testified that he went to the Chisholm residence after hearing Deputy Leake's radio transmission that he had found the Defendant's vehicle. When he arrived, the Defendant was standing in the driveway; he did not appear to be under duress, he was not in handcuffs, and officers did not have their weapons drawn. After the Defendant consented to a search of his vehicle, Sheriff Avery and Deputy Allison found a knife near the center console. The knife had a "red substance" on it where the blade and the handle met.

Deputy Jason Tubbs testified that Deputy Allison instructed deputies that, if they saw the Defendant, they should stop and ask if he was selling guns. Deputy Tubbs testified that he went to the Chisholm residence after hearing Deputy Leake's radio transmission that he had located the Defendant but that the Defendant was "running out the back door." When Deputy Tubbs arrived at the residence, the Defendant and Deputy Leake were coming out the front door of the house. Deputy Leake did not have his weapon drawn and was not touching the Defendant, and the Defendant never said that he wanted to leave. Deputy Tubbs asked the Defendant for consent to search his vehicle. The Defendant consented to the search and asked Deputy Tubbs, "What's this about, Owl Hoot?" Deputy Tubbs recalled that the Defendant then took a step towards the vehicle as if he was going to open the door for Deputy Tubbs when Deputy Allison pulled into the driveway. Deputy Tubbs informed Deputy Allison that the Defendant had given consent to search his car. Deputy Allison also asked for permission to search the vehicle, and the Defendant stated, "Yes, sir, go ahead." Deputy Tubbs searched the trunk of the vehicle. The trunk was "pretty packed," but underneath everything, Deputy Tubbs found a Crown Royal bag containing jewelry. When Deputy Allison instructed everyone to "[g]et away from the vehicle," Deputy Tubbs closed the trunk.

Deputy Corey Glidewell testified that Deputy Allison told deputies to "be on the lookout" for the Defendant because the Defendant was supposed to have been selling guns that may have come from the Shell residence. Deputy Glidewell arrived at the Chisholm residence after Deputy Leake and Deputy Montgomery. Deputy Glidewell saw Deputy Leake perform a pat down search of the Defendant while they were under the carport in the driveway. Deputy Leake told the Defendant that he was going to pat down the Defendant "for safety."

Dennis Chisholm testified that, on March 4, 2011, he was at his residence on Headden Drive in Tiptonville with his wife and son, Curt, when Deputy Leake knocked on his door. Deputy Leake asked if the Defendant was there and if he could speak to the Defendant. Mr. Chisholm told Deputy Leake that the Defendant "just went out the back door." At that time, Deputy Leake "came through the house to the door that [the Defendant] had left out of." Two other officers stood inside the door but did not come through the house with Deputy Leake. Mr. Chisholm later counted twenty-four officers outside the front of the house and saw that there were patrol cars blocking the Defendant's car in the driveway. Both Mr. Chisholm and his wife, Rachelle Chisholm, testified that, in their interactions with the Defendant earlier that afternoon, the Defendant appeared to be intoxicated.

Deputy Mario Montgomery testified that, after the sheriff's department received information from "someone" that the Defendant "had been trying to sell a stolen pistol or a computer," he and Deputy Leake found the Defendant's vehicle at the Chisholm

residence on Headden Drive. Deputy Montgomery said that he had known the Defendant for several years and was familiar with the Defendant's car. Deputy Montgomery said that they pulled in the driveway and "parked behind [the Defendant's] vehicle." Deputy Montgomery explained that he was standing in the carport area when he heard Deputy Leake say, "He's running out the back door." Deputy Montgomery entered the fenced backyard where he saw the Defendant beside a shed, petting some puppies. Deputy Montgomery recalled that Deputy Leake asked the Defendant if he could conduct a pat down for his safety while they were still in the backyard. The Defendant said, "I don't have anything on me . . . you can search me if you like." When Deputy Leake patted down the Defendant, he felt "bulges" in the Defendant's jacket. When Deputy Leake asked what it was, several bags of marijuana fell onto the ground. Deputy Montgomery testified that, after the discovery of the bags of marijuana, Deputy Leake placed the Defendant in handcuffs and walked "through the [fence] gate back onto the concreted driveway." When they got to the front yard, the Defendant asked him, "This doesn't have anything to do with the . . . Shells' murder, does it?" Deputy Montgomery told him that he was "not at liberty to discuss anything with [the Defendant] at th[at] time." He told the Defendant that he was just there to "pick him up" and that an investigator "wanted to speak with [the Defendant]."

Following the hearing, the trial court entered a memorandum opinion, which read in pertinent part:

> [W]hile officers were investigating a gruesome murder scene, they discovered that there [were] jewelry and guns missing. During the investigation at the crime scene, they received a call from Chief Kenny Lee stating that an unidentified informant had advised them that [the Defendant] was attempting to sell guns. Knowing that guns had been taken from the Shell home and with this tip, the Lake County Sheriff's Department deputies were notified to locate [the Defendant], and question him about whether or not he had been selling guns. Sheriff Avery, [] Deputy Allison, [] Agent Bishop and [] Agent Ferguson continued their investigation at the scene. Deputy Leake located the [D]efendant's car at the Dennis Chisholm home in Tiptonville. Deputy Leake went to the home and knocked on the front door and asked Mr. Chisholm if [the Defendant] was there. He was told that he was there. Deputy Leake was invited in to talk to [the Defendant]. At this point, Kirk Chisholm standing in the kitchen[,] stated that [the Defendant] had just run out the back door. The Sheriff's Department was notified that the [D]efendant had run out the back door. Deputy Leake called for the [D]efendant[,] who was in the backyard. The [D]efendant came to the house. They went out the front of the house at which point the [D]efendant was asked by Deputy Tubbs if they could

search his car. At this time, [] Deputy Allison arrived. The [D]efendant had already been *[M]irandized*, and Chief [Deputy] Allison *[M]irandized* him again and also got permission to search the vehicle. At this point, Deputy Leake performed a pat down and found drug paraphernalia. During the search of the vehicle, the Lake County Sheriff's Department found evidence of jewelry and a knife which appeared to have blood on it. Up to this point, the [D]efendant had not been in custody. The defense argues that he was unable to leave because he was blocked in and because there appeared to be an overwhelming number of law enforcement officers present. The [D]efendant, however, was not in custody and no custodial interrogation had taken place at that time. He was then placed under arrest for being in possession of drug paraphernalia. He was taken to the Sheriff's Department where he was again *[M]irandized* and he was interviewed. He had asked a question at the Chisholm home as to whether or not this involved Owl Hoot Road. The Shell home was on Owl Hoot Road. Although the [D]efendant was never formally advised the reason for the pat down or a search of his vehicle, it appears that the [D]efendant knew why the requests were made. At no time at the Chisholm home were any weapons drawn or any threats or attempts to coerce the [D]efendant [made]. The [D]efendant was not handcuffed when his consent to search his vehicle was given or when his consent to a pat down was given. The search of the vehicle started after the [D]efendant had been [M]irandized and after he had given permission to search the vehicle.

The Court does not find that there was a formal seizure of the [D]efendant until after the pat down. The Court also finds that the *Terry* pat down was constitutionally valid as it was supported by reasonable suspicion of criminal activity. In addition to the anonymous tip, all of the officers involved were aware that there had been a gruesome murder. They were aware that there was a relationship between the [D]efendant and the parties murdered. They also were aware that jewelry and guns had been taken from the crime scene. When Deputy Leake went to the Chisholm home, it appeared that the [D]efendant was running out the back door. With all this information, the Court finds that a *Terry* stop was proper under the circumstances of this case.

The Court finds also that[,] although the Defendant may not have appeared to have been himself, there is no evidence to conclude that he was under the influence of alcohol or drugs so that he was unable to understand the request being made of him or the *Miranda* Rights which he was given on multiple occasions. The Court, therefore, finds that he gave consent to

- 49 -

search the vehicle and consent to make the pat down although it does not appear necessarily that consent for the pat down was necessary. Although there were many officers present and the driveway was blocked, the Court does not feel that the consent to search the vehicle should be suppressed because of a coercive environment. The defendant was not threatened or coerced in any way. He was not placed under arrest or handcuffed until after the pat down when drug paraphernalia was discovered. The conduct of all the officers present does not negatively affect the validity of the consent.

Accordingly, the trial court denied the Defendant's motion to suppress.[7]

On appeal, the Defendant contends that his rights under the Fourth Amendment of the United States Constitution and Article I, section 7 of the Tennessee Constitution were violated by the trial court's denial of his motion to suppress evidence obtained by the search of his person and automobile. The Defendant contends that the trial court: (1) erroneously relied upon the anonymous tip as a basis for the detention; (2) erroneously found that the Defendant was not in custody when he was searched by Deputy Leake; (3) erroneously found that, although the Defendant was never formally advised of the reason for the pat down search or a search of his vehicle, it appeared that the Defendant knew why the requests were made; (4) erred in finding there was no formal seizure of the Defendant until after the pat down; and (5) erred in finding the *Terry* pat down was constitutionally valid and supported by reasonable suspicion. The State responds that the trial court properly denied the motion to suppress because the Defendant's encounter with law enforcement was consensual "up to and including the time digital scales containing marijuana residue were discovered on his person." Alternatively, the State asserts that any *Terry* stop was supported by reasonable suspicion.

### *A. Standard of Review*

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable

---

[7] The Defendant subsequently filed a motion to alter or amend the trial court order denying the motion to suppress. Following a second evidentiary hearing, however, the trial court found that "there was no material change in the testimony of various witnesses" and concluded, after reviewing the transcript of the Defendant's preliminary hearing, the transcript of a defense expert, and the transcript of evidence from the initial motion to suppress hearing, that there was no basis for altering or amending the trial court's original memorandum opinion.

inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998).

### B. Police-Citizen Encounters

It is well-settled that courts have divided police-citizen encounters into three different categories: (1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification. *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (citing *Brown v. Illinois*, 422 U.S. 590 (1975); *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968); *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "Of the three categories, only the first two rise to the level of a 'seizure' for constitutional analysis purposes." *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008).

The United States and Tennessee Constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7; *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). A seizure occurs when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." *Daniel*, 12 S.W.3d at 425 (internal citations omitted). "In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter." *Id.* (quoting *Bostick*, 501 U.S. at 440) (internal quotation marks omitted). The factors that a court should consider when determining whether a seizure has occurred include, but are not limited to, "the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen." *Id.* at 425-26 (internal citations omitted). The Fourth Amendment is implicated when a police officer:

(1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; [or] (7) displays a weapon during the encounter.

*Id.* at 426 (citing 4 Wayne R. LaFave, *Search & Seizure*, § 9.3 (a), at 104 (3d ed. 1996 & Supp. 1999) (collecting cases)).

### C. Consent Exception to the Warrant Requirement

Consent is one of the recognized exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In order to be valid, consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Ingram*, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007)) (internal quotation marks omitted). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *Berrios*, 235 S.W.3d at 109. "The pertinent question is . . . whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005) (citing *Schneckloth*, 412 U.S. at 225-26). Factors to be considered when evaluating the voluntariness of consent include the time and place of the encounter; whether the encounter was in a public or secluded place; the number of officers present; the degree of hostility; whether weapons were displayed; whether consent was requested; and whether the consenter initiated contact with the police. *Id.* The State bears the burden of proving that the consent was freely and voluntarily given. *State v. Blackwood*, 713 S.W.2d 677, 680 (Tenn. Crim. App. 1986).

Here, the evidence shows that, after Deputy Leake saw the Defendant's car at the Chisholm residence, he parked his patrol car in the driveway, exited the vehicle, and knocked on the front door of the residence. Mr. Chisholm answered the door, and Deputy Leake asked if the Defendant was there. Mr. Chisholm replied in the affirmative and invited Deputy Leake into the residence to speak to the Defendant. Curt Chisholm, who was standing in the kitchen, stated that the Defendant had "just run out the back door." Deputy Leake went to the open back door, looked outside, and saw the Defendant standing by a shed in the backyard. Deputy Leake did not approach the Defendant. He stood rather in the doorway and called to the Defendant, "Hunter, come here," and the Defendant "walked right to [him]." Deputy Leake explained that he needed to talk to the

Defendant and suggested that they "go out front." The Defendant and Deputy Leake then walked back through the residence to the front of the house and stood in the driveway. Additional officers had arrived at the residence by this time; there were approximately five patrol cars in the driveway and on the road. There were four or five deputies standing outside with the Defendant and some officers sitting in their patrol cars on the street. However, the blue lights on the patrol cars were not activated.

When the Defendant came outside, Deputy Tubbs asked the Defendant for consent to search his vehicle, and the Defendant gave consent. The Defendant said, "[Y]eah, search it, there's nothing in there," and then the Defendant asked Deputy Tubbs, "What's this about, Owl Hoot?" The Defendant took a step towards the vehicle as if he was going to open the door for Deputy Tubbs when Deputy Allison pulled into the driveway. Deputy Tubbs informed Deputy Allison that the Defendant had given consent to search his car. After providing the Defendant his *Miranda* rights, Deputy Allison asked the Defendant if he had sold any guns, and the Defendant said that he had not. Deputy Allison then asked if he could search the Defendant's vehicle, and the Defendant again consented. At this point, Deputy Leake asked the Defendant if he could perform a pat down search for officer safety and asked the Defendant, "Do you have anything on you?" The Defendant responded, "Go ahead, there's nothing on me or in my car." Deputy Leake performed a pat down and found a set of digital scales, which contained marijuana residue. While searching the Defendant's car, deputies discovered jewelry in the trunk and a bloody knife in between the front seats. Deputy Allison placed the Defendant under arrest for possession of drug paraphernalia.

Under the totality of the circumstances, we conclude that the deputies' initial interaction with the Defendant was a consensual encounter and that the search of his person and vehicle were based on the Defendant's voluntary consent. Deputy Leake lawfully approached the Chisholm residence to conduct a "knock and talk," which required no basis for suspecting the Defendant of having committed a crime. *See State v. Cothran*, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003). The evidence shows that the deputy was invited to enter the residence by Mr. Chisholm. Deputy Leake did not go out into the backyard after the Defendant but stood in the doorway and called for the Defendant. The Defendant showed no hesitation in speaking with Deputy Leake and "walked right to [him]." As they came back through the residence, Deputy Leake did not touch the Defendant or place him in handcuffs. When Deputy Tubbs asked the Defendant for consent to search his vehicle, the Defendant expressed a desire to cooperate with the officers. The Defendant replied, "[Y]eah, search it, there's nothing in there," and he stepped towards the vehicle as if to open the door for the deputies. After being given his *Miranda* warnings, the Defendant again consented to a search of his vehicle. The Defendant also consented to Deputy Leake's pat down search, which led to the finding of the drug paraphernalia. The deputies made no threats toward the

Defendant or attempts to coerce him to consent to the search, and no weapons were drawn. His responses to the requests for consent showed no indication that the Defendant was ambivalent or equivocal in his consent. Further, the trial court determined that there was no evidence to conclude that the Defendant was under the influence of alcohol or drugs such that he was unable to understand his *Miranda* rights and the requests being made of him.

The Defendant contends that the initial encounter with Deputy Leake was not consensual because of the overwhelming number of police officers outside the Chisholm residence and because his vehicle was blocked in the driveway. However, the evidence shows that the Defendant gave no indication he wanted to leave, and there is no allegation that deputies physically restrained him. *Daniel*, 12 S.W.3d at 426. The Defendant also argues that that Deputy Leake had no cause to conduct the pat down search because he did not have reasonable suspicion of criminal conduct. However, Deputy Leake did not need reasonable suspicion because the Defendant freely and voluntarily consented to the pat down search.

On balance, we agree with the trial court that the Defendant's initial encounter with the deputies was consensual; he voluntarily consented to the search of his person and vehicle. He was not "seized" until Deputy Leake found him in possession of drug paraphernalia, at which time deputies had probable cause to arrest the Defendant. This issue is without merit.

## II. Exclusion of Statements Made by Mr. Hill and Mr. Hernandez

During several jury-out hearings, the Defendant testified about various out-of-court statements objected to by the State as hearsay. In one hearing, the Defendant testified that Mr. Hill told him during the drive to the Kentucky state line that he and Mr. Hernandez had already agreed upon the sale price for the marijuana by the pound. However, Mr. Hill stated that he was going to try to get the people from Kentucky to buy the marijuana for more money and, at the same time, he was going to tell Mr. Hernandez that "he couldn't get what they had agreed on, that he could only get less." Mr. Hill said that he was going to "short" Mr. Hernandez. He then instructed the Defendant that, if he were ever asked about the marijuana, he needed to "take up" for Mr. Hill and tell Mr. Hernandez that there was "nothing going on."

The Defendant additionally testified about a phone conversation he overheard between Mr. Hill and Mr. Hernandez when the Defendant and Mr. Hill were at the Kentucky state line. He explained that there was a dispute between Mr. Hill and Mr. Hernandez and that the Defendant heard Mr. Hill tell Mr. Hernandez that he could not sell the marijuana for $1100 or $1300 per pound and that the people from Kentucky were

only willing to pay $700 or $750 per pound. The Defendant testified, "[Mr. Hill] was saying he couldn't help the fact that they were saying that it wasn't good marijuana and he said he was trying to sell it but [Mr. Hernandez] was gonna have to work with him on it."

The Defendant also testified that he heard a conversation between Mr. Hill and Mr. Hernandez while at Cabin 9. Mr. Hernandez told Mr. Hill that it "wasn't his weed and he couldn't just go back and tell the people that he . . . brought it down from that he couldn't sell it." Mr. Hernandez complained that "they had already agreed on the amount and that he couldn't . . . just get less for it like that." Mr. Hernandez said that it was "good weed."

In another jury-out hearing, the Defendant testified about his conversation with Mr. Hernandez during the drive to Jackson. Mr. Hernandez stated that the Defendant was supposed to start picking him up from Texas and driving him to West Tennessee. Mr. Hernandez explained that it was too risky and dangerous for him to use the bus any longer and that he was afraid "they were gonna get caught riding on the bus." Mr. Hernandez told the Defendant:

> It's a lot safer and easier for [the Defendant] to use [his] car moving the stuff. They could move a lot more marijuana and that . . . [the Defendant] would be driving from Texas to pick him up and take him back every time.

The Defendant testified that, at this time, he knew he was in "way [] over his head[.]" The Defendant told Mr. Hernandez he did not mind picking him up at the bus station. Mr. Hernandez asked, "Has [Mr. Hill] not talked to you about this?" He then told the Defendant, "Look, we're not using the bus no more [sic]. It's done. It's way too dangerous. We can't take that risk anymore. You're - you're the bus. You're gonna be coming to pick me up from Texas and driving me back and forth." The Defendant stated that he told Mr. Hernandez that he was in school and lived at home with his mother. However, Mr. Hernandez stated that "[t]he decision's already been made. You are the bus from now on." Mr. Hernandez said that he had "already talked to [his] people" and that they would all "be making a lot more money."

The Defendant testified that he did not argue further with Mr. Hernandez; the Defendant thought that Mr. Hill would "be reasonable" about the situation because Mr. Hill "knew that [the Defendant] was in school [and] that [he] wouldn't have time to do it." However, the Defendant testified that, when he later asked Mr. Hill about the plan for him to drive to Texas, Mr. Hill told the Defendant that it was "already a done deal . . . that it was gonna be better for everybody, that everybody was gonna be making a lot more money."

- 55 -

The Defendant further testified that, during the ride to Jackson, Mr. Hernandez was worried about going back to Texas without the money that he was supposed to have. Mr. Hernandez blamed Mr. Hill for this and asked the Defendant, "[W]hy would [Mr. Hill] do[] this to me? Why is he doing this?" The Defendant stated:

[Mr. Hernandez] asked me that and he kept saying, "I don't know what I'm gonna do when I get back. I don't know what I'm gonna tell them." He went through all the prices. That's when he said, "We agreed on [sic] I was supposed to get [$]1100 or $1300 for every pound." He's telling me "I'm only getting this and I know that it's crap; that I should be getting more and I don't know what I'm gonna tell the people that I got it from. It's not my weed. I gotta tell them something and they're not gonna be happy about that."

The Defendant responded to Mr. Hernandez by saying, "I don't think that [Mr. Hill] would be doing anything like that and all the times that I've been with him he hasn't done that from what I know."

Mr. Hernandez then asked the Defendant what the Defendant thought about driving and "selling more weight." The Defendant told Mr. Hernandez that he did not know enough people and that he could not drive to Texas. However, Mr. Hernandez asked for the Defendant's cell phone number, and he placed his number into the Defendant's cell phone under the name "Lobo."

The Defendant testified that he called Mr. Hill after dropping off Mr. Hernandez. The Defendant told Mr. Hill that Mr. Hernandez knew Mr. Hill was "shorting him." When the Defendant told Mr. Hill that Mr. Hernandez wanted him to sell marijuana, Mr. Hill became angry with the Defendant. Mr. Hill then instructed the Defendant to "come straight to [Mr. Hill's] house." The Defendant explained that Mr. Hill was mad initially because he thought that the Defendant had told Mr. Hernandez about "shorting him[.]" The Defendant described the rest of his conversation with Mr. Hill at Mr. Hill's residence, as the following:

He started asking me again what all I'd said to [Mr. Hernandez] and what all [Mr. Hernandez] had said to me, talking about the day before on the way to Jackson. And I told him again that . . . it seemed to me that [Mr. Hernandez] was wanting me to sell marijuana for him, that he had put his number in my phone but I had told him that I couldn't sell marijuana for him; that I couldn't do any of that. I couldn't do it. And [Mr. Hill] told me,

"You did the right thing.  You made the smart choice.  You did the right thing."

The Defendant testified that he was scared during this conversation with Mr. Hill because he believed that Mr. Hill "at any moment . . . was just gonna rear back and smack [him]."

The Defendant testified at an additional jury-out hearing about a conversation he had with Mr. Hill during the 11:42 p.m. phone call on March 3.  The Defendant explained that Mr. Hill demanded that he "[g]et up and come over here" because "we've gotta do something."  When he got to Mr. Hill's residence, Mr. Hill walked over to his car and told the Defendant, "We got somewhere we've gotta go.  They're gonna be following us."  Mr. Hill then directed the Defendant to drive out to Owl Hoot Road.  Once there, he ordered the Defendant to pull into the driveway of the victims' residence.  The Defendant asked, "What's going on?"  Mr. Hill replied, "Just pull in the f***ing driveway."

The Defendant also testified that, after the murders, Mr. Hill told him to "find a way into" the victims' laptop and to "hold everything" in his car until morning.  The following day at Mr. Hill's residence, Mr. Hill instructed the Defendant to sell the victims' property quickly so "we don't have to worry about it anymore."  Mr. Hill also threatened him saying, "Because we know where your family's at.  We know where you're all at out on the highway.  We know where your granddaddy lives over in the Ville.  We know where your grandparents live.  You know what'll happen."

The trial court ruled that the Defendant was seeking to admit this evidence for the truth of the matters asserted.  The trial court noted that Rule 803(3) allows for the admission of statements of intent "to prove the declarant's future conduct but not to prove the future conduct of another person," and the trial court determined that the purpose of the Defendant's proposed testimony was to try "to prove the plan of what you're referring to as the Mexican Cartel or the Mexican Mafia."  The trial court stated that it had also considered the Defendant's due process rights and found that it did not "override, in this situation, the rules of evidence[.]"

On appeal, the Defendant asserts that the trial court erroneously excluded as hearsay portions of the Defendant's testimony regarding statements made by Mr. Hill and Mr. Hernandez.[8]  The Defendant contends that the statements were non-hearsay offered to show the impact on the listener and that the statements were admissible under the state

---

[8] In his brief, the Defendant additionally contends that the trial court erroneously excluded portions of the Defendant's testimony regarding statements made by "the Mexicans."  However, he fails to identify any statements purportedly made by "the Mexicans" that the trial court ruled inadmissible.  Accordingly, the Defendant has waived consideration of this issue.  *See* Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A).

of mind hearsay exception pursuant to Rule 803(3) of the Tennessee Rules of Evidence. Further, the Defendant argues that the proposed testimony—which consisted of Mr. Hill's plan to "short" Mr. Hernandez, Mr. Hernandez's plan to use the Defendant as "the bus," and the threats made to the Defendant by Mr. Hill and Mr. Hernandez—was critical to establishing the defense of duress. He asserts that the trial court's rulings denied the Defendant his constitutional right to present a defense. The State responds that the trial court properly excluded the evidence as hearsay and, alternatively, that any error was harmless because the substance of the evidence was introduced in other ways during the presentation of the defense case.

## A. Hearsay

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. One exception long-recognized by Tennessee courts is the state of mind hearsay exception, which applies to:

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tenn. R. Evid. 803(3). The Advisory Commission Comment concerning the exception provides that "[t]he Commission contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." *Id.*, Advisory Comm'n Cmts.; *State v. Leming*, 3 S.W.3d 7, 17-18 (Tenn. Crim. App. 1998). Additionally, this court has held that evidence under this Rule is only admissible when the declarant's state of mind would be relevant. *State v. Burns*, 29 S.W.3d 40, 47 (Tenn. Crim. App. 1999).

Declarations are non-hearsay when they are used to prove the effect on a listener:

> [A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

- 58 -

Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 8.01[7], at 8-23 (5th ed. 2005)); *see also State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (noting that the victim's statement was not hearsay because it was offered for its effect on the hearer, the defendant, and established evidence of his motive in returning to the scene of the crime later in the day and threatening the victim); *State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at \*14-15 (Tenn. Crim. App. Sept. 30, 2010), *perm. app. denied* (Tenn. Mar. 9, 2011) (concluding that declarant's statements were non-hearsay and were properly admitted to prove the effect they had on the listener).

Even if a statement qualifies as a hearsay exception or is non-hearsay, it must be relevant to be admissible. Tenn. R. Evid. 402. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Advisory Committee Note to Federal Rule of Evidence 403).

In *Kendrick v. State*, our supreme court addressed the standard of review applicable to the review of hearsay statements:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.2d [739], 759-61 [(Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

454 S.W.3d 450, 479 (Tenn. 2015).

In his brief, the Defendant identifies ten sets of statements that he contends the trial court erred by excluding. We will address each in turn.

### 1. Mr. Hill's statements about his plan to short Mr. Hernandez

The Defendant acknowledges that Mr. Hill's statements about his plan to cheat Mr. Hernandez were hearsay but asserts that they were admissible under the state of mind hearsay exception found in Rule 803(3) because they were statements of Mr. Hill's plan or design. He contends that Mr. Hill's shorting of Mr. Hernandez led to a dispute between Mr. Hill and Mr. Hernandez and, ultimately, the killing of the victims. The State concedes that Mr. Hill's statements could amount to a "plan" under Rule 803(3) and that they would be admissible to show that Mr. Hill had, in fact, carried out that plan. The State argues, however, that Mr. Hill's cheating Mr. Hernandez would establish a "motive to retaliate against [Mr.] Hill, not [the Defendant]." In excluding the evidence, the trial court determined that the true purpose of the statements was to establish the Mexikanemi's role in the murders. Because only the declarant's conduct, not some third party's conduct, is provable by the state of mind hearsay exception, we conclude that the testimony was not admissible under Rule 803(3). *See* Tenn. R. Evid. 803(3), Advisory Comm'n Cmts.; *Leming*, 3 S.W.3d at 17-18; *State v. Farmer*, 927 S.W.2d 582, 595 (Tenn. Crim. App. 1996).

### 2. Statements made by Mr. Hill to Mr. Hernandez as Mr. Hill carried out his plan to short Mr. Hernandez

The Defendant contends that the statements made by Mr. Hill to Mr. Hernandez as Mr. Hill carried out his plan to short Mr. Hernandez were admissible because they were non-hearsay. He asserts that they were not offered for the truth of the matter asserted but to show the impact on the Defendant. However, the Defendant did not testify about the effect these statements had on him during the defense proffer. Thus, we cannot determine the relevance of the statements' impact on the Defendant. The Defendant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of the appeal." Tenn. R. App. P. 24(b). The scope of appellate review is limited to the facts established in the record. Tenn. R. App. P. 13(c). In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence. *See Vermilye v. State*, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979). Because the Defendant did not testify about the effect these statements had on him during the defense proffer, we must conclude that the trial court's ruling was proper.

## 3. Statements by Mr. Hill and Mr. Hernandez about their plan for the Defendant to transport drugs from Texas

The Defendant argues that the statements made by Mr. Hill and Mr. Hernandez that the Defendant would be required to transport large amounts of marijuana from Texas to Tennessee were admissible under the state of mind hearsay exception because they were statements of their plan or intent for the purposes of Rule 803(3). We agree that Mr. Hill's and Mr. Hernandez's statements concerning the Defendant's transporting marijuana to Texas were statements of intent or plan for purposes of Rule 803(3) which would be admissible to prove conduct in conformity with the plan. However, in excluding the evidence, the trial court determined that the Defendant's purpose in admitting the statements was to establish the Mexikanemi's plan or role in victims' murders—not that of Mr. Hill or Mr. Hernandez. Because only the declarant's conduct, not some third party's conduct, is provable by the state of mind hearsay exception, we conclude that the testimony was not admissible under the exception. *See* Tenn. R. Evid. 803(3), Advisory Comm'n Cmts.; *Leming*, 3 S.W.3d at 17-18; *Farmer*, 927 S.W.2d at 595.

In any event, as noted by the trial court and the State, the substance of this testimony was admitted at trial. Specifically, the Defendant testified that, while driving Mr. Hernandez to the bus station in Jackson, Mr. Hernandez told the Defendant that "from now on" the Defendant would be going to Texas to pick up Mr. Hernandez and the marijuana instead of Mr. Hernandez taking a bus. The Defendant further testified that he attempted to talk to Mr. Hill about driving back and forth to Texas. He explained why he could not do it, but Mr. Hill did not accept his explanation. Mr. Hill said that the Defendant did not have any choice about whether to drive Mr. Hernandez. The Defendant is not entitled to relief on this ground.

## 4. Mr. Hernandez's statements to the Defendant indicating that Mr. Hernandez knew that Mr. Hill was shorting him

The Defendant asserts that Mr. Hernandez's statements indicating that Mr. Hernandez knew that Mr. Hill was shorting him were admissible under Rule 803(3) because they established Mr. Hernandez's fear and concern of "going back to his superiors without the money because it was not his marijuana." The Defendant argues that the testimony showed Mr. Hernandez's then-existing state of mind and "the reason for the actions taken in response." However, even if the statements concerned Mr. Hernandez's state of mind, Mr. Hernandez's state of mind would not be relevant. Mr. Hernandez did not kill the victims, and his statements would only be relevant to provide the reason for the actions of third parties, *i.e.*, the Mexikanemi members. Thus, we conclude that the testimony was not admissible under Rule 803(3). *See* Tenn. R. Evid.

803(3), Advisory Comm'n Cmts.; *Leming*, 3 S.W.3d at 17-18; *Farmer*, 927 S.W.2d at 595.

### 5. Statements made by Mr. Hernandez and Mr. Hill during their argument at Cabin 9

The Defendant asserts that the statements made by Mr. Hernandez and Mr. Hill during their argument at Cabin 9 were offered for the purpose of establishing their state of mind and for the impact those statements had on the Defendant. Upon review, we note that the Defendant did not testify about the impact the statements had on him during the defense proffer. Additionally, despite the trial court's initial ruling, the Defendant testified about the argument at Cabin 9 during trial. The Defendant testified that he drove Mr. Hill back to Cabin 9, and they both went into the cabin. The Defendant testified that there was "an intense discussion" between Mr. Hill and Mr. Hernandez at that time and that it looked like the men were going to fight. Mr. Hernandez was angry and scared and "wasn't happy with the way things were going." The Defendant explained that, although the agreed-upon sale price for the marijuana had been between $1100 and $1300 per pound, Mr. Hernandez was "getting considerably less" from Mr. Hill—around $700 to $800 per pound. Because the Defendant was able to put this evidence before the jury, any error in the trial court's ruling did not affect the judgment or result in prejudice to the judicial process. *See* Tenn. R. App. P. 36(b); *State v. Rodriguez*, 254 S.W.3d 361, 375 (Tenn. 2008). The Defendant is not entitled to relief.

### 6. Mr. Hernandez's and Mr. Hill's response to the Defendant's refusal to be the driver to and from Texas

The Defendant asserts that the responses from Mr. Hernandez and Mr. Hill to the Defendant's refusal to drive were admissible for the impact on the Defendant, *i.e.*, "to show why the Defendant became alarmed and fearful." Once again, it appears from the record that, despite the trial court's ruling, the Defendant was allowed to present the substance of these statements. Specifically, the Defendant testified that he realized he was "in over his head" when Mr. Hernandez spoke of the plan to use the Defendant to transport him and marijuana from Texas. The Defendant testified that Mr. Hernandez did not accept his refusal to drive; instead, Mr. Hernandez asked the Defendant for his phone number because he wanted to be able to contact the Defendant directly. The Defendant testified that, rather than arguing with Mr. Hernandez about it, he decided to talk to Mr. Hill about the plan. He stated that he believed Mr. Hill would "be reasonable" about the situation because Mr. Hill knew that the Defendant lived at home with his mother. The Defendant stated, however, that when he explained to Mr. Hill why he could not do it, Mr. Hill did not accept his explanation. Mr. Hill said that the Defendant did not have any choice about whether to drive Mr. Hernandez. Because the Defendant was able to put this evidence before the jury, any error in the trial court's ruling did not affect the

judgment or result in prejudice to the juridical process. *See Rodriguez*, 254 S.W.3d at 375. The Defendant is not entitled to relief based on this claim.

### 7. Mr. Hernandez's statements to the Defendant that the Defendant would be dealing directly with him instead of Mr. Hill and would be "selling more weight"

The Defendant argues that Mr. Hernandez's statements that the Defendant would be dealing directly with him instead of Mr. Hill and would be "selling more weight" were admissible for the impact on the Defendant and not for the truth of the matter asserted. It appears from the record that, in fact, the Defendant testified to these statements at trial. He testified that Mr. Hernandez stated that the Defendant was "gonna be selling more marijuana, a lot of . . . large amounts of marijuana." The Defendant explained that Mr. Hernandez asked the Defendant for his phone number because he wanted to be able to contact the Defendant. Mr. Hernandez then stored his phone number in the Defendant's cell phone under the name "Lobo." The Defendant also testified that, during the conversation, he realized that he was in "way [] over his head" but that, rather than arguing with Mr. Hernandez, he decided to talk to Mr. Hill about the plan. The Defendant's trial testimony is nearly identical to his proffered testimony. As such, any error in the trial court's ruling did not affect the judgment or result in prejudice to the judicial process, and we see no basis for relief based on the Defendant's claim.

### 8. Mr. Hill's conversations with the Defendant about Mr. Hernandez

The Defendant argues that Mr. Hill's statements and questions about Mr. Hernandez were admissible under Rule 803(3) to show Mr. Hill's state of mind and were also admissible to "provide the reason for [the Defendant]'s fear." From a review of the record, it is clear that the Defendant testified to the substance of his conversations with Mr. Hill about Mr. Hernandez. He testified that Mr. Hill was mad at Mr. Hernandez "for approaching [the Defendant] to sell marijuana" and that, by their second phone call, Mr. Hill was "very mad" at the Defendant as well. Once at Mr. Hill's residence, Mr. Hill began "grilling" the Defendant about what he had said to Mr. Hernandez. The Defendant assured Mr. Hill that he had "take[n] up" for Mr. Hill. However, Mr. Hill did not believe the Defendant. The Defendant testified that he feared Mr. Hill would "smack" him. He said that he was scared of what Mr. Hill was accusing him of and felt threatened by Mr. Hill. The further Defendant testified:

> Because what we were talking involved way, way, way more than what I was prepared to do and it was on so many levels on top of what I was, what I could ever be. And I knew that there was [sic] some serious people involved and I couldn't - I didn't want to be involved in this. And they

were - they were telling me that I was involved, that I was gonna be involved, that I didn't have any choice about it.

Here, the trial court clearly allowed the Defendant to testify extensively about the conversations with Mr. Hill about Mr. Hernandez and about the impact of those conversations on the Defendant. There is nothing in the defense proffer that was not testified to by the Defendant at trial. Because the Defendant was able to put this evidence before the jury, any error did not affect the judgment or result in prejudice to the judicial process. *See Rodriguez*, 254 S.W.3d at 375. Accordingly, the Defendant is not entitled to relief on this ground.

### 9. Mr. Hill's statement during his late-night phone call to the Defendant that "[t]here's something we've gotta do"

The Defendant contends Mr. Hill's statement that "[t]here's something we've gotta do," although hearsay, was admissible under Rule 803(3) to establish Mr. Hill's state of mind. The trial court ruled that the statement was not admissible. We agree with the Defendant that the statement at issue reflects Mr. Hill's then-existing mental state and intent to do "something" and would be admissible to prove Mr. Hill's future conduct. Nevertheless, the trial court determined that the purpose of the Defendant's proposed testimony was to try "to prove the plan of what you're referring to as the Mexican Cartel or the Mexican Mafia." Because the testimony was offered to prove conduct of not only the declarant but of another person, the testimony was not admissible under Rule 803(3). *See* Tenn. R. Evid. 803(3), Advisory Comm'n Cmts.; *Leming*, 3 S.W.3d at 17-18; *Farmer*, 927 S.W.2d at 595.

Although not specifically argued by the Defendant on appeal, the statement could have been admissible as non-hearsay for the effect it had on the Defendant, *i.e.*, that it caused the Defendant to get out of bed and drive to Mr. Hill's residence on the night of the murders. *See Venable*, 606 S.W.2d at 301. We conclude, however, that any error in excluding Mr. Hill's statement was harmless because the Defendant was allowed to testify about the effect that Mr. Hill's phone call had on him. The Defendant testified that, after the call, he put clothes back on and went to Mr. Hill's residence because the Defendant did not want Mr. Hill to continue to be angry with him. The Defendant is not entitled to any relief on this ground.

### 10. Mr. Hill's statements to the Defendant after the murders threatening the Defendant's family

The Defendant contends that the trial court erred in excluding Mr. Hill's threat the morning after the murders. Specifically, the Defendant testified that Mr. Hill said, "[W]e

know where your family's at. We know where you're all at out on the highway. We know where your granddaddy lives over in the Ville. We know where your grandparents live. You know what'll happen." The Defendant argues that Mr. Hill's statements were not offered for the truth of the matter asserted but for the non-hearsay purposes of providing context for and explaining why the Defendant was selling or attempting to sell the victims' property. The State appears to respond that any error in the exclusion of this testimony was harmless because the Defendant was able to put before the jury the "tall Mexican's" threats on the night of the murders and because the Defendant was allowed to testify that as a result of his conversation with Mr. Hill the following morning he "had to sell all the stuff quick . . . so that [they] wouldn't have to worry about it."

Upon review, we agree with the Defendant that Mr. Hill's statements were non-hearsay because they were offered for the effect on the hearer, the Defendant, and would tend to establish that the Defendant was acting under duress when he sold the victims' property as instructed by Mr. Hill the day after the crime. *See Venable*, 606 S.W.2d at 301. Nevertheless, we cannot conclude that the error more probably than not affected the judgment. As noted by the State, the Defendant testified extensively regarding the threats made the previous night when the victims were killed. Specifically, the Defendant testified that the "tall Mexican" told him, "This is what happens to people who think that they can f*** with us" and stated, "You are going to do every[thing] and anything that you're told to do or this s*** [will] happen again." The Defendant testified that he was not at the victims' residence that night of his own free will and that he did not want to enter the house. He went in because the "tall Mexican" made him. The Defendant further testified to his fear and terror following the murders and stated, "They thought that they had just killed my great-granny and [Mr. Hill] knew where my mama lived, where my brothers lived." Moreover, the Defendant testified that he asked Mr. Hill what to do with the victims' property and that he acted to sell the victims' property based on Mr. Hill's instructions. The Defendant testified that, when he sold the items taken from the victims' residence, he was not acting of his own free will. He said that he had not wanted to sell the items. Accordingly, the Defendant is not entitled to relief based upon the trial court's erroneous exclusion of Mr. Hill's statements.

*B. Right to Present a Defense*

"Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence." *State v. Flood*, 219 S.W.3d 307, 315-16 (Tenn. 2007). "Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony." *Id.* at 316 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)). In *Washington v. Texas*, the United States Supreme Court stated:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. 14, 19 (1967).

The right to present witnesses, while of critical importance, is not absolute. *Brown*, 29 S.W.3d at 432 (quoting *Chambers*, 410 U.S at 295). "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id.* "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

Based on our review, the evidence excluded by the trial court as hearsay consisted of Mr. Hill's statements about his plan to short Mr. Hernandez; Mr. Hernandez's statements indicating that he knew that Mr. Hill was shorting him; Mr. Hill's statement that "we've gotta do something"; and Mr. Hill's statements after the murders threatening the Defendant's family. In order to determine whether the exclusion of this evidence rises to the level of a constitutional violation, we consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301). We must carefully consider the facts of the case to determine whether the constitutional right to present a defense was violated by this exclusion of evidence. *See id.* at 433.

### 1. Evidence critical to the defense

The United States Supreme Court has recognized that an exclusion of evidence is unconstitutional when it "significantly undermine[s] fundamental elements of the defendant's defense." *See Scheffer*, 523 U.S. at 315. The question of whether excluded evidence is critical to a defense is a fact-specific inquiry. *See Chambers*, 410 U.S. at 303. Types of evidence previously recognized as critical to the defense include: evidence that

someone else confessed to the crime, *Chambers*, 410 U.S. at 300; evidence that a minor victim had sex with an adolescent to establish an alternative basis for the child's injury, *Brown*, 29 S.W.3d at 434-36; evidence of the defendant's hypnotically enhanced memories to his establish his recollection of the crime, *Rock v. Arkansas*, 483 U.S. 44, 62 (1987), and testimony about the circumstances and voluntariness of the defendant's confession, *Crane v. Kentucky*, 476 U.S. 683, 691 (1986).

In this case, Mr. Hill's plan to short Mr. Hernandez and Mr. Hernandez's knowledge of the plan would establish a motive for Mr. Hernandez and the Mexikanemi to retaliate against Mr. Hill, not against the Defendant. Additionally, although Mr. Hill's threat to the Defendant following the murders would tend to show that the Defendant was acting under duress when selling the victims' property, the Defendant was allowed to testify about the threats from the "tall Mexican" and about the fear and terror he felt following the murders. The Defendant testified that he was not at the victims' residence that night of his own free will and that he did not want to enter the house. He went in because the "tall Mexican" made him. The Defendant also stated that, when he sold the items taken from the victims' residence, he was not acting of his own free will. He said that he was acting on Mr. Hill's instructions and that he had not wanted to sell the items. The Defendant testified that Mr. Hill knew where his family lived and that he "wasn't gonna let that happen to [his] family." Thus, evidence that the Defendant was acting under duress was presented to the jury. Likewise, although the jury did not hear Mr. Hill's statement that "we've gotta do something," the jury heard the effect Mr. Hill's statement had on the Defendant—the purpose for which it would have been admissible. Because the exclusions did not significantly undermine any elements of the defense, the exclusions did not consist of the type of evidence that has previously been recognized as critical, and in light of the Defendant's additional testimony concerning duress, we conclude that the excluded testimony was not critical to the defense.

## 2. Sufficient indicia of reliability

We agree with the Defendant that Mr. Hill's statements regarding his shorting of Mr. Hernandez and Mr. Hernandez's statements that he knew Mr. Hill was shorting him have some indicia of reliability. Both Mr. Hill and Mr. Hernandez testified at trial that Mr. Hernandez brought marijuana from Texas, which Mr. Hill was to sell for an agreed-upon price. Additionally, Mr. Hill testified that he paid Mr. Hernandez considerably less than what Mr. Hernandez wanted for it because, according to Mr. Hill, the marijuana was of poor quality. Mr. Hernandez, however, testified Mr. Hill had "ma[de] up stories about [how] the weed [wa]s no good." The Defendant's testimony about Mr. Hill's statement that "we've gotta do something," however, bares no indicia of reliability except that the defense offered phone records that showed Mr. Hill called the Defendant at 11:42 p.m. on the night of the murders. Finally, nothing indicates that the Defendant's testimony—that

Mr. Hill threatened him and his family following the murders—was reliable. We conclude that, although the excluded statements about Mr. Hill shorting Mr. Hernandez and Mr. Hernandez's awareness of this contain some indicia of reliability, this consideration is not determinative under the facts and circumstances of this case.

### 3. Interest supporting exclusion

Here, the interests supporting exclusion are the interests behind Rule 802 of the Tennessee Rules of Evidence. Rule 802 provides generally that hearsay is not admissible and serves an important interest in excluding testimony that is untrustworthy. The United States Supreme Court described the interest behind the hearsay rule in *Chambers*:

> The hearsay rule, which long has been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of the statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

410 U.S. at 298 (citing *California v. Green*, 399 U.S. 149, 158 (1970)).

As we have previously determined, Mr. Hill's statements about his plan to cheat Mr. Hernandez and Mr. Hernandez's statements indicating that he knew Mr. Hill was cheating him do not fall within a recognized hearsay exception and were, thus, excluded based on their unreliability. Accordingly, the interests behind Rule 802 supported the exclusion of this testimony. Moreover, the exclusion of this evidence did not significantly undermine any elements of the defense. *See Scheffer*, 523 U.S. at 315. We conclude, therefore, that the trial court's exclusion of this testimony did not deny the Defendant the right to present a defense.

Mr. Hill's statement that "we've gotta do something" and his statements threatening the Defendant's family following the murders were admissible for the non-hearsay purpose of showing their effect on the listener, and the interests behind Rule 802 did not support the exclusion of this testimony. However, in light of our earlier conclusion that this evidence bares no indicia of reliability and our conclusion that the Defendant's testimony was not critical to the defense, we conclude that the trial court's exclusion of this testimony did not deny the Defendant the right to present a defense.

### III. Exclusion of Testimony from the Defendant's Crime Scene Expert

The Defendant next contends that the trial court abused its discretion by excluding relevant and material testimony from the Defendant's crime scene investigation expert, Ms. Johnson, which would have corroborated the Defendant's testimony that the victims were killed by more than one perpetrator. He contends that the trial court failed to apply the correct legal standard governing the admission of Ms. Johnson's testimony and that the trial court's error was "determinative and highly prejudicial" because it eliminated the Defendant's corroborating evidence and "left the prosecution free to repeatedly and emphatically argue that there was no evidence to corroborate the Defendant's testimony." The State responds that the trial court properly excluded Ms. Johnson's testimony as speculative and that, in any event, any error is harmless because Dr. Valdez testified to the same matters.

At a jury-out *voir dire* hearing conducted before her testimony, Ms. Johnson testified that she was a forensic specialist based out of Florida. Ms. Johnson explained that, as a forensic specialist, she collected and analyzed forensic evidence from crime scenes and participated in crime scene reconstruction. She explained that, as part of her work as a crime scene reconstructionist, she would "study a case, take the forensic evidence from the case and form a hypothesis . . . and then [] test the hypothesis and then come up with the final conclusion" of what she believed occurred at a crime scene. When asked if she was able to use forensic facts to determine whether or not a crime was committed by more than one person, Ms. Johnson stated, "Sometimes that's possible. You may have an opinion based upon your training and experience throughout the years."

Ms. Johnson reviewed her extensive credentials, including her education, training, and more than thirty years of experience in crime scene analysis. Ms. Johnson explained that she began her career in 1967 working for the FBI as a fingerprint examiner. She then worked with the Florida Department of Law Enforcement, where she was trained to conduct crime scene analysis for the State of Florida. Following her training, Ms. Johnson worked as a crime scene analyst for ten counties in conjunction with other law enforcement agencies. Ms. Johnson explained that she started her own forensics training business where she trained local law enforcement in Florida and other states on bloodstain pattern analysis and basic and advanced crime scene analysis. She stated that she also opened her own lab in Pensacola, where she screened evidence for fingerprints, DNA, gunshot residue, and trace materials. Ms. Johnson stated that she could look at crime scene photographs and, based upon her education, training, and experience, testify as to whether a crime scene was properly documented. Ms. Johnson further stated that she was certified as a "Senior Crime Scene Analyst" by the International Association for Identification—the oldest and largest forensic association both in the United States and internationally. She stated that she had conducted bloodstain pattern analysis in

"[t]housands" of cases. Regarding crime scene reconstruction, Ms. Johnson explained, "When you first get to a crime scene oftentimes it's hard to sort out what has happened. But based upon the documentation, the analysis of the crime scene and the forensic evidence at the scene, . . . you start to put the pieces together." She stated that the job of a crime scene reconstructionist was to "sequence things" at a crime scene and put the events that occurred at the scene "in order." She testified that she had trained law enforcement officers, prosecutors, and defense attorneys on "basic and advanced crime scene techniques, basic and advanced blood stain pattern analysis" and that she had previously testified as an expert in crime scene analysis "[n]umerous times."

Regarding the Defendant's case, Ms. Johnson testified that she had reviewed and analyzed the evidence collected by the TBI and the Lake County Sheriff's Office, including the photographs, crime scene video, and lab reports, and she stated that she had independently examined and tested the tangible items of evidence collected. She testified that she could "look at crime scene photographs based upon [her] education and training and experience and tell [] if a scene has been properly documented or not." Additionally, she reiterated that as a crime scene analysist she could "look at the forensic evidence and look at the scene and form a hypothesis." The Defendant tendered Ms. Johnson as an expert in "the area of crime scene investigation, blood spatter and crime scene analysis, evidence identification, and concerning the procedures and protocols required [for the proper collection and examination of evidence]."[9]

During Ms. Johnson's subsequent trial testimony before the jury, the following colloquy occurred:

[DEFENSE COUNSEL]: The State's scenario is that [the Defendant] acted alone by himself, attacked the Shells and carried out . . . these two murders. The defense's position is that there were four people that went in the house and attacked the Shells and killed them, killed them quickly. I want you to assume that those are the two positions. Based upon your experience, education and expertise in the field of crime scene reconstruction, analysis and examination and your years of experience, which, if either, of those scenarios is consistent with what you found?

[THE STATE]: Objection.

THE COURT: Now, wait just a second. Approach the bench.

---

[9] Although the trial court did not specifically state that Ms. Johnson was qualified to give an expert opinion following the jury-out *voir dire*, it is apparent from her subsequent testimony before the jury that the trial court concluded she was qualified to give expert testimony.

. . .

THE COURT:  You're far afield, [defense counsel].

[DEFENSE COUNSEL]:  I don't think so.

THE COURT:  I think you are.

[THE STATE]:  Your Honor --

THE COURT:  It's not in her area of expertise.

[THE STATE]: And she's testified that she didn't have enough to do a reconstruction.  She said the evidence wasn't gathered, Your Honor.

THE COURT: I'm gonna sustain the objection.

During a subsequent jury-out hearing, the Defendant made an offer of proof regarding Ms. Johnson's proposed testimony.  The following exchange occurred:

[DEFENSE COUNSEL]:  Based upon your review of the TBI evidence that was presented to you, documents in the file, the lab reports, your own independent testing, your experience, education and expertise and your analysis of the evidence in this case, I want you to assume two different scenarios.  The first scenario is the State's position that [the Defendant] acted alone, went into this house sometime the late evening of March the 3rd . . . and brutally attacked these two individuals, acted alone. The second scenario is that four individuals went into the house, three at a time -- three Mexicans with knives and a 6'1" 279-pound man went in who also had a knife and that they killed these people with these violent attacks. Based upon the blood spatter that came from the victims, based upon the position of the furniture that's in the house as shown in the photographs, which of those two scenarios is the most consistent with the evidence presented?

[MS. JOHNSON]:  The one with the three individuals.

[DEFENSE COUNSEL]: Why?

- 71 -

[MS. JOHNSON]:  Because I -- By looking at the scene and all the evidence that I reviewed, to me this was a more controlling attack versus someone who's trying to ward off two individuals.

[DEFENSE COUNSEL]:  Okay.  Assuming that someone stabbed Mr. Clarence Shell seven up to nine times, and assuming that they stabbed Mrs. Shell multiple times, which scenario would be more consistent?

[MS. JOHNSON]:  Again, the one with the three individuals.  More controlling.

Ms. Johnson explained that a "controlling attack" meant that "[s]omeone is basically attacking each person separately at the same time."

The State cross-examined Ms. Johnson regarding her proffer, and the following exchange took place:

[THE STATE]:  Ms. Johnson, you testified about the failure to document and record evidence already today, is that correct?

[MS. JOHNSON]:  Yes.

[THE STATE]:  And that evidence would be necessary for you to reconstruct the crime scene, is that correct?

[MS. JOHNSON]:  The collection of that evidence, yes.

[THE STATE]:  Yes, ma'am.  And that evidence was not collected?

[MS. JOHNSON]:  No.

[THE STATE]:  So the opinion you just stated is based on assumption?

[MS. JOHNSON]:  The opinion is based upon the forensic evidence that I looked at to include the crime scene photographs, the TBI's documentation, the evidence that was collected from [the Defendant] and all the other evidence.

[THE STATE]:  Okay.

[MS. JOHNSON]:  That is my opinion.

[THE STATE]:  That's what I'm saying.  You're not able to reconstruct because the evidence isn't there?

[MS. JOHNSON]:  I may be able to go further with reconstruction as far as sequencing who was killed first or second based upon the blood evidence but I can't go any further than I've just stated.

[THE STATE]:  And the blood spatter that you saw in the photograph, without further measurement, further pictures, can you come to any results from that blood spatter?

[MS. JOHNSON]:  No, sir.

[THE STATE]:  Okay.  And so [your] opinion is based strictly on the number of wounds that they had and the lack of any signs of struggle?

[MS. JOHNSON]:  And also, that obviously there was personal contact with both individuals because they both had defensive injuries.

[THE STATE]:  Thank you.

[MS. JOHNSON]:  So that would put the perpetrator up close and personal versus twenty-five feet away.  So I would expect some spatter of blood . . . on that individual.


. . . .

[THE STATE]:  What . . . specifically did you see that would indicate more than one perpetrator from the evidence?

[MS. JOHNSON]:  If it's a controlling situation there may be no evidence of that.

[THE STATE]:  Okay.  So that's what I'm saying.  There is no evidence of a second perpetrator?

[MS. JOHNSON]:  I didn't see any evidence of a second perpetrator.

- 73 -

[THE STATE]:  Thank you.

[MS. JOHNSON]:  With the evidence that was collected and processed.

At the conclusion of the defense proffer, the trial court commented, without elaboration or explanation, "I'm even more confident after hearing your offer of proof [that] I was correct in sustaining the objection."  The trial court further addressed the issue in its order denying the Defendant's motion for new trial, stating that Ms. Johnson's testimony was excluded because "the evidence that she was prepared to give was speculative."

*A. Tennessee Rules of Evidence 702 and 703*

The admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703.  *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005).  Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."  Tenn. R. Evid. 702.  Rule 703 provides that

[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.  Our supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

Trial courts act as gatekeepers when it comes to the admissibility of expert testimony.  Their role "is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  A court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation."

*State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations omitted).

When determining the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to give an opinion within the limits of the witness's expertise. *Scott*, 275 S.W.3d at 402; *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). "The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." *Stevens*, 78 S.W.3d at 834. Additionally, trial courts "must analyze the science and not merely the qualifications [of the expert]." *Scott*, 275 S.W.3d at 402 (quoting *McDaniel v. CSX Transp.*, Inc., 955 S.W.2d 257, 265 (Tenn. 1997)) (internal quotation marks omitted). Our supreme court explained in *Scott*:

> Analyzing the science requires the trial court to consider whether the "basis for the witness's opinion, *i.e.*, testing, research, studies, or experience-based observations, adequately supports that expert's conclusions" to ensure that there is not a significant analytical gap between the expert's opinion and the data upon which the opinion is based. As part of this analysis, the courts should consider how and why the expert was able to extrapolate from certain data to the conclusions that he or she has reached. When assessing the connection between an expert's conclusions and the underlying data upon which those conclusions are based, expert testimony may warrant exclusion where "there is simply too great an analytical gap between the data and the opinion proffered."

*Id.* at 402-03 (internal citations and footnote omitted).

Courts should also consider the methodological and foundational reliability of the expert's testimony. *Id.* at 403. In *McDaniel*, our supreme court provided the following non-exhaustive list of factors for a trial court to consider in assessing methodological and foundational reliability:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d at 265; *see also Scott*, 275 S.W.3d at 403-04. Trial courts need not apply these factors rigidly. *Copeland*, 226 S.W.3d at 302. Moreover, because not all expert testimony will "fit" with these factors, the exact considerations that may be appropriate

will vary depending upon "the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony." *Brown*, 181 S.W.3d at 277.

Our supreme court has acknowledged that not all expert testimony is based on scientific theory and methodology and that some expert testimony is based on "nonscientific 'specialized knowledge,' that is, the expert's experience." *Stevens*, 78 S.W.3d at 832-33. In determining whether nonscientific expert testimony should be admitted, trial courts may consider the following:

> (1) the *McDaniel* factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered.

*Id.* at 834-35. A trial court "may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by a rational explanation which reasonable [persons] could accept as more correct than not correct." *Id.* at 834 (internal quotation marks omitted).

It is well-established that questions regarding the admissibility, relevancy, and competency of expert testimony are left to the broad discretion of the trial court. *Brown*, 181 S.W.3d at 273; *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion." *Brown*, 181 S.W.3d at 273; *see also McLeod*, 937 S.W.2d at 871. A trial court abuses its discretion "when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404-05 (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

In disallowing Ms. Johnson's testimony that it had been a "controlling attack," in which the victims were attacked simultaneously by multiple people, the trial court stated that the testimony was "outside her area of expertise." However, Ms. Johnson's extensive credentials and more than thirty years of work in the field show that she was highly qualified "by knowledge, skill, experience, training, [and] education" to provide expert testimony on the subject matters proffered by the defense. *Scott*, 275 S.W.3d at 402. Additionally, it appears that there was not a significant analytical gap between Ms. Johnson's opinion and the data upon which it was based. *See id.* at 402-03*; Stevens*, 78 S.W.3d at 834-35. Ms. Johnson testified that she reviewed the crime scene photographs, the evidence collected from the Defendant, the TBI's documentation, and the blood

spatter. She explained that the evidence showed a more "controlling attack," meaning that the victims were attacked "separately [and] at the same time," and thus, the evidence was more consistent with the scenario proposed by the defense that three individuals were involved in the murders rather than one. Ms. Johnson testified that this conclusion was based on the position of the furniture in the residence, the number of stab wounds, the lack of any signs of a struggle, the defensive wounds found on the victims, and the proximity of the perpetrator to both victims. Ms. Johnson acknowledged that her conclusions were limited by the lack of adequate collection and documentation of evidence by investigators and explained that she was unable to go further in reconstructing the crime scene "as far as sequencing who was killed first or second based upon the blood evidence." As to the methodological and foundational reliability of her testimony, we note that the State did not object to the reliability of her field of expertise itself and that testimony about crime scene analysis and reconstruction is routinely admitted in criminal cases. *See e.g., Stevens*, 78 S.W.3d at 828, 831; *State v. William Langston*, No. W2015-02359-CCA-R3-CD, 2017 WL 1968827, at *5-6 (Tenn. Crim. App. May 12, 2017), *Rule 11 app. filed*; *State v. Christopher Michael Ferrell*, No. M2015-01011-CCA-R3-CD, 2016 WL 6819784, at *9 (Tenn. Crim. App. Nov. 18, 2016), *perm. app. denied* (Tenn. Mar. 9, 2017); *State v. Pamela Taylor*, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at *32, 34 (Tenn. Crim. App. Sept. 30, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015); *State v. Deon Lamont Cartmell*, No. M2012-01925-CCA-R3-CD, 2014 WL 3056164, at *7, 11 (Tenn. Crim. App. July 7, 2014), *perm. app. denied* (Tenn. Nov. 20, 2014); *State v. Cyntoia Denise Brown*, No. M2007-00427-CCA-R3-CD, 2009 WL 1038275, at *30 (Tenn. Crim. App. Apr. 20, 2009), *perm. app. denied* (Tenn. Sept. 28, 2009). The State points to the trial court's finding in denying the Defendant's motion for new trial that Ms. Johnson's proffered testimony was properly excluded because it was "speculative" and argues that because Ms. Johnson testified that she "didn't see any evidence of a second perpetrator . . . [w]ith the evidence that was collected and processed[,]" her conclusions were speculative. However, before this statement, Ms. Johnson had testified to the facts and evidence that supported her conclusion that the murders were part of a "controlling attack."

In this case, Ms. Johnson was qualified to give an expert opinion regarding her analysis of the crime scene; her opinion that the evidence supported a conclusion that the victims were attacked simultaneously in a "controlling attack" did not have a significant analytical gap; the methodology did not provide grounds for exclusion; and her testimony would have assisted the trier of fact in determining whether the Defendant's story was credible. We conclude that the trial court abused its discretion by basing its decision on a clearly erroneous assessment of the evidence.

Regarding trial errors, our supreme court has previously stated:

> All errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial. Accordingly, for the purpose of the harmless error analysis, this Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories of error are more than academic because they define the standards that the appellate courts use to determine whether each category of error can be harmless.

*Rodriguez*, 254 S.W.3d at 371. Structural constitutional error requires automatic reversal. *Id.* (citing *Cottingham v. Cottingham*, 193 S.W.3d 531, 537 (Tenn. 2006); *State v. Scott*, 33 S.W.3d 746, 755 n. 6 (Tenn. 2000)). Non-structural constitutional error does not require automatic reversal but shifts the burden to the State to prove beyond a reasonable doubt that the error is harmless. *Id.* at 371-72 (citing *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002); *State v. Rice*, 184 S.W.3d 646, 670 (Tenn. 2006)). Non-constitutional error places the burden on the Defendant to prove "that the error more probably than not affected the judgment or would result in prejudice to the judicial process." *Id.* at 372.

The State asserts that any error in the exclusion of Ms. Johnson's testimony was harmless based on the testimony of Dr. Valdez. We disagree. Although Dr. Valdez testified that, in his estimation, "a single person could not have committed the murders," Dr. Valdez was not an expert in forensic crime scene analysis. He testified as an expert in gangs. We agree with the Defendant that Ms. Johnson's proffered testimony was significant because it would have corroborated the Defendant's testimony that the murders were committed by multiple perpetrators and rebutted the State's theory that the Defendant acted alone. Without Ms. Johnson's expert testimony, the Defendant's testimony was largely uncorroborated by other proof. Accordingly, we believe that the error resulted in prejudice to the judicial process, and the trial court's error cannot be considered harmless. The Defendant is entitled to a new trial.

### B. Right to Present a Defense

In his brief, the Defendant also asserts that he has a constitutional right to offer the testimony of witnesses and that his right to present a defense was implicated by the trial

court's exclusion of Ms. Johnson's expert testimony.[10]  As previously discussed, "[e]xclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence."  *Flood*, 219 S.W.3d at 315-19.  "Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony." *Id.* (citing *Chambers*, 410 U.S. at 294); *Brown*, 29 S.W.3d at 431.  In order to determine whether the exclusion of this evidence rises to the level of a constitutional violation, we consider whether:  (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.  *Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301).

Applying this test to the facts of this case, we agree with the Defendant that Ms. Johnson's proffered testimony would have corroborated the Defendant's testimony that the murders were committed by multiple perpetrators and rebutted the State's theory that the Defendant alone killed the victims.  During closing arguments, the State argued repeatedly that there was no evidence to corroborate the Defendant's version of events. For example, the State argued:

> And there's no forensic or physical evidence of any kind that points to anyone else other than the [D]efendant.
>
> . . . .
>
> Every piece of physical evidence, tangible evidence, [and] testimony other than the [D]efendant's own testimony points to him and him only.
>
> . . . .
>
> [I]n order for you to conclude that anyone else was involved in this you have to believe the [D]efendant.  And you heard his testimony and . . . it's just not believable.
>
> . . .

---

[10] We note that the Defendant's assertion is contained in one sentence of his brief, and the brief contains no analysis of this issue.  As such, the issue is dangerously close to being considered waived by the court.  *See* Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A).  Due to the nature of the case and the gravity of the Defendant's convictions, however, we will review the issue in the interest of justice.

And the reason I'm telling you [that] you can't believe his story is where is there any corroboration or proof that what he's telling you is the truth? Where is there any proof that there's these other three gang members there? That [Mr.] Hill's there?

. . .

Did [the Defendant's experts] give you one thing to substantiate [the Defendant's] story after four years? Not a word.

. . .

Did they bring in one witness that substantiates [the Defendant's] story? No.

Establishing corroboration of the Defendant's story was clearly critical to his defense. The Defendant was charged with first-degree murder in the deaths of two victims, and the State was seeking the death penalty. The trial court allowed Agent Bishop to testify for the State that he did not see any indication of a violent struggle between multiple people. Ms. Johnson's proffered testimony that the crime scene was consistent with the Defendant's claim that there were multiple perpetrators was a significant part of the otherwise slim evidence corroborating the Defendant's testimony about the murders. Therefore, the proof sought to be introduced in this case was substantially critical to the defense. Additionally, Ms. Johnson's proffered testimony contains sufficient indicia of reliability. As previously explained, Ms. Johnson was highly credentialed and had over thirty years' experience in her area of expertise, and she provided a reasonable explanation for the basis of her opinion. Dr. Valdez's testimony that it was an "overwhelming attack" supported Ms. Johnson's proffered testimony, and the lack of blood on the Defendant's overalls, jeans, boots, and hat and inside his car supported her conclusion that the evidence was more consistent with the defense theory. Thus, it appears that Ms. Johnson's testimony was reliable. Finally, because we have determined that the trial court erred in excluding Ms. Johnson's testimony under Rules 702 and 703, the interest supporting exclusion is clearly not sufficient to prohibit the presentation of her testimony as part of the defense.

As explained previously, although Dr. Valdez opined that "a single person could not have committed the murders[,]" he was not an expert in forensic crime scene analysis; he testified as an expert in gangs. Ms. Johnson's proffered testimony would have corroborated the Defendant's story that the murders were committed by multiple perpetrators and rebutted the State's theory that the Defendant acted alone. Without Ms. Johnson's expert testimony, the Defendant's testimony was largely uncorroborated by

other proof. For these reasons, we conclude that the Defendant's constitutional right to present a defense was violated by the trial court's exclusion of Ms. Johnson's proffered testimony and that the State has not established that the error was harmless beyond a reasonable doubt. *See Rodriguez*, 254 S.W.3d at 372. Accordingly, the Defendant is also entitled to a new trial on this basis.

## IV. Prosecutorial Misconduct

The Defendant argues that he is entitled to a new trial because of prosecutorial misconduct. Specifically, he contends that prosecutors: (1) improperly interfered with a defense expert witness, causing the expert witness to withdraw; (2) misused a confidential offer of settlement to prepare Mr. Hill's testimony; (3) withheld exculpatory evidence consisting of Mr. Hill's statements and Agent Carter's report; and (4) made numerous improper statements during rebuttal closing argument. The State responds that the Defendant's claims are meritless and that he has failed to establish prosecutorial misconduct warranting a new trial.

### A. Improper Interference with a Defense Expert Witness

During a jury-out hearing at trial, the following exchange occurred regarding a designated defense expert witness, Lieutenant Anthony Carter of the Memphis Police Department:

> [DEFENSE COUNSEL]: Your Honor, I am -- regret having to bring this up, but something has happened with regard to one of our fact witnesses and our expert witnesses, that I think impacts this trial and impacts [the Defendant's] right to a fair trial with due process. We had, and have had since well before this affidavit was filed in -- obtained in September of 2013. And it was provided to -- I believe we provided it to the general and his office with a disclosure, well, at least the substance of it, anyway.

> . . . .

> [DEFENSE COUNSEL]: Okay. We contacted several law enforcement people to learn if there were gangs operating in this area. We learned that there were. Virtually every county except Lake County has acknowledged that they were and are. [Lieutenant] Carter is a 28-year veteran African-American, was contacted, he agreed, yes, they are here, and he agreed to testify about their activities and their modus operandi. We disclosed [Lieutenant] Carter, and it's my understanding, from what we

have been informed by [Lieutenant] Carter and people who work with him, that he had obtained permission from his director, to participate as a fact witness, not as a law enforcement officer, but as a fact witness and as an expert. It is my understanding that the Assistant District Attorney General Lance Webb contacted the higher-ups in the drug task force and asked them, ["]What in the world is he doing?["] As a result of that, . . . Michael Hardy came down on [Lieutenant] Carter and said, ["]It's probably best you don't do this.["] So [Lieutenant] Carter is now not going to testify because of that pressure.

[GENERAL] BIVENS: Your Honor, if I could clarify the record. Mr. Webb didn't contact anybody. When I got the CV on [Lieutenant] Carter and saw that he was an active officer with the Memphis Police Department, I contacted District Attorney Amy Weirich in Memphis and asked General Weirich if she was aware of [Lieutenant] Carter, and that he was shown as an expert witness for the defense in this case. She said, "I know him. That's unusual. He is no longer with the task force, has not been on the task force for some time." She said, "I'll find out what's going on." She contacted MPD and simply asked, you know, what he was doing testifying as a defense expert in the case. I think I even have the email back from her, that she forwarded me, that she had received from the deputy chief down there. The deputy chief said that he found out that [Lieutenant] Carter was working a secondary job with a private investigative firm in Memphis, that [defense counsel's] office had contacted, and that he was doing this as his secondary job. There was nothing in those emails about any action being taken against him, anything like that. I did contact . . . the head of that task force that he had been formerly on and asked him about rebuttal witnesses, and he gave me some names, and we have talked to those people. The other thing, Your Honor, I would point out is, the only thing we received, that said in that email, is he had been asked about gang activity in Tipton County, is what Investigator Clark told the people that had spoken to him. We've not taken any action to try to have him disciplined in any manner or prevent him from testifying, Your Honor.

[DEFENSE COUNSEL]: There is pressure placed without threats. There's --

THE COURT: What is it that you're suggesting, [defense counsel]?

[DEFENSE COUNSEL]: Your Honor, I suggest that we have a mistrial. But I'm reluctant to -- when -- when the State there is no conflict

between a fact witness who testifies, who happens to work for the State, and the State -- the State has an obligation not just to prosecute. The State has an obligation to find the truth. And when the State puts pressure directly or indirectly on a witness in a case, it deprives the defense [of] due process.

[GENERAL] BIVENS: Again, Your Honor, all we did was inquire about his background, that he was shown as an officer now on the police department -- Memphis Police Department. We inquired of District Attorney Weirich as to what his background was, was he still on the task force, was he still employed with the Memphis PD. We took no other action. And the only action she took, Your Honor, was to inquire with the deputy chief were they aware that he was testifying. And . . . their reply was, yes, he has a secondary job with Hogan -- I can't remember the name of the private investigator that is employed by [defense counsel's] firm in this case.

THE COURT: [Defense counsel], if he refuses to testify, you'll just have to find somebody else.

The Defendant then filed as an exhibit to the record an affidavit previously prepared by Lieutenant Carter. The affidavit read, in pertinent part:

1.      My name is Anthony Carter. I am currently serving as a lieutenant for the Memphis Police Department in Memphis, Shelby County, Tennessee. I have been a law enforcement officer in West Tennessee for 28 years. I have been active in gang investigations throughout my entire career, including several homicide investigations, and am currently the Assistant Commander for the Multi-Agency Gang Unit for West Tennessee. I have extensive training and education in the recognition of and activities of gangs who are often involved in violent criminal activities, including robbery, homicides, and random acts of gang violence. In my training, education, and experience as a law enforcement officer, I have studied the behaviors, activities, operations, rivalries, insignia, colors, and emblems of various gangs.

2.      The Law Office of J. Houston Gordon, counsel for [the Defendant], requested that I review crime scene photographs, evidentiary photographs, autopsy reports, and autopsy photographs from the homicides of Clarence and Sue Shell in Lake County, Tennessee. In reviewing the photographs taken by law enforcement at the crime scene on March 4, 2011 and later

provided to [d]efense counsel, I saw two specific photographs of two pieces of torn blue plaid fabric lying on the ground. The fabric pieces were on top of the grass and leaves despite the recent rain, indicating that the fabric had been placed or dropped in the yard within a very short time of when the photographs were taken. The photographs of the fabric pieces, both out of place and seemingly fresh, were of particular interest to me, because of the design and colors of the fabric and the appearance of possible stains and/or matter on or around the fabric.

3.     Based upon my education, training and years of experience, the fabric shown in the photographs taken at the scene is consistent with the colors, patterns and type of material displayed and at times worn by the predominantly Mexican gang, the Surenos. The Surenos, based on my training and experience, were active in West Tennessee in 2011.

4.     I have reviewed the photographs and diagrams showing the nature, location, and severity of the wounds to Clarence and Sue Shell in the two autopsy reports and autopsy photographs, both Clarence and Sue Shell appeared to suffer multiple lacerations and puncture wounds, including slicing wounds across both victims' necks. In both murders, the perpetrator would have to have been in close, direct contact with the victim. The perpetrator(s) clearly targeted the neck region on both victims, transecting the carotid artery of both Clarence and Sue Shell with the slicing wounds.

5.     Based upon my education, training, experience and my review of the photographs and reports regarding the murders of Clarence and Sue Shell, both the types of injuries and wounds sustained by the victims and the brutality of the crime are consistent with similar crimes carried out by Mexican gangs, such as the Surenos and Mexican Mafia, as well as the Mexican cartels, such as Los Zetas. These Mexican gangs and cartels frequently have enforcers and/or assassins commit these type of brutal slayings in an effort to "send a message" to someone who has crossed them in any way, including cheating the gang/cartel in a crime related business transaction. It is also not unusual for a gang member to call on another gang member from outside his area to carry out "hits" on designated victims in order to keep the requesting gang/gang member from being implicated.

During the hearing on the Defendant's motion for new trial, Amy Weirich testified that she was the District Attorney General for Shelby County, Tennessee. General Weirich stated that she received a phone call from one of the prosecutors in the

Defendant's case, General Bivens, concerning an officer with the Memphis Police Department, Lieutenant Anthony Carter. Regarding the phone call, General Weirich testified:

> As best I can recall, General Bivens called to let me know that there had been an officer with the Memphis Police Department who had been -- who was going to potentially testify for the defense in a murder case. And General Bivens was calling to find out if I knew who this officer was and if I knew any officers that might be willing to also come and testify in rebuttal for the State.

General Weirich testified that, at the time she received the phone call from General Bivens, Lieutenant Carter was a member of a multi-agency gang unit which focused on gang enforcement and suppression. General Weirich stated that she was chairman of the board of the multi-agency gang unit. As a result of her conversation with General Bivens, General Weirich called Director Tony Armstrong of the Memphis Police Department. She explained that she called Director Armstrong to "give him a heads-up" about Lieutenant Carter's testifying for the defense.

On cross-examination, General Weirich stated that during her conversation with General Bivens about Lieutenant Carter she said, "I know him, that's unusual." She explained that it was "[u]nusual that he would be testifying on behalf of the defense as an expert in the area of gangs, unusual that he would be testifying in a court other than [in] Shelby County, just, the circumstances were unusual." She told General Bivens that she would "find out what's going on," and then she contacted Director Armstrong.

Lieutenant Anthony Carter of the Memphis Police Department testified that he had worked for the police department for thirty-one years and had investigated gang-related crime since 1991. Lieutenant Carter stated that he reviewed the crime scene photographs at the request of defense counsel. Lieutenant Carter explained that, at the time he was contacted by the defense, he also worked for a private investigator at Haney & Associates. He recalled that he was scheduled to come and testify on behalf of the Defendant, but he was approached by one of his commanders "who thought it would be a conflict of interest for [Lieutenant Carter] to come and testify in this particular case." He stated that the commander did not say that he could not come to court but "strongly intimated that [he] probably shouldn't do it." Lieutenant Carter testified:

> Well, what he told -- came to me and said was that he had been contacted -- he didn't say who contacted him, but he had been contacted in regards to me coming and testifying. And my immediate supervisor first approached me, and then my chief had a conversation with me. And I just

- 85 -

felt like, because I've been in this department for [thirty] years at the time, that I didn't want to have any conflicts. I haven't had any problems, I didn't want to have any now. So it just -- just took the steam out of me even wanting to get involved.

He stated that, but for the pressure put on him, he would have testified at trial.

On cross-examination, Lieutenant Carter agreed that his commander did not tell him that he could not testify but stated that it was a conflict of interest. The chief also told him that it would be a conflict of interest. Lieutenant Carter stated that, but for the conversation with the chief, he would have testified at the Defendant's trial. He then identified an affidavit he prepared after his review of the case, which summarized what his expert testimony would have been if called as a witness by the Defendant.

In denying the Defendant's motion for new trial, the trial court found that there was "no basis for [the Defendant's] claim that the State interfered with Lieutenant Carter testifying in this case." The court concluded that the evidence "merely show[ed] that District Attorney Bivens contacted District Attorney Weirich only about a possible rebuttal witness."

On appeal, the Defendant asserts that the prosecutor, acting through the Shelby County District Attorney General, caused a designated defense expert witness, Lieutenant Carter, to withdraw from testifying on the Defendant's behalf. The State responds that the prosecutor's office did not improperly interfere with the Defendant's expert witness.

A defendant's right to present his own witnesses to establish a defense constitutes a fundamental element of due process and is protected by the Compulsory Process Clause of the Sixth Amendment. *Washington*, 388 U.S. at 19. ". . . *Washington v. Texas* clearly established that, under the Sixth Amendment, a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense." *Davis v. Straub*, 430 F.3d 281, 290 (6th Cir. 2005) (citing *Washington*, 388 U.S. at 23). Government conduct that rises to the level of "substantial interference" with a witness's "free and unhampered determination to testify" violates this right. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997); *see, e.g.*, *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam) (reversing the defendant's conviction when the trial court severely admonished the sole witness proffered by the defense who declined to testify as a result); *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973) (reversing a conviction obtained after a Secret Service agent, in an ex parte communication, advised a defense witness of possible prosecution if he testified). Even when such interference occurs, however, a violation of a defendant's right to call witnesses in his defense is subject to

harmless error analysis. *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001); *Foster*, 128 F.3d at 953 & n. 4.

In this case, after the prosecutor learned that Lieutenant Carter intended to testify on the Defendant's behalf, he called the prosecutor in Shelby County who, in turn, called Lieutenant Carter's supervisors to ask "what [Lieutenant Carter] was doing testifying as a defense expert in the case." Lieutenant Carter was then approached by both his commander and the chief of police, who informed him that it would be a "conflict of interest" for him to testify for the Defendant, and Lieutenant Carter's commander "strongly intimated that [he] probably shouldn't do it." Lieutenant Carter said that, based on these conversations, he was no longer willing to testify. He explained that he had been with the police department for thirty years and stated, "I haven't had any problems, I didn't want to have any now." Based on Lieutenant Carter's affidavit and testimony, it is clear that his proposed testimony was relevant and material to the defense. Moreover, it appears that the words used by Lieutenant Carter's superiors "could well have exerted such duress on the witness'[s] mind as to preclude him from making a free and voluntary choice whether or not to testify." *Davis*, 430 F.3d at 287 (quoting *Webb*, 409 U.S. at 98) (internal quotation marks omitted). Moreover, we can discern no valid reason for the Shelby County prosecutor's inquiring into "what [Lieutenant Carter] was doing testifying as a defense expert in the case," nor can we see how Lieutenant Carter's testimony was a conflict of interest as the Memphis Police Department had no part in the investigation into the victims' murders. Under these facts, we conclude that the government actors' conduct substantially interfered with Lieutenant Carter's prior determination to testify, in violation of the Defendant's constitutional right to present his own witnesses to establish a defense.

Our inquiry does not end here, however. As previously stated, a violation of a defendant's right to call witnesses in his defense is subject to harmless error analysis. *Emuegbunam*, 268 F.3d at 400. Lieutenant Carter was being offered as an expert witness to testify about Mexican gang activity in West Tennessee and about how aspects of the murders were consistent with the modus operandi of these gangs. During trial, the Defendant presented a gang expert, Dr. Valdez, who testified to the same matters. The Defendant has not explained how Lieutenant Carter's testimony would not have been cumulative to that of Dr. Valdez. Accordingly, we conclude that the interference in this case was harmless beyond a reasonable doubt.

### B. Misuse of a Confidential Offer of Settlement

The Defendant also contends that prosecutors improperly provided the Defendant's confidential offer of settlement to TBI agents who then revealed information

in the offer during an interview with Mr. Hill.[11] The trial court addressed this claim as follows:

> Next, the [D]efendant raises [as] error a claim that the prosecution improperly disclosed the contents of [the D]efendant's confidential offer of settlement . . . . The [D]efendant claims that witness, Shondell Hill, therefore, changed his testimony. There is no evidence in the record to indicate that [Mr.] Hill was advised of any confidential offer from the defendant to the State.
>
> . . .
>
> Agent Bishop testified that he never read any proffer letter although he was told there was one. He knew the gist of the letter. He did not visit with [Mr.] Hill. He testified that Mr. Van Hoosier of the T.B.I. directed the Lake County officers to see [Mr.] Hill. He did not know anything that they discussed. There was no evidence from either Mr. Hill or any other witness that any confidential offer settlement was discussed with [Mr.] Hill. The Court notes that [Mr.] Hill was a defense witness. The Court does not know the contents of the confidential offer. There is nothing to suggest that [Mr.] Hill was to receive any benefit from testifying or not testifying. The Court does not see how any such information could have caused [Mr. Hill] to change his testimony, if, in fact, he did change any testimony. The Court does not find any prosecutorial misconduct on the part of the State.

The record supports the trial court's findings in this regard. At the motion for new trial hearing, Agent Bishop testified that he knew only the "gist" of the Defendant's proposed settlement offer. He stated that he never read the settlement offer, he did not interview Mr. Hill about the offer, and he did not know what was said by Lake County investigators during their interview with Mr. Hill. Moreover, a copy of the confidential offer of settlement does not appear in the record, making it impossible to determine whether Mr. Hill had been made aware of the information contained in the offer based on his trial testimony. The Defendant failed to establish that prosecutors divulged the contents of the confidential proposed settlement offer or that investigators in any way discussed the contents of the offer with Mr. Hill.[12] Thus, he has not proven his claim of

---

[11] It is unclear from the record what was contained in this offer of settlement. As noted below, the offer was not introduced into evidence at trial.

[12] We also note that the Defendant failed to cite to any applicable case law in support of his argument in his brief.

prosecutorial misconduct in the handling of the confidential settlement offer. He is not entitled to relief on this ground.

## C. Withholding of Exculpatory Evidence

The Defendant also contends that prosecutors withheld exculpatory evidence in the form of a written report, containing statements made by Mr. Hill during an interview with TBI Special Agent Joshua Carter in June 2014. The Defendant contends that Mr. Hill's trial testimony could have been impeached, and the Defendant's corroborated, through the testimony of Agent Carter. However, Agent Carter was not identified as a witness because his report was not produced by the State before trial.[13] The State responds that the Defendant has failed to establish a *Brady* violation.

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to establish a *Brady* violation, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). "The prosecution is not required to disclose information that the accused already possesses or is able to obtain . . . or information which is not possessed by or under the control of the prosecution or another governmental agency." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing *State v. Caldwell*, 656 S.W.2d 864, 897 (Tenn. Crim. App. 1983) and *Banks v. State*, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). The defendant must prove, by a

---

[13] Although it is not entirely clear, it appears from the record that, following the motion for new trial hearing, General Webb contacted Agent Carter to inquire whether a report had been made following the TBI's second interview with Mr. Hill. On April 7, 2016, Agent Carter sent General Webb an undated written report, which contained Agent Carter's "recollection of an oral interview he conducted with [Mr.] Hill on June 19, 2014." General Webb then turned over Agent Carter's report to the Defendant.

preponderance of the evidence, that a *Brady* violation has occurred. *Edgin*, 902 S.W.2d at 389.

In order to establish a *Brady* violation, the evidence need not be admissible; it only needs to be favorable to the defendant. *State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensible, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (internal quotation marks omitted). Evidence is material under *Brady* "only if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). A "reasonable probability" is "a probability sufficient to undermine the confidence in the outcome." *Id.* (internal quotation marks omitted).

Here, the record establishes that the Defendant requested the information at issue, and the trial court ordered the State to turn over all such reports by law enforcement. Further, the State does not dispute that it failed to provide Agent Carter's report to the defense until after trial. The evidence appears favorable to the Defendant as it would have identified Agent Carter as a witness and potentially assisted the Defendant in his attempts to impeach Mr. Hill's testimony.

As previously noted, however, to make out a *Brady* claim the Defendant must also show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* The Defendant argues that Agent Carter's report contained numerous "patently false statement[s]" made by Mr. Hill to Agent Carter and asserts that he could have impeached Mr. Hill with these false statements at trial. Mr. Hill's trial testimony was generally consistent with his statement to Agent Carter; however, the Defendant contends that the following statements made by Mr. Hill to Agent Carter were false: that, on March 4, 2011, he had multiple missed phone calls from the Defendant around 4:00 a.m.; that he received a text message from the Defendant at 6:30 a.m., in which the Defendant asked Mr. Hill to call him; and that he called the Defendant early that same morning.

In addressing this issue, the trial court found that the issues raised from the report were covered in the Defendant's cross-examination of Mr. Hill, and we agree. A review of the record shows that the Defendant cross-examined Mr. Hill in detail about the number and timing of the phone calls and texts between Mr. Hill and the Defendant, using the stipulated phone records. For example, Mr. Hill acknowledged during cross-examination that his phone records did not show that the Defendant called him five or six

times on the morning of March 4. The Defendant had access to the stipulated phone records and used those to impeach Mr. Hill's testimony. Thus, we cannot conclude that the result of the proceeding would have been different had the State turned over Agent Carter's report. The Defendant is not entitled to relief on this ground.

### D. Improper Statements During Rebuttal Closing Argument

The Defendant alleges multiple instances of prosecutorial misconduct based on statements made by General Bivens during rebuttal closing argument. The Defendant contends that General Bivens: (1) made improper and repeated attacks on defense counsel; (2) improperly shifted the burden of proof; (3) misstated evidence; and (4) mocked and ridiculed the Defendant. The State responds that the Defendant waived the issue by failing to raise a contemporaneous objection and that the Defendant has failed to establish plain error based on General Bivens' statements.

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). Additionally, a prosecutor's argument should not "reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Hill*, 333 S.W.3d 106, 131 (Tenn. Crim. App. 2010).

In *State v. Goltz*, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

- 91 -

*Goltz*, 111 S.W.3d at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Id.* at 344.

As noted by the State, the Defendant failed to make any contemporaneous objections to General Bivens' rebuttal closing argument. The failure to make a contemporaneous objection constitutes waiver of an issue on appeal. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008); *see also* Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error[]").

However, "[w]hen necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

a) the record must clearly establish what occurred at trial;

b) a clear and unequivocal rule of law must have been breached;

c) a substantial right of the accused must have been adversely affected;

d) the accused did not waive the issue for tactical reasons; and

e) consideration of the error is "necessary to do substantial justice."

*Adkisson*, 899 S.W.2d at 641-42.

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the *Adkisson* test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection[.]" In order to be entitled to plain error relief, all five factors must be established, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. Further, "'the plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642). The Defendant bears the burden of persuading the appellate court that the trial court committed plain error. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

### 1. Improper attacks on defense counsel

During his rebuttal closing, General Bivens stated, "Ladies and gentlemen, four years later [defense counsel] and his staff and [the Defendant] come up with this great story about how he was forced to do all this by a gang." The Defendant asserts that General Bivens' comment was an improper attack upon defense counsel and constituted plain error. The State responds that defense counsel injected the quality of his own investigation into his closing argument and that General Bivens' remarks "highlighted that [the Defendant's] trial testimony was a recent and previously unrevealed version of events carefully calculated to fit the facts that defense counsel had unearthed."

In its review of this issue, the trial court stated:

> The Court finds that [General] Bivens did state in his rebuttal argument, "four years later [defense counsel] and his staff and [the Defendant] come up with this great story about how he was forced to do all this by a gang." The State claims that this response was an invited response. It is improper to accuse defense counsel and his staff of developing the story of the [D]efendant. The Court, however, in light of the defense presented, finds that the response was an invited response. The statement was an isolated statement by [General Bivens] and the evidence of guilt was very strong. The Court also instructed the jury that any statement of counsel was not to be considered as evidence and further that the jury was to disregard any statement of counsel which it found not to be part of the evidence introduced at the trial.

We agree with the trial court that it was improper for General Bivens to accuse defense counsel and his staff of coming up with the Defendant's story. However, when

- 93 -

viewed in the context of the facts of the case, we conclude that the improper conduct did not affect the verdict to the prejudice of the Defendant. The comment was an isolated one, and defense counsel did not object or mention the comment in his motion for mistrial made after General Bivens' rebuttal closing argument. Here, the record does not establish either that "the accused did not waive the issue for tactical reasons" or that "consideration of the error is 'necessary to do substantial justice.'" *See Smith*, 24 S.W.3d at 282. Accordingly, we cannot say that the prosecutor's argument, even if improper, rises to the level of "plain error."

### 2. Improper shifting of the burden of proof

The Defendant also contends that General Bivens improperly shifted the burden of proof when he repeatedly argued to the jury that there was no corroboration to the Defendant's story that he acted under duress. He asserts that the comments "clearly [misled] the jury as to the burden of proof as to the defense of duress." The State responds that General Bivens was questioning the credibility of the Defendant's story and that he was not required to explain to the jury the burden of proof. We agree with the State. Moreover, the trial court instructed the jury on the State's general burden of proof of beyond a reasonable doubt in a criminal case and additionally instructed that the State had the burden to establish beyond a reasonable doubt that the Defendant was not acting under duress. Accordingly, General Bivens' comments do not constitute plain error.

### 3. Misstating evidence

The Defendant asserts that General Bivens misstated the evidence when he argued that: (a) the Defendant told investigators "I must have used a knife. The knife is in my car. I stabbed them[]"; (b) Ms. Nugent saw a "goldish" car with "Texas plates but . . . never saw anybody at the car"; (c) the Hispanic man approached Mr. Eddlemon looking for the Defendant "[t]hree or four days before this murder"; (d) Mr. Reynolds and Ms. Jones saw the Defendant withdrawing money from the ATM "at about 9 or 9:30" the night of March 3; (e) Ms. Hinson's and Mr. Corum's testimony conflicted as to whom the Defendant dropped off first on March 3; (f) Dr. Valdez testified that "in Mexico the cartels will attack the families to send a message but not so much in the states because of law enforcement. It's common in Mexico but not in the states[]"; (g) Dr. Valdez testified that Mr. Hernandez was a "low ranking gang member"; and (h) Trooper Sipes stated that the "big drug grow over in Obion County had absolutely no connections with Lake County." The State responds that General Bivens did not intentionally misstate evidence and that the Defendant is not entitled to relief under plain error analysis.

Regarding this issue, the trial court found:

In his statement to the [TBI], the [D]efendant stated, "it had to have been the knife I used," although [General Bivens] misstated, "I stabbed them, the knife is in my car," it is not . . . an intentional misstatement. The Court notes that there are several transcripts of testimony. This trial lasted three weeks. The same would be true about other misstatements made by the State as set out above. Any such misstatements are isolated and do not appear to be intentional and many of them are not total misstatements of the facts. Again, . . . General Bivens was arguing a case that had lasted for three weeks with multiple transcripts of evidence. The jury also was specifically directed that no statements by either attorney should be considered as evidence and that they were to disregard any argument made by the attorneys which the jury did not find was supported by the evidence. The Court also notes that the evidence of [the D]efendant's guilt was overwhelming. The Court does not find that the [D]efendant was deprived of a fundamentally fair trial by any alleged misstatement.

Upon review, we agree with the trial court's assessment of this issue. Although there may be some discrepancies between the evidence and General Bivens' rebuttal closing argument, it does not appear that the discrepancies were intentional on General Bivens' part, and the discrepancies were not so egregious that they drew an objection from the Defendant. As noted by the trial court, some of the alleged misstatements "are not total misstatements of fact." For example, although Dr. Valdez did not say that Mr. Hernandez was a "low ranking gang member," he did state that Mr. Hernandez had a "lower raking position" in the Mexikanemi. In any event, the trial court plainly instructed the jury that argument of counsel was not evidence and that it should disregard comments not supported by the evidence. Under these circumstances, the Defendant has not established plain error.

### 4. Mocking the Defendant

Additionally, the Defendant contends that General Bivens improperly mocked and ridiculed him during rebuttal closing argument, accusing the Defendant of "dramatics" and "acting" during trial. The State responds that the Defendant's in-court behavior was part of the evidence and that, because he testified and placed his credibility at issue, argument about the Defendant's demeanor was proper.

During his rebuttal closing argument, General Bivens stated, "Whoo, some dramatics. What class had he just taken a test in? Theater. Oh, I can't take it. The smell, the taste of the blood." Following trial, defense counsel filed affidavits asserting

that General Bivens was "changing the pitch of his voice and using his body to imitate and exaggerate [the Defendant's] statements" when he made these statements. In the order denying the motion for new trial, the trial court noted the Defendant's claim that the prosecutor's comments on the Defendant's in-court behavior were improper but did not specifically address the claim. Upon review, we conclude that, even if improper, General Bivens' conduct did not affect the verdict to the prejudice of the Defendant when viewed in context and in the light of the facts of the case. *See Judge*, 539 S.W.2d at 344. Moreover, if General Bivens' comments and behavior were as "undignified, contemptuous and derisive" as claimed by defense counsel, we can only assume that the Defendant waived his objection for tactical reasons. Consequently, the Defendant is not entitled to relief under a plain error analysis.

## V. Denial of Motion to Dismiss Indictment

At the conclusion of the State's case-in-chief, the Defendant made a motion to dismiss the indictment based on the State's "failure . . . to preserve and protect evidence which was exculpatory or likely to be exculpatory to the [D]efendant," which the trial court denied. The Defendant specifically argued that the State failed to collect blood stains, including stains on the carpet and kitchen table, and failed to obtain fingerprints from the crime scene. The Defendant further argued:

> The State did not preserve the door handles, the glass on the front door, the glass on the gun case, the door handle of the gun case, the shotgun shells box that had been opened, the shotgun shell that was on the floor, where shotgun shells are not normally found. They did not preserve any of the jewelry that was located on the bed itself. They did not preserve the sheets. They did not preserve -- in that room alone, we pointed out at least ten items that were part of the ransacking, including the computer box, the CD discs that was in the floor, various pieces of paper that were out of the drawer. There was a drawer taken out of the bureau, but no -- nothing was preserved of it.
>
> . . .
>
> That's the first one -- the first part of this motion.

The Defendant explained that the second part of his motion was based on investigators' failure to preserve the secondary crime scene at Cabin 9, which the Defendant argued contained exculpatory evidence. Finally, the Defendant argued that, after he was taken into custody, all of the text messages on his cell phone from a certain period of time were intentionally deleted by someone other than the Defendant.

- 96 -

On appeal, the Defendant argues that the trial court erred in denying his motion to dismiss the indictment. He contends that he was denied a fair trial by: (1) the officers' intentional destruction of relevant, material, exculpatory evidence; (2) the State's failure to collect, obtain, and preserve exculpatory evidence; and (3) the trial court's subsequent refusal to provide the jury with Special Jury Instruction No. 5, regarding spoliation of evidence. The State responds that the Defendant has failed to prove a violation pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999).

In *Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d at 915-16). The court determined that the due process required under the Tennessee Constitution was broader than that required under the United States Constitution and rejected the "bad faith" analysis adopted by the United States Supreme Court. *Id.* at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), which stated that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.") Instead, the court in *Ferguson* adopted a balancing approach in which a trial court to must determine "[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." *Id.* at 785 (quoting *Ferguson*, 2 S.W.3d at 914.)

When a defendant raises a *Ferguson* claim, a trial court must first "determine whether the State had a duty to preserve the evidence." *Merriman*, 410 S.W.3d at 785. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). To meet this constitutional materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (footnote omitted).

If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court is required to balance these factors to determine whether conducting a trial without the missing evidence would be fundamentally fair. *Merriman*, 410 S.W.3d at 785. "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.*

This court reviews the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791. The trial court's findings of fact, however, are entitled to substantial deference on appeal and are conclusive unless the evidence preponderates against them. *See id.* (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). We review the trial court's choice of remedy for a *Ferguson* violation under the abuse of discretion standard. *Id.*

## A. Intentional Destruction of Exculpatory Evidence

The Defendant contends that after his arrest, while he was handcuffed and in custody, all text messages sent and received before 9:20 p.m. on March 4, 2011, were intentionally deleted from his cell phone. He alleges that text messages between Mr. Hill and the Defendant would have corroborated the Defendant's testimony about "a drug deal gone bad," Mr. Hill's threats to the Defendant, Mr. Hill's role in the murders, and the duress the Defendant was under. The Defendant asserts that the State had a duty to preserve the evidence after the cell phone was seized by officers and that the deletion of the evidence made his trial fundamentally unfair and warranted dismissal of the indictment. However, when addressing the issue in the order denying the motion for new trial, the trial court found:

> All of the officers who came in contact with the [D]efendant's cell phone denied under oath having deleted any text messages before he surrendered the phone. On the night of his arrest, the [D]efendant had an opportunity to delete text messages. The only proof [that] the State destroyed evidence is the conclusion that the defense reaches that text messages were destroyed while the cell phone was in the custody of the State. It is significant to note also from the testimony at trial and on Motion for New Trial that text messages can be deleted remotely on cell phones. The Court does not find that the State deleted the text messages. The defense also had an

opportunity to retrieve any text messages after they had been employed and before the carrier systematically deleted the messages.

The evidence does not preponderate against the trial court's factual findings. The officers who possessed the Defendant's cell phone following his arrest testified that they did not delete or attempt to delete any text messages from the cell phone. The Defendant's expert, Mr. Davis, agreed that the Defendant could have deleted all of the text messages before his arrest. Mr. Davis also stated that some drug dealers will delete their text messages shortly after the messages are received so that no record of the text messages exists. He stated that it was "[j]ust as possible" that the Defendant deleted the messages shortly after they were received as it was that someone else deleted the messages from the cell phone after his arrest. At the motion for new trial hearing, Officer McDowell testified that it was possible to delete information from a cell phone remotely and that "it would not be difficult for one of [the Defendant's] associates, a family member, anyone else that would have the same interest as him in getting rid of the messages" to delete them in this manner. Officer McDowell further testified that, as the account holder, the Defendant could have requested that the cell phone company preserve his text messages at any time. Based on the foregoing, the Defendant failed to establish destruction of evidence by the State. Accordingly, he is not entitled to relief under *Ferguson*.

### B. Law enforcement's Failure to Collect and Preserve Exculpatory Evidence

The Defendant also asserts that the State violated *Ferguson* when TBI investigators failed to collect additional blood samples and check for latent fingerprints at the victims' residence and when they failed to collect and preserve the bloody towel and fruit punch cans at Cabin 9. The State replies that investigators did not fail to preserve any evidence which it had a duty to preserve. Relying on this court's opinion in *State v. Brock*, 327 S.W.3d 645 (Tenn. Crim. App. 2009), the State contends that it had no duty to preserve these items because they were never taken into evidence by police. In *Brock*, the defendant raised a *Ferguson* claim based upon the State's failure to collect fingerprint evidence and a bloody shoeprint on the carpet near the victim's body. *Id.* at 698. This court concluded that due process did not require the State to collect the evidence in question. *Id.* at 699. The court explained:

On the one hand, the State is not required to investigate cases in any particular way: "Due process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process." Moreover, "[i]t is not the duty of this [c]ourt to pass judgment regarding the investigative techniques used by law

enforcement unless they violate specific statutory or constitutional mandates." Accordingly, when the police have not conducted a fingerprint analysis, there is typically no duty to preserve what is essentially nonexistent evidence.

*Id.* (quoting *State v. Tony Best*, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at *13 (Tenn. Crim. App. Sept. 25, 2008), *perm. app. denied* (Tenn. Mar. 16, 2009)) (citations omitted); *see also State v. Cordell Bufford*, No. W2013-00841-CCA-R3-CD, 2014 WL 2129526, at *13 (Tenn. Crim. App. May 20, 2014), *no perm. app. filed* (concluding that the defendant's claim that "the State should have collected more evidence because that evidence might have been exculpatory" did not meet the standard required for a *Ferguson* jury instruction on the State's duty to preserve evidence).

### 1. Bloody towel and fruit punch cans from Cabin 9

The proof in this case showed that the Defendant rented Cabin 9 at Boyette's from March 1-4. After check-out time on March 4, two housekeepers, Ms. Patterson and Ms. Nugent, cleaned the cabin. Ms. Patterson saw a towel laying in the floor that had "a little blood on it." She stated that finding a towel with a small amount of blood on it was not unusual because guests often cleaned fish in the cabins, so she rolled the towels up and put them into a large laundry bag along with the sheets. The fruit punch cans were taken out to the dumpster as part of the trash. Two to three days after the murders, Ms. Capps called Sheriff Avery and informed him that the Defendant had recently rented a cabin at Boyette's. Sheriff Avery responded to the cabin and spoke to Ms. Patterson and Ms. Nugent. He learned that a Hispanic man had stayed in the cabin and that the cabin had been cleaned already. Sheriff Avery went into the cabin to look around but found that it was clean and that there was nothing inside. Although Ms. Patterson testified that she thought she mentioned the bloody towel to Sheriff Avery, he testified that he was not told about the bloody towel at that time. It is not clear from the testimony whether anyone informed Sheriff Avery about the existence of the fruit punch cans. Several weeks later, Investigator Vernon went to Boyette's and spoke to Ms. Patterson and Ms. Nugent. They told him that, when they cleaned Cabin 9 on the morning of March 4, they found about a towel with blood on it in the bathroom. Investigator Vernon testified, however, that by this time they did not have the bloody towel, and the cabin had been cleaned. Although Sheriff Avery told Agent Bishop about Cabin 9, Agent Bishop testified that he did not have the cabin processed as a secondary crime scene because it was "two or three days after the homicide[s], and . . . it was already cleaned."

In the order denying the motion for new trial, the trial court found that "[t]here was no proof that the evidence that the defense claimed was not gathered or preserved would have been exculpatory for the [D]efendant." Nevertheless, the Defendant

speculates that the bloody towel and the fruit punch cans, found in a room he rented, could have in some way yielded exculpatory evidence. However, we have previously held that "[t]he mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under *Ferguson*." *State v. Ronnie D. Sims*, No. M2004-02491-CCA-R3-CD, 2005 WL 3132441, at *8 (Tenn. Crim. App. Nov. 22, 2005), *perm. app. denied* (Tenn. Mar. 20, 2006) (internal citation omitted). Here, it appears that law enforcement was not made aware of the bloody towel until possibly weeks after Cabin 9 had been cleaned. The towel contained only a small amount of blood and did not raise the suspicions of Ms. Patterson and Ms. Nugent. It is unclear when investigators learned about the fruit punch cans, but it was also sometime after the cabin had been cleaned. Moreover, the Defendant never told investigators about Mr. Hernandez's staying in Cabin 9 or about Mr. Hernandez's connection to "the three Mexicans," who allegedly committed the murders. Under these facts, we cannot conclude that the State had a duty to collect the bloody towel or fruit punch cans. Because it had no duty to collect the evidence in the first place, the State also had no duty under *Ferguson* to preserve such evidence.

## 2. Blood stain samples and fingerprints

Similarly, the State had no duty to collect fingerprints and additional blood samples from the victims' residence. At trial, crime scene investigators testified extensively about the blood samples that were collected and why they were collected. They also testified about the feasibility of dusting for fingerprints on various surfaces. Agent Lafferty explained that certain items of evidence collected from the scene were dusted for fingerprints with negative results. Agent Nelson testified that there was no evidence with any apparent evidentiary value that was not collected at the victims' residence. In denying the Defendant's motion to dismiss the indictment, the trial court stated:

> There's not anything before the Court . . . to lead the Court to think that there is any particular exculpatory evidence in that -- in all the blood evidence, the -- the latent fingerprints, there's not any evidence that they found anything that would indicate that there were latent prints. They tried to take prints from the area that might be. And all of the information that was gathered appears to me to be the information that they would have suspected would be the necessary information. The fact that there is blood that was not tested, to me does not violate the law set out in the *Ferguson* case.

Although the Defendant's experts opined that additional blood samples should have been taken and that the crime scene dusted for fingerprints, the Defendant has not

shown that the investigative techniques used by law enforcement violated "specific statutory or constitutional mandates." *Brock*, 327 S.W.3d 699. Moreover, because the Defendant was allowed to present considerable expert testimony to the jury about the investigative negligence of the TBI, the "reliability of the evidence gathered by the police [was] tested in the crucible of a trial." *Id.* at 698. The Defendant is not entitled to relief.

## *C. Special Jury Instruction No. 5*

The Defendant contends that the trial court erred when it denied his request that the trial court charge the jury pursuant to Tennessee Pattern Criminal Jury Instruction 42.23 on the State's duty to preserve evidence, which states in part:

> If, after considering all of the proof, you find that the State failed to gather evidence or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the [D]efendant, you may infer that the absent evidence would be favorable to the [D]efendant.

Because there was no *Ferguson* violation in this case, as explained above, the trial court did not err by declining to give the Defendant's requested instruction. It is only when a trial court concludes that "a trial would be fundamentally unfair without the missing evidence" that a trial court may impose an appropriate remedy, such as providing the Defendant's requested instruction. *See Merriman*, 410 S.W.3d at 785-86. This issue is without merit.

## VI. Due Process Violations

The Defendant contends that the State committed a *Brady* violation by failing to disclose the State's agreement with Mr. Hernandez that he not be treated as a "suspect" in the victims' murders and by not disclosing Mr. Hernandez's complete criminal record. The Defendant also argues that the prosecutor's objections to Mr. Hernandez's testifying about the Mexikanemi amounted to a violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The State responds that it did not violate the Defendant's due process rights with respect to Mr. Hernandez.

## *A. <u>Brady</u> Violation*

As previously discussed, the United States Supreme Court stated in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

Even if the defendant does not specifically request evidence, favorable evidence is material, and its suppression is a constitutional violation, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "Reasonable probability" is defined as "a probability sufficient to undermine the confidence in the outcome." *Id.* The defendant bears the burden of proving a constitutional violation by a preponderance of the evidence. *Edgin*, 902 S.W.2d at 389.

The prosecution's duty to disclose *Brady* material also applies to evidence affecting the credibility of a government witness, including evidence of any agreement or promise of leniency given to the witness in exchange for favorable testimony against an accused. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (requiring the prosecution to reveal the contents of plea agreements with key government witnesses); *see also Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001).

## 1. Agreement with Mr. Hernandez

During trial, Mr. Hernandez testified that the prosecutor told him that, if he did not testify, he would "be a suspect" in the victims' murders. The Defendant contends that if he had known about Mr. Hernandez's agreement with the State, "the decision to call [Mr.] Hernandez as a hostile witness would have been different." In addressing this issue, the trial court stated:

> The defense raises as error a claim that the State failed to disclose to the defense negotiations with [Mr.] Hernandez in an agreement that Mr. Hernandez would not be a suspect in the Shells' murder in return for his testimony in support of the State. The State denies that there was any agreement. The Court does not find that there was a specific agreement between Mr. Hernandez and the State that he would not be a suspect if he testified.

The record supports the findings and conclusions of the trial court. Mr. Hernandez's testimony that he would "be a suspect" if he did not testify does not establish a promise of leniency in exchange for his trial testimony. Moreover, Mr. Hernandez testified about the alleged agreement, and the Defendant had ample opportunity to question Mr. Hernandez regarding his bias. *See State v. Bolden,* 979 S.W.2d 587, 590 (Tenn. 1998) ("In most instances, any potential for prejudice to a defendant's case will be avoided by allowing the witness to testify subject to searching cross-examination intended to develop fully any evidence of bias or motive on the part of the witness, or improper conduct on the part of the State.") Finally, in his brief, the Defendant fails to explain how the decision to call Mr. Hernandez would have been

"different," leaving this court to speculate as to how the Defendant suffered prejudice. The Defendant has not established a *Brady* violation and is not entitled to relief.

### 2. Mr. Hernandez's complete criminal record

In his brief, the Defendant asserts that he learned after trial that the State did not produce records concerning Mr. Hernandez's charges from Laredo, Texas of aggravated assault with a deadly weapon, charges involving an assault with a shank on a fellow inmate, and records showing that the federal penal system designated Mr. Hernandez as "High Risk and Assaultive." Regarding this issue, the trial court found:

> The defense claims that the State failed to comply with the Court's order to produce all of the evidence concerning arrest and criminal records of [Mr.] Hernandez. Mr. Hernandez testified during trial that certain convictions in Texas were not him, but his father. It appears that the State provided any known evidence of prior convictions. The Court also notes that defense counsel adequately examined Mr. Hernandez about all convictions.

We conclude that the Defendant has failed to establish a *Brady* violation. First, we note that, beyond allegations in the Defendant's motion for new trial, there is no proof in the record of these additional charges from Laredo, Texas or of Mr. Hernandez's alleged designation in federal prison. Instead, the record shows that the State provided the Defendant with evidence of Mr. Hernandez's known prior convictions, which described in detail Mr. Hernandez's known criminal history, as well as his known gang involvement. Even if the State had some duty under *Brady* to obtain and provide Mr. Hernandez's complete criminal record, any error in failing to do so is harmless beyond a reasonable doubt. This is especially true given the Defendant's extensive direct examination of Mr. Hernandez concerning his criminal history, prison disciplinary history, and gang involvement. This issue is without merit.

### B. *Napue* Violation

During trial, Mr. Hernandez denied multiple times that he was a member of the Mexikanemi. Mr. Hernandez stated that he was merely "an associate" of the prison gang and that he could be "stabbed" in prison if he said he was a member of the gang when he was not. The following exchange then took place:

[DEFENSE COUNSEL]: . . . And they have [] a constitution, don't they?

[MR. HERNANDEZ]: I believe so.

[DEFENSE COUNSEL]: I want [you to] look at this document and [to] ask you if this is not the Mexican Mafia Constitution?

[MR. HERNANDEZ]: With all due respect, I can't see that.

[DEFENSE COUNSEL]: You can't see it?

[MR. HERNANDEZ]: No.  I am not a member.  I am not going to touch something that I am not a member of.

[DEFENSE COUNSEL]: Let me ask you one of the things that's in it.

[GENERAL BIVENS]: Your Honor, objection.  He stated that he can't look at it.  He's not a member.

THE COURT: He can ask him if he knows the contents of the document and he will have to lay the proper ground work . . . .

Defense counsel's questioning then continued, as follows:

[DEFENSE COUNSEL]: You knew they had a constitution, didn't you?

[MR. HERNANDEZ]: I heard it from some other like associates around there like, you know, things that you know.  I'm just an associate and I didn't want nothing [sic] to do with those people.

[DEFENSE COUNSEL]: And the [Mexikanemi] is a criminal organization. It's a criminal gang, isn't it.

[MR. HERNANDEZ]: Big bad boys.

[DEFENSE COUNSEL]: Pardon?

[MR. HERNANDEZ]: Big bad boys from prison.

[DEFENSE COUNSEL]: And the big bad boys from prison run stuff outside prison, don't they?

[MR. HERNANDEZ]: Only they can answer that.

The Defendant argues that the State's objection "mislead the trial court" and allowed false testimony to be presented to the jury and go uncorrected, which deprived the Defendant of a fair trial. He notes that the prosecutor later conceded during closing argument that Mr. Hernandez lied when he denied being a member of the Mexikanemi. The Defendant asserts that the prosecutor had "an affirmative duty to prevent and correct false testimony," but the prosecutor objected to defense counsel's questioning Mr. Hernandez about the Mexikanemi in order to "protect" Mr. Hernandez.

It is well-established law that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). As such, the State may not knowingly present false testimony, and it has an affirmative duty to correct the false testimony of its witnesses. *State v. Giglio*, 405 U.S. 150, 153-54 (1972). In order to be granted a new trial based on the presentation of false testimony, the defendant must establish that "the State presented false testimony; the State knew the testimony was false, and the testimony was material." *State v. Cureton*, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000). If testimony is determined to be false, this court must determine whether the false testimony could have affected the jury's judgment. *Giglio*, 405 U.S. at 154 (citing *Napue*, 360 U.S. at 271).

We conclude that, although the State's objection may have been unfounded, there was no knowing presentation of false testimony by the State. The State did not present Mr. Hernandez's allegedly false testimony; instead, defense counsel elicited the testimony. Moreover, the trial court did not "sustain[] the objection and foreclose[] cross-examination," as claimed by the Defendant. Clearly, defense counsel continued to question Mr. Hernandez about whether he was a member of the Mexikanemi. Additionally, Dr. Valdez testified at length about the Mexikanemi constitution, and the document was made an exhibit at trial. Dr. Valdez further opined that Mr. Hernandez was a member of the gang, and the State conceded that Mr. Hernandez was a member of the Mexikanemi during closing argument. Thus, any perceived limitation on cross-examination was harmless. The Defendant is not entitled to relief.

## VII. Admission of the Defendant's Jailhouse Letter

During cross-examination of the Defendant, the State approached the Defendant with a letter written by the Defendant at the Lake County Jail, and defense counsel objected on the basis that the letter had not been disclosed previously. Defense counsel argued that he had "never seen that letter," but the State responded that it had sent a copy of the letter to defense counsel's investigator before trial. The State introduced a copy of a letter sent to defense counsel's office dated February 7, 2013, which indicated that the Defendant's jailhouse letter was enclosed. Ultimately, the trial court did "not find any

prosecutorial misconduct in this case because the defense failed to receive a copy of this letter" and allowed the State to introduce the letter, which the Defendant acknowledged he had written while in jail.

On appeal, the Defendant argues that the trial court erred by admitting a copy of the Defendant's letter based on the State's failure to produce the letter before trial. The State responds that the trial court did not abuse its discretion by admitting the letter into evidence.

"Generally, the admission of evidence at trial is entrusted to the broad discretion of the trial court, and as such, a trial court's ruling on the admission of evidence where relevance is questioned may only be disturbed upon a showing of an abuse of that discretion." *State v. Martinez*, 372 S.W.3d 598, 619 (Tenn. Crim. App. 2011) (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004)). An abuse of discretion occurs when a trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W. 3d at 404-05.

Rule 16 of the Tennessee Rules of Criminal Procedure provides that, upon a defendant's request, the State must disclose "the defendant's relevant written or recorded statements, or copies thereof, if . . . the statement is within the [S]tate's possession, custody, or control[.]" Tenn. R. Crim. P. 16(a)(1)(B)(i)(I). Rule 16 further provides:

If a party fails to comply with this rule, the court may:

(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;

(B) grant a continuance;

(C) prohibit the party from introducing the undisclosed evidence; or

(D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2).

In this case, the Defendant filed a motion for discovery under Rule 16, requesting all relevant written statements of the Defendant. The State asserted that it had provided the letter to the Defendant and offered proof of its mailing. Thus, the record supports the trial court's conclusion that there was no improper conduct on the part of the State that

- 107 -

resulted in defense counsel's not receiving the letter. Moreover, as noted by the State, from the time the letter was introduced into evidence until the end of the Defendant's proof the next day, defense counsel had "nearly an entire day to examine the letter and discuss it with [the Defendant]." Defense counsel did not recall the Defendant for the purpose of explaining the contents of the letter, including the poem at the end. Because the information was in the Defendant's possession before the close of proof and he had an opportunity to offer evidence about the letter to the jury, we fail to see how the trial court's ruling resulted in "an injustice to the complaining party." *Scott*, 275 S.W. 3d at 404-05. Accordingly, we hold that the trial court did not abuse its discretion in admitting the Defendant's letter into evidence. This issue is without merit.

## VIII. Errors in the Trial Court's Instructions to the Jury

### *A. Felony Murder Instruction*

The Defendant contends that the trial court's instructions regarding first degree felony murder were unclear and confusing due to the trial court's use of cross-references to earlier instructions. Specifically, he asserts that jurors "did not realize that Felony Murder was First Degree Murder and did not realize that their verdict would expose [the Defendant] to the death penalty and the other two harsher punishments." The State responds that the trial court did not err in instructing the jury.

"[T]he trial court has a duty to provide a 'complete charge of the law applicable to the facts of the case.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). However, jury instructions must be reviewed in their entirety, and phrases may not be examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2008) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)) (internal quotation marks omitted). As noted by our supreme court:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Rimmer*, 250 S.W.3d at 31 (quoting *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)). To determine whether a defendant is harmed by an ambiguous instruction, "we must

- 108 -

consider 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Rimmer*, 250 S.W.3d at 31 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  To make that determination, the "significant question" is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).  Whether jury instructions are sufficient is a question of law, which we review de novo with no presumption of correctness.  *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

In *State v. Cravens*, our supreme court stated that "all of the elements of each offense should be described and defined in connection with that offense, although . . . there could be cross-referencing or repetition in connection with the lesser offenses since jury instructions in felony cases are required by statute to be written and physically delivered to the jurors for use in their deliberations."  764 S.W.2d 754, 756 (Tenn. 1989).  The court further held that combining the charge regarding two different degrees of murder was not generally approved of, but did not constitute reversible error.  *See id.*

In this case, the Defendant was charged with first degree felony murder in Counts Three and Four.  The instructions for Count Three read:

Any person who commits first degree murder is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the [D]efendant unlawfully killed the alleged victims as set out in Counts Three and Four of the indictment;

and

(2) that the killing was committed in the perpetration of or the attempt to perpetrate the alleged robbery or theft; that is, that the killing was closely connected to the alleged robbery or theft and was not a separate, distinct and independent event;

and

(3) that the [D]efendant intended to commit the alleged robbery or theft.

- 109 -

The essential elements of the offense of Especially Aggravated Robbery and its lesser included offenses of Aggravated Robbery, Robbery and Theft will be described and defined for you later in these instructions.

The intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim. Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Consideration of such factors as time, place and causation is helpful in determining whether a killing was committed in the perpetration of the alleged robbery or theft. The killing may precede, coincide with, or follow the robbery or theft and still be considered as occurring in the perpetration of the robbery or theft, so long as there is a connection in time, place and continuity of action.

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

If you find from the proof beyond a reasonable doubt that the [D]efendant is guilty of murder in the first degree, then it shall be your duty after a separate sentencing hearing to determine whether the defendant will be sentenced to death, life imprisonment without the possibility of parole or life in prison[.]

As to Count Four, the trial court instructed, "The essential elements of First Degree Felony Murder are identical to the essential elements of First Degree Felony Murder as set out in Count Three of the indictment."

Despite the Defendant's claim to the contrary, the instructions for Count Three, and by reference Count Four, clearly informed jurors that that the charge was first degree murder and specifically stated that, if the jury found the Defendant guilty of the offense, the jury would sentence the Defendant to three possible sentences: death, life without parole, or life. When taken as a whole, we conclude that the jury instructions adequately defined all the relevant legal terms for first degree felony murder and fairly submitted the legal issues for the jury's determination. *See Majors*, 318 S.W.3d at 864-65. Thus, any error in the trial court's instruction was harmless, and the Defendant is not entitled to relief.

*B. Special Jury Instructions*

The Defendant further asserts that the trial court erred when it failed to instruct the jury pursuant to the Defendant's Special Jury Instructions No. 6, 7, 9, and 10, and by failing to instruct the jury that the Defendant had to be present when the victims were killed to be found guilty of murder.[14] He contends that the failure to give these instructions resulted in unfair prejudice and requires a new trial. In response, the State asserts that the trial court properly instructed the jury.

## 1. Special Instruction No. 6

The Defendant's Special Jury Instruction No. 6 read:

> 6. Any action or attempt by law enforcement which results in the State's failure to preserve, or obtain, or to conceal destruction of evidence is a circumstance which, when considered with all the facts of the case, may justify an inference of a reasonable doubt of guilt of the [D]efendant. While that inference is not automatically strong enough in and of itself to warrant reasonable doubt, it may become one of a series of circumstances from which reasonable doubt may be logically inferred. If evidence indicates failure to preserve or obtain, or the concealment or destruction of evidence, and this fact is proven, this fact alone does not automatically, but may, allow you to find that the defendant is not guilty of the crime alleged.

> The failure to preserve or obtain or the destruction or concealment of evidence may be explained by proof offered or[] by the facts and circumstances in the case. Since the failure to preserve or obtain or the concealment or destruction of evidence, whether negligently or intentionally, may raise a concern about the adequacy of the investigation, you may consider this fact, if it is so proven, together with all of the other evidence when you decide the guilt or innocence of the [D]efendant.

> The weight to be given to such evidence, are questions for you to determine.

The Defendant asserts that because the evidence showed that all text messages sent and received between the Defendant and Mr. Hill were intentionally deleted from the

---

[14] Under this section of the Defendant's brief, the Defendant also challenges the trial court's failure to instruct the jury using Special Jury Instruction No. 5; however, we have already addressed Special Jury Instruction No. 5 in part V., and we will not revisit it here.

Defendant's cell phone, it was error for the trial court to deny the Defendant's request to instruct the jury as to the inference raised by the destruction of evidence. However, as previously discussed, the trial court accredited the testimony of officers, who denied deleting any text messages from the Defendant's cell phone. Additionally, the evidence demonstrated that the Defendant himself had the opportunity to delete text messages before he was taken into custody. Accordingly, the trial court correctly refused to give the requested Special Jury Instruction No. 6.

## 2. Special Instruction No. 7

The Defendant's Special Jury Instruction No. 7, regarding felony murder, was a modified version of Tennessee Pattern Criminal Jury Instruction 7.03, in which the Defendant changed "first degree murder" to "first degree felony murder" and added the words "and that the killing must have had an intimate relation and close connection with the robbery or theft" to the second full paragraph of the pattern instruction. In his brief, the Defendant contends that the trial court erred by failing to give this modified instruction but offers no argument or analysis to support his contention. Thus, we conclude that the Defendant has waived our consideration of this issue. *See* Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A).

In any event, we note that the trial court instructed the jury as to first degree felony murder with Tennessee Pattern Criminal Jury Instruction 7.03. The trial court's instruction was a full, fair, and complete statement of the law as it relates to the timing and connection of the underlying felony and the killings needed to convict someone of felony murder. *See James*, 315 S.W.3d at 446. Accordingly, the trial court did not err in refusing to provide the special jury instruction.

## 3. Special Instruction No. 9

The Defendant also argues that "[t]he trial court erred by failing to instruct the jury that the 'scientific, technical, or other specialized knowledge, skill, experience, training or education' of the expert was to be 'considered' by them[,]" as requested in Special Jury Instruction No. 9. However, the Defendant makes no argument in his brief to support his position, and he cites to no authority. Accordingly, we conclude that the Defendant has waived this issue. *See* Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A).

Waiver notwithstanding, the issue is meritless, as found by the trial court when denying the motion for new trial:

Next, the [D]efendant claims that the Court was in error in denying special jury instruction request [No.] 9 dealing with expert witness testimony. [The] Defendant claims that this special request would have more fully explained how the jury was to consider such testimony. The Court gave the standard charge dealing with expert testimony indicating that such testimony should be received with caution and the jury was not bound to accept expert testimony, but that they should give such weight and value as they thought it deserved along with all the other evidence in the case governed by the purpose to arrive at the truth. The Court finds that the special request was contained in the standard charge regarding expert witnesses.

Here, the trial court instructed the jury pursuant to Tennessee Pattern Criminal Jury Instruction 42.02, relating to expert testimony. Because the trial court's instruction was a fair, full, and complete statement of the law, the trial court did not err by failing to provide the Defendant's Special Instruction No. 9.

### 4. Instruction No. 10

The Defendant also contends that the trial court erred in denying his request for Special Jury Instruction No. 10, regarding possession of recently stolen property. Again, the Defendant makes no argument and cites to no authority in his brief to support his claim. Accordingly, we conclude that the Defendant has waived this issue. *See* Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A).

In addition to being waived, the issue is meritless. In its order denying the motion for new trial, the trial court found:

The [D]efendant claims that the Court was in error in rejecting special jury instruction request [No.] 10 regarding duress as a defense against inferences that could be drawn from possession of recently stolen property. The Court gave a charge dealing with the inference that could be drawn by having recently stolen property in one's possession. The Court also gave the Tennessee Pattern Instruction charge regarding duress. The [D]efendant was seeking to have the Court modify the charge to again instruct the jury on duress as a defense against inferences in the instruction dealing with an inference that could be drawn from one having recently stolen property in his possession. The duress charge was given. The jury was instructed that it was never required to make such an inference and further that if they found from the evidence in this case that the inference was not warranted, they could reject any such inference. The Court finds

- 113 -

that the information requested in the special request [No.] 10 is covered by both of these charges mentioned.

We agree with the trial court. The pattern instruction provided to the jury—Tennessee Pattern Criminal Jury Instruction 42.20 on the inference from possession of recently stolen property—was based on the testimony of several witnesses, including the Defendant, who testified that the Defendant was in possession of property taken from the victims' residence the day after the murders. The instruction informed the jury that, if it found "beyond a reasonable doubt" that the Defendant was in possession of recently stolen property, the jury may reasonably draw an inference that the Defendant gained possession of said property through theft, unless the possession is "satisfactorily explained." 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.02. Thus, the instruction covered the Defendant's explanation that he was acting under duress based on threats from Mr. Hill and "the three Mexicans" when he sold the victims' property. Additionally, the instruction stated that the jury was "never required to make this inference." Because Tennessee Pattern Criminal Jury Instruction 42.20 provided a full, fair, and correct statement of the law regarding this inference, the Defendant would not be entitled to relief even if the issue were not waived.

### 5. Instruction requiring presence for felony murder

The Defendant also asserts that the trial court erred when it refused to instruct the jury that the State had to prove that he was present when the victims were killed, in addition to knowingly and willfully participating in their deaths. However, in his brief the Defendant cites to no authority for this proposition and makes no argument. Accordingly, the Defendant has waived this issue. *See* Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A).

In any event, the trial court properly refused this instruction. Based on the Defendant's testimony, the trial court instructed the jury on the theory of criminal responsibility; however, there is no requirement under the law that someone criminally responsible for the actions of another be present when and where the crime occurs. Under a theory of criminal responsibility, a defendant's presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which that defendant's participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). To be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that the offense is to be committed, and share in the criminal intent of the principal in the first

- 114 -

degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)); *see e.g., State v. Lewis*, 919 S.W.2d 62, 66 (Tenn. Crim. App. 1995) (determining that the jury properly found the defendant criminally responsible for felony murder which was committed by another person outside of the defendant's car while the defendant remained inside the vehicle), *overruled on other grounds by State v. Williams*, 977 S.W.2d 101, 106 n.7 (Tenn. 1998); *State v. Chad Medford*, No. E2012-00335-CCA-R3-CD, 2013 WL 2424137, at *16 (Tenn. Crim. App. June 5, 2013) (concluding that the evidence was sufficient to establish that the defendant was criminally responsible for the acts of his two co-defendants, and thus guilty of felony murder, when the defendant provided the co-defendants information about a safe in the victims' residence, dropped off the co-defendants at the victims' residence on the night of the murder, and picked up the co-defendants after they ran from the crime scene), *no perm. app. filed*. Waiver notwithstanding, this issue is without merit.

## IX. Sufficiency of the Evidence

The Defendant argues that the trial court erred by denying his motion for judgment of acquittal because the evidence was insufficient to prove beyond a reasonable doubt that the Defendant was not acting under duress, which is a complete defense. He further contends that his convictions must be overturned because the State presented no testimony to rebut his claim that he acted under duress. The State first responds that the Defendant has waived his claim regarding the motion for judgment of acquittal. Additionally, the State argues that the jury had sufficient evidence to reject the Defendant's claim of duress.

### A. Motion for Judgment of Acquittal

Rule 29 of the Tennessee Rules of Criminal Procedure "empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the [S]tate rests or at the conclusion of all the evidence." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010) (citing *Overturf v. State*, 571 S.W.2d 837, 839 & n. 2 (Tenn. 1978)). When considering a motion for judgment of acquittal, whether at the close of the State's proof or after the conclusion of all proof at trial, the trial court is only concerned with the legal sufficiency of the evidence and not with the weight of the evidence. *State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013). A defendant waives his right to appeal from the trial court's denial of a motion for judgment of acquittal made at the close of the State's case-in-chief if the defendant introduces proof after making the motion. *Finch v. State*, 226 S.W.3d 307, 316-17 (Tenn. 2007). In this case, the trial court denied the motion for judgment of acquittal, and thereafter, the Defendant testified and presented witnesses. For that reason, we agree with the State that the Defendant

waived any claim of error for failure to grant the motion after the State rested its case. The Defendant, however, may still challenge the denial of the motion for judgement of acquittal made at the close of all proof. *Collier*, 411 S.W.3d at 893. Because "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[,]" we will review the Defendant's claim as a sufficiency of the evidence challenge. *Id.*; *see also State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

## B. Sufficiency of the Evidence

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

"First degree [felony] murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2010). A conviction for felony murder requires no culpable mental state "except the intent to commit the enumerated offenses . . . ." Tenn. Code Ann. § 39-13-202(b) (2010). The intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim, and whether such intent existed is a question of fact to be decided by the jury. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony

prior to, or concurrent with, the killing." *Id.* at 108. As relevant here, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2010). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). Especially aggravated robbery is robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2010). Second degree murder is defined as a "knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2010).

The jury in this case was instructed on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *Maxey*, 898 S.W.2d at 757; *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

When viewed in the light most favorable to the State, the evidence shows that the victims were violently attacked and stabbed to death in their home. The Defendant admitted that he was present at the residence at the time of the murders and that he carried the victims' property out of the house. The Defendant further admitted that he sold the victims' camera and two of their guns the next day for $35 and $100, respectively. The Defendant destroyed evidence of the crime by burning gloves worn during the murders. Shortly after the murders, the Defendant was found in possession of the victims' jewelry, laptop, and pistol, which he had been trying to sell. Investigators found a blood-stained knife inside the Defendant's vehicle, and subsequent DNA testing revealed that the knife contained a mixture of both victims' blood. Additionally, analysis

of the Defendant's clothing revealed the presence of Mr. Shell's blood, and the tread of the Defendant's boots were consistent with the bloody shoeprints found at the crime scene. When questioned by investigators, the Defendant had knowledge of the details of the crime, including that the victims had been stabbed, that Mr. Shell was found in the living room, and that Mrs. Shell was found in the kitchen. The State also presented evidence that the TBI collected a blood droplet from Mr. Shell's body that contained both his and Mrs. Shell's blood, suggesting that the same knife was used to kill both victims. Additionally, there was testimony that a washcloth collected by the TBI contained both victims' blood, from which the jury could infer that the same person killed both victims and then wiped their blood on the washcloth. Both Mr. Hill and Mr. Hernandez testified that they were not involved in the murders, and Mr. Hill denied that he threatened the Defendant or his family. It appears that the jury chose to accredit their testimony over the Defendant's, as was its prerogative. *State v. Berry*, 141 S.W.3d 549, 566 (Tenn. 2004).

### C. Duress

At trial, the Defendant argued that he acted under duress on the night of the murders and the following day, and based on his testimony, the trial court provided the jury with an instruction on duress. On appeal, the Defendant contends that the State presented no testimony to rebut his claim that he acted under duress beyond a reasonable doubt. We disagree.

Duress is one of the general defenses codified in Part 5 of Chapter 11, Title 39 of the Tennessee Code Annotated; specifically, section 39-11-504 provides:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Tenn. Code Ann. § 39-11-504. The Sentencing Commission Comments to this section advise that the duress defense requires that the offense must be committed because another person threatens death or serious bodily injury if the offense is not committed. *Id.*, Sentencing Comm'n. Cmts. Additionally, there must be no reasonable means to escape the compulsion to commit the offense. *Id.*; *see also State v. Robinson*, 622 S.W.2d 62, 73 (Tenn. Crim. App. 1980).

Because it is not an affirmative defense, a defendant need not prove duress by a preponderance of the evidence in order to merit a jury instruction. *State v. Culp*, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994). Instead, if the evidence fairly raises its applicability, the trial court is required to submit the defense to the jury, "and the prosecution must 'prove beyond a reasonable doubt that the defense does not apply.'" *Id.* (quoting *State v. Hood*, 868 S.W.2d 744 (Tenn. Crim. App. 1993)). If the jury retains any reasonable doubt about the applicability of the defense, it must acquit the defendant of the relevant charge. *Bledsoe*, 226 S.W.3d at 355 (citing Tenn. Code Ann. § 39-11-203(d)).

Upon review, we agree with the State that Mr. Hill's and Mr. Hernandez's testimony that they were not involved in the murders and did not threaten the Defendant was sufficient evidence to rebut the duress defense. Again, the jury was free to accredit their testimony and discredit the Defendant's testimony on this issue. Moreover, the Defendant had reasonable means and opportunity to escape the compulsion to commit the offenses. By the Defendant's own testimony, the threatened harm was not continuous and imminent. The Defendant testified that he refused to come inside the victims' residence when Mr. Hill motioned for him. Instead, the Defendant stayed outside, with his car, while Mr. Hill and "the three Mexicans" committed the murders. Thus, the Defendant had the opportunity to get in his car, drive away, and "withdraw in safety." Tenn. Code Ann. § 39-11-504(a). This issue is without merit.

## X. Imposition of Consecutive Sentences

The Defendant argues that the trial court abused its discretion by imposing consecutive sentences. He contends that the trial court failed to find under *Wilkerson* that the public would be at risk if the Defendant was not sentenced to consecutive terms. The Defendant argues that he expressed remorse for his involvement in the offenses; multiple witnesses testified that he was non-combative and passive and avoided conflict; he had no prior record; and he had no behavior issues during his four years of incarceration. The State responds that the trial court properly imposed consecutive sentences.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our

Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2014), Sentencing Comm'n Cmts.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2014); *Bise*, 380 S.W.3d at 706. While the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (Supp. 2015); *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). A trial court's "misapplication of an enhancement or mitigation factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

The Tennessee Supreme Court has expanded the standard of review in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

As relevant here, a trial court may order sentences to run consecutively pursuant Tennessee Code Annotated section 40-35-115 if the court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4). Before imposing consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939.

In this case, the record fully supports the trial court's sentencing decision. In imposing consecutive sentences, the trial court considered the gruesome facts and circumstances of the offenses and concluded that the nature and severity of the offenses put the Defendant in the dangerous offender category. The trial court specifically referenced *Wilkerson* and found that the Defendant was a danger to the public. The trial court also observed that the Defendant had failed to "accept direct responsibility for the crimes" as the Defendant persisted in his claim that "the three Mexicans" were responsible for the crimes. The trial court found that the Defendant's lack of candor and remorse supported consecutive sentences. Under the facts of this case, we hold that the

trial court did not abuse its discretion when it imposed consecutive sentences. The Defendant is not entitled to relief on this claim.

## XI. Denial of Motion for Recusal

The Defendant contends that the trial court erred in denying his motion for recusal and by failing to rule that Tennessee Code Annotated section 40-11-102 was unconstitutional as applied to the Defendant. He argues that, by denying bail prior to trial pursuant to section 40-11-102, the trial court pre-judged the Defendant's guilt, and it was, therefore, impossible for the trial court to impartially carry out its duty as thirteenth juror. The State responds that the trial court's denial of bail did not reasonably call into question the court's impartiality and that section 40-11-102 is not unconstitutional as applied to the Defendant.

On July 7, 2014, the Defendant filed a motion for release on bail pending trial. In his motion, the Defendant sought release so that he could "effectively assist his counsel in the presentation of his defense[.]" In denying the Defendant's motion, the trial court found as follows:

> The Court has considered the [D]efendant's Motion for Bond or Bail. This case is a capital case. It involves two rather gruesome murders. . . . [T]he Court finds that the State has found in the possession of the [D]efendant a knife which contains DNA evidence of blood of the victims. The State also found that . . . in March 2011, Laquisha Tyler, delivered to the Lake County Sheriff a camera which she indicates was bought from the [D]efendant on March 4, 2011. The [victims'] heirs have indicated that a camera was taken from the [victims'] house. [Mr.] Chisholm also surrendered a laptop which was later identified as belonging to the [victims]. [Mr.] Chisholm also delivered to the Lake County Sheriff a . . . handgun which appeared to have been taken from the [victims]. There was also jewelry found in the trunk of the [D]efendant's vehicle which appeared to come from the [victims]. The Court has also considered the testimony of forensic specialist, Janice Johnson. Her testimony is that there should be some evidence of blood spatters in the crime scene, and that there is no forensic evidence of the [D]efendant's participation in th[e] murders. Although the testimony of Janice Johnson is logical for consideration by the jury, the Court notes that the [D]efendant had ample opportunity to wash and destroy any biological evidence.

> Article 1 § 15 of the Tennessee Constitution provides "that all prisoners shall be bailable by sufficient sureties, unless for capital offenses,

- 121 -

when the proof is evident, or the presumption is great." Based on consideration of all of the items mentioned above, it appears to the Court that proof of conviction is likely and the presumption is great. The [D]efendant has failed to rebut the presumption that the [D]efendant committed the crimes and that the aggravating factors as stated by the State and the documents previously filed in this case are present. The Court finds that there is a likelihood of conviction in this case. The Court also finds that as a matter of safety for the community and the [D]efendant that the [D]efendant should be denied bail.[15]

On March 3, 2015, the Defendant filed a motion for recusal. In a written order denying the motion for recusal, the trial court found that: (1) sufficient grounds did not exist to require the recusal of the trial judge; and (2) section 40-11-102 was constitutionally sound. Specifically, the trial court reasoned:

This court previously ruled [that] the [D]efendant, who is charged with capital murder, [wa]s not entitled to bail. In so ruling, the court, following the dictates of Tenn. Code Ann. § 40 11-102 and Article I, Section 15 of the Tennessee Constitution, determined the State had established through testimony at the preliminary hearing, a hearing on motion to suppress, and the hearing on the [D]efendant's Motion for Bond[,] evident proof of the [D]efendant's guilt. Thus, the court concluded the likelihood of conviction weighed in favor of denying bail. Considering this factor and the severity of the offense and possible sentence in conjunction with other factors relating to the suitability for release, the court determined bail should be denied.

. . . .

This court does not find any person of ordinary prudence in the court's position, knowing all the facts known to the court, would find a reasonable basis for questioning the court's impartiality. This court issued a ruling upon a legal issue after careful consideration of the evidence presented by both sides. In so ruling, the court was called upon by statute and the Tennessee Constitution to evaluate the strength of the State's case and the likelihood of the [D]efendant's conviction based upon the evidence

---

[15] At the motion hearing, defense counsel argued in part that the Obion County Jail where the Defendant was housed was a "distance" from counsel's office and that the jail had "limited facilities" in which counsel could meet with the Defendant. Although the trial court denied the motion for bail, the trial court agreed to transfer the Defendant from the Obion County Jail to the custody and control of the Tipton County Sheriff.

- 122 -

available to the State. The court did so based solely upon the law and the evidence available to the court and without interjection of personal opinion or bias.

## *A. Motion to Recuse*

Trial judges should recuse themselves whenever they have any doubt as to their ability to preside impartially in a criminal case or whenever their impartiality can reasonably be questioned. *Pannel v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001) (citing *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). Additionally, recusal is appropriate "when a person of ordinary prudence in the judge's position would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (citing *State v. Cash*, 867 S.W.2d 741 (Tenn. Crim. App. 1993). The judge generally need not recuse him or herself if the bias or perceived bias is "based upon actual observance of witnesses and evidence during trial." *Id.* However, if the judge's bias is "so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial." *Id.* Whether to grant a motion to recuse rests within the discretion of the trial court, and this court will not reverse the trial judge's decision absent an abuse of discretion. *Hines*, 919 S.W.2d at 578. A trial court abuses its discretion "only when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Section 40-11-102 provides in relevant part that "[b]efore trial, all defendants shall be bailable by sufficient sureties, *except for capital offenses where the proof is evident or the presumption great*." Tenn. Code Ann. § 40-11-102 (2014) (emphasis added). In his brief, the Defendant argues that "when the same judge who decides to deny bail also becomes the trial judge, his impartiality has been removed." He asserts that section 40-11-102's requirement that proof of guilt be "evident" for bail to be denied "requires the hearing judge to weigh evidence pretrial and determine the likelihood of conviction, as the [trial] [c]ourt did here." We note, however, that the Defendant failed to cite to any applicable legal authority for his argument; thus, this issue is waived. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Nevertheless, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for recusal. "Adverse rulings by a trial court are not usually sufficient grounds to establish bias." *Alley*, 882 S.W.2d at 821 (internal citation omitted). "A trial judge is not disqualified because that judge has previously presided over legal proceedings involving the same defendant." *State v. Reid*, 213 S.W.3d 792,

815 (Tenn. 2006) (citing *Hines*, 919 S.W.2d at 578). Here, the trial court concluded that no "person of ordinary prudence in the court's position, knowing all the facts known to the court, would find a reasonable basis for questioning the court's impartiality." The trial court also concluded that it denied the Defendant's motion to be released on bail "after careful consideration of the evidence presented by both sides." There is no evidence in the record that the trial judge was subjectively biased against the Defendant based on his denial of the Defendant's motion to be released on bail, nor is there any evidence of objective bias against the Defendant. The Defendant is not entitled to relief on this ground. *See State v. Vesper Denton Hicks*, No. 200, 1986 WL 677, at *2 (Tenn. Crim. App. Jan. 10, 1986), *aff'd*, 1987 WL 16204 (Tenn. Aug. 31, 1987) (concluding that the trial court properly denied defendant's motion to recuse because there were "no remarks or actions by the trial judge which may have indicated to the jury he was not impartial in trying this case[]" and because "[t]he record show[ed] [that] the bail order containing the statements complained of [wa]s in full compliance with T.C.A. § 40-11-102 . . .").

## B. Constitutionality Challenge

The Defendant also argues that Tennessee Code Annotated section 40-11-102 is unconstitutional when "the same judge who denies bail becomes the trial judge[]" because the trial court predetermined the Defendant's guilt in denying bail and, therefore, shifted the burden of proof to the Defendant when the trial court acted in its capacity as thirteenth juror. The Defendant contends that this statute violates his right to a fair trial as applied. The State asserts that because section 40-11-102 "does not in fact 'remove' the trial judge's 'impartiality' . . . , the statute cannot be unconstitutional as applied to [the Defendant]."

Regarding the Defendant's challenge to the constitutionality of the bail statute, the trial court determined:

> The statute was designed to protect capital defendants from being denied bail where the proof of guilt was not evident from the evidence available to the State. Essentially, the statute was designed to ensure the State could not secure the denial of bail merely by filing a notice of its intention to seek the death penalty. Recognizing the severity of such offense and the need to protect the public while also balancing the rights of defendant[]s to bail, the Tennessee Constitution, codified at Tenn. Code Ann. § 40-11-102, requires proof of guilt in capital cases to be "evident" before bail may be denied. Requiring the court to make such a determination upon a motion for bail does not remove the presumption of innocence which continues to follow a defendant until conviction.

- 124 -

Moreover, any such finding by a trial court does not create an impermissible comment upon the evidence or a predetermination of guilt. A finding that the proof of guilt is sufficiently evident to deny bail does not amount to a finding of guilt beyond a reasonable doubt and does not indicate bias on the part of the court. Therefore, [the] [D]efendant's request for this court to conclude the statute is unconstitutional and rescind its previous order denying bail is, hereby, DENIED.

Our courts are charged with upholding the constitutionality of statutes whenever possible. *State v. Pickett*, 211 S.W.3d 696, 700 (Tenn. 2007). When analyzing the constitutionality of a statute, we begin with the presumption that the statute is constitutional. *Id.* (citing *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003)). "[A]n as 'applied challenge' to the constitutionality of a statute is evaluated considering how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations." *State v. Crank*, 468 S.W.3d 15, 24 n.5 (Tenn. 2015) (quoting *City of Memphis v. Hargett*, 414 S.W.3d 88, 107 (Tenn. 2013)) (internal quotation marks omitted). The constitutional interpretation of a statute is a question of law which we review de novo. *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009).

Upon review, we conclude that the trial court did not err in determining that the bail statute was constitutional as applied to the Defendant. As previously noted, section 40-11-102 states, as relevant here, that "[b]efore trial, all defendants shall be bailable by sufficient sureties, except for capital offenses where the proof is evident or the presumption great." Tenn. Code Ann. § 40-11-102. We agree with the trial court that a trial court's conclusion that the proof of the defendant's guilt is "evident" for purposes of a bail hearing "does not create an impermissible comment upon the evidence or a predetermination of guilt[]" because "[a] finding that the proof of guilt is sufficiently evident to deny bail does not amount to a finding of guilt beyond a reasonable doubt and does not indicate bias on the part of the court." The Defendant is not entitled to relief on this ground.

### XII. Violations of the Trial Court's Order of Sequestration

The Defendant asserts that he is entitled to a new trial due to the violation of the trial court's order of sequestration and due to jurors' exposure to "unknown contacts and outside information." The Defendant contends that juror separation occurred when: (1) jurors played card games in other jurors' hotel rooms and used the hotel exercise room; (2) jurors were allowed to make phone calls to family members; (3) jurors met with family members on Sundays; and (4) jurors came into contact with "unidentified persons" at the hotel breakfast buffet each morning. Additionally, the Defendant contends that "jurors were exposed to prejudicial 'facts' about [the Defendant] and his family not in

evidence." The State responds that the Defendant is not entitled to relief because he failed to show that the jurors were separated or exposed to extraneous information.

## *A. Jury Sequestration*

In criminal prosecutions in which a jury is sequestered, the trial court "shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." Tenn. Code Ann. § 40-18-116 (2010). The purpose of the sequestration rule is to protect juries from outside influences in order to ensure that the jurors will base their verdict only upon evidence presented at trial and, thus, preserve a defendant's right to a fair trial and an impartial jury. *State v. Bondurant*, 4 S.W.3d 662, 671 (Tenn. 1999). However, the sequestration rule does not literally require each juror to remain in the presence of the other jurors at all times; rather, the "real test is whether a juror passes from the attendance and control of the court officer." *Id.*

Once a jury separation has been shown by a defendant, the State then has the burden of showing that such separation did not result in prejudice to the defendant. *State v. Jackson*, 173 S.W.3d 401, 410 (Tenn. 2005) (citing *Gonzales v. State*, 593 S.W.2d 288, 291 (Tenn. 1980)). "It is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial." *Gonzales*, 593 S.W.2d at 291 (quoting *Cartwright v. State*, 80 Tenn. 620, 625 (1883)) (internal quotation marks omitted). If the State fails to satisfy its burden of showing that the separation did not result in prejudice to the defendant, then a new trial is required. *Bondurant*, 4 S.W.3d at 672 (citation omitted). A mere possibility of a separation, though, is insufficient to place the burden upon the State to show lack of prejudice. *State v. McClain*, 667 S.W.2d 64, 66 (Tenn. 1984). A defendant must show that an actual separation occurred. *Id.*

### 1. Playing cards and using the hotel exercise room

Upon review, we conclude that the Defendant has failed to show a jury separation based on jurors' playing cards and using the hotel exercise room. First, the card games are not separations because there is no indication that anyone other than one or more of the jurors was in the hotel room during the games. As noted by the trial court in addressing this issue, the jury was sequestered in a hotel where court officers were on duty twenty-four hours a day, and there was a camera monitoring the activities of the jurors. At most, the jurors' meeting for card games raises a concern that jurors might engage in premature deliberations; however, Ms. Edwards testified that jurors were "very careful" not to discuss the trial while playing cards. As for jurors' use of the hotel exercise room, the record reflects that the jurors were accompanied by court officers at all times while exercising and that jurors had no contact with third parties. Because no juror

passed "from the attendance and control of the court officer," the Defendant has not established a jury separation during card games or during the use of the exercise room. *Bondurant*, 4 S.W.3d at 671.

## 2. Making phone calls

At the end of the first day of trial, the trial court provided the jury with thorough instructions regarding its sequestration. Within these instructions, the trial court stated, "[Y]ou're not gonna have your cell phone. . . . You're not gonna have any way to communicate outside except by the telephone that they have available for you to use." The Defendant did not raise an objection to the jurors' making telephone calls at the time but raised it as an issue in his motion for new trial. During the motion for new trial hearing, eleven court officers and five jurors testified. The evidence established that, during the course of trial, jurors were allowed to make telephone calls to family members. The jurors were not allowed cell phones and the telephones in their hotel rooms were removed. Under the supervision of court officers, jurors made telephone calls one at a time inside a hotel room. Court officers logged the jurors' calls, including the name of the juror, the person called, and the subject of each call. During jurors' telephone calls, court officers stood within two feet of the jurors and heard one full side of the conversation. The State introduced as an exhibit an extensive call log, which contained a description of the topic of the jurors' conversation for each telephone call.

From our review, it appears that panels of this court have addressed this issue on a few occasions, with varying results. In *State v. Tracey Pendergrass*, No. 03C01-9608-CC-00310, 1997 WL 760724, at *7-9 (Tenn. Crim. App. Dec. 11, 1997), *perm. app. denied* (Tenn. Sept. 21, 1998), the defendant argued that the trial court abused its discretion when it refused to grant the defendant's motion for mistrial after four jurors on the sequestered jury were allowed to use the telephone during the jury's deliberations to make arrangements for staying over another night. During a hearing on the motion, the three court officers who had taken the jurors to make their telephone calls testified. *Id.* at *8. One of the officers testified that he "did not hear any portions of the conversations" while the other court officers testified that they "did not know what was being said on the other end of the telephone conversations." *Id.* The trial court determined that there had not "been anything improper" and that there was no "prejudice to the defendant as far as the activities of the jury." *Id.* Upon review, this court concluded that a jury separation had occurred. *Id.* The court, however, concluded that the trial court had used an erroneous test in resolving the issue and remanded the matter to the trial court for an evidentiary hearing, in which the State would be allowed the opportunity to show that the communications to each juror were "upon subjects not involving the trial and that no impressions other than those drawn from the testimony were made upon the juror's mind." *Id.* at *8-9.

In *State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *185-86 (Tenn. Crim. App. June 28, 2002), *perm. app. denied* (Tenn. Feb. 18, 2003), the court again addressed this issue when the defendant asserted that a jury separation had occurred when sequestered jurors were allowed telephone contact with family members. However, this court concluded that allowing the jurors to call their families in the presence of a court officer was not error. *Id.* at *186. Citing *Bondurant*, the court reasoned that the trial court specifically instructed the jurors and the court officers that any phone calls would occur in the officer's presence, and there was no evidence in the record that any juror "passed from the attendance and control of the court officer." *Id.*

Recently, in *State v. Tony Edward Bigoms*, No. E2015-02475-CCA-R3-CD, 2017 WL 2562176, at *17 (Tenn. Crim. App. June 7, 2017), *no perm. app. filed*, multiple members of the sequestered jury made telephone calls throughout the defendant's trial, but a court officer was in the room with the jurors when the telephone calls were made. Noting the factual similarities with *Tracey Pendergrass*, Judge Thomas concluded that a jury separation had occurred. *Id.* Judge Thomas noted that the telephone calls were made in groups of three and four jurors with all of the conversations occurring at the same time and that, "[m]ore importantly, the court officers were able to hear only the jurors' side of the conversations and did not hear what the outside persons said to the jurors." *Id.* However, Judge Montgomery wrote a separate concurring opinion, in which Judge Easter joined. *Id.* (Montgomery, J., concurring). Judge Montgomery concluded that no jury separation occurred when jurors called family members in the presence of court officers, reasoning:

> The jurors in the present case remained within the custody and control of court officers at all times relevant to the telephone calls. The court officers were present, and the jurors were in the presence of other jurors during the calls. The calls were brief, and what the jurors said could be heard by the court officers. The jurors were not allowed to keep their cell phones during the trial, and their only opportunity to use them was brief, supervised, and communal. Neither the testifying court officers nor the jury foreman had any indication that any information relevant to the trial had been received during the telephone calls and, in fact, all indications were to the contrary. In my view, the circumstances and environment in which the calls were made created no meaningful opportunity for a violation of the rule of sequestration to occur, and no evidence shows that one did, in fact, take place.

*Id.*

We are persuaded by the rationale in Judge Montgomery's concurring opinion in *Tony Edward Bigoms* and conclude that the Defendant has not established a separation based on the jurors' phone calls to family members. *See also Thomas Dee Huskey*, 2002 WL 1400059, at *185-86. In this case, the trial court specifically instructed the jurors and the court officers that telephone calls would occur in the officer's presence, and the Defendant did not object. Moreover, the record shows that the jurors remained within the custody and control of court officers at all times relevant to the telephone calls. Court officers allowed jurors to make the calls, one at a time, through the use of a designated hotel room telephone. The calls were short and were to family members only. Court officers logged each call, noting the name of the juror, the person called, and the subject of the call. The court officers were instructed to stand within two feet of jurors during the telephone calls and to listen to the jurors' conversations. From their vantage point, court officers could hear one full side of the conversation and could observe the jurors' demeanor and tone of voice. At the motion for new trial hearing, the court officers who supervised the phone calls testified that there was never any indication that information relevant to the trial had been received by the jurors during the phone calls. We conclude that the evidence does not establish that any juror "passed from the attendance and control of the court officer."[16] *Bondurant*, 4 S.W.3d at 671.

Even if the Defendant had established a separation based on the jurors' telephone calls to family members, we would conclude that the State met its burden of showing that such separation did not result in prejudice to the Defendant. In addressing the issue of juror separation, the trial court found that there was "no basis to believe that the jury ever received any extraneous information about this trial[,]" and the record supports this finding. Each of the court officers who supervised the jurors' telephone calls testified that they were close enough to hear the jurors' conversations, and there was no indication that the jurors' received information about the trial during the calls. The phone call log shows that the topics of conversation between the jurors and family members consisted of general matters such as jurors needing supplies and jurors checking on children or other family members. Additionally, five jurors testified that their telephone calls were monitored and that they did not discuss anything related to the Defendant's trial during the calls. Consequently, any jury separation did not result in prejudice to the Defendant, and the Defendant is not entitled to a new trial on this basis. *See Bondurant*, 4 S.W.3d at 672.

### 3. Meeting with family members on Sundays

---

[16] Nevertheless, we agree with Judge Thomas's admonition in *Tony Edward Bigoms* that "the better practice would be to have the jurors make phone calls one at a time in the presence of a court officer and on speaker phone so the officer can hear both sides of the conversation." 2017 WL 2562176, at *17.

During the three-week trial, jurors were allowed two family member visits. The guidelines for the visits were "very strict," and jurors were told that, if they were caught discussing the case with family members, the trial would end. The visits were held in a confined space, and jurors and family members were supervised by multiple court officers. The court officers patrolled the designated visitation area, listening in on the conversations taking place between jurors and family members, and from the record there is no indication that jurors visited with family members outside the designated area. Officers could "understand what [jurors] were saying enough to know what they were and were not talking about," and they never heard jurors and family members discussing the Defendant's case. Because no juror passed "from the attendance and control of the court officer," the Defendant has not established a jury separation during family member visitations. *Bondurant*, 4 S.W.3d at 671; *see e.g.*, *Tony Edward Bigoms*, 2017 WL 2562176, at *18 (finding no jury separation when jurors and their family members were in the same room with the doors locked, three to four court officers observed their conversations, and jurors were instructed not to discuss the trial with family members); *James Dellinger and Gary Wayne Sutton v. State*, No. E2004-01068-CCA-R3-PC, 2006 WL 1679595, at *23 (Tenn. Crim. App. June 19, 2006) (concluding that jurors were not outside the attendance and control of the court officers when the family visitation was confined to one large room and there was no evidence that jurors left the designated area), *perm. app. denied* (Tenn. Oct. 30, 2006).

### 4. Coming into contact with "unidentified persons" at hotel breakfast buffet

Testimony at the motion for new trial hearing established that jurors ate breakfast every morning at the hotel where they were sequestered. Although there would typically be a few hotel guests eating at the same time, court officers were in the breakfast room supervising jurors at all times. Jurors sat at tables with other jurors, and there is no indication in the record of any interaction with third parties in the room. Because the record does not support the Defendant's claim of a jury separation during breakfast, he is not entitled to relief.

### B. Outside Influence

"A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *State v. Adams*, 405 S.W.3d 641, 651 (Tenn. 2013). "Extraneous prejudicial information" encompasses "the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case," and improper outside influence is considered "any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial

about the matter pending before the jury.'" *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). "[W]hen it has been shown that a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005) (citing *Blackwell*, 664 S.W.2d at 689).

In determining whether the State has rebutted the presumption of prejudice, trial courts should consider the following factors: (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial. *Adams*, 405 S.W.3d at 654. No single factor is dispositive; rather, trial courts should consider all of the factors in light of the ultimate inquiry—"whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict." *Id.*

On appeal, the Defendant contends that jurors were exposed to "prejudicial 'facts' about [the Defendant] and his family not in evidence." The Defendant's claim is based on Juror Johnson's testimony that Juror Bennett told the jury that the Defendant's "granddaddy was a big farmer who had money, [] that he had been known for buying his family members out of trouble with his money[,]" and that the Defendant's "granddaddy was paying for his legal fees." Juror Bennett, however, recalled the conversation differently. She testified that she mentioned during deliberations that a member of the Defendant's family was "a well[-]known farmer in Lake County." She explained:

> I had said that I had known his grandmother, Miss Billie, for several years, and I hated that she was having to go through what she was having to go through. And that's the only thing I remember ever saying about that.

Juror Bennett testified that she did not recall saying that the Defendant's grandfather "always bought those boys out of trouble[.]" When asked about the issue, Juror Vestal testified that she did not recall Juror Bennett saying anything about the Defendant's grandfather.

In addressing this issue, the trial court found that there was "no basis to believe that the jury ever received any extraneous information about this trial," and we agree. The statement attributed to Juror Bennett does not qualify as "extraneous information" warranting a new trial. In *State v. David W. Gaddis*, No. E2011-00003-CCA-R3-CD, 2012 WL 2370636, at *14 (Tenn. Crim. App. June 25, 2012), *no perm. app. filed*, this court rejected a defendant's claim that a juror's statement concerning a defendant's

- 131 -

reputation in the community qualified as "extraneous information" and demonstrated "juror bias." In reaching the conclusion, the court reasoned:

> It is true that one of the questions asked by the jury—inquiring as to whether any bias might arise from a juror having allegedly stated "if you had known David Gaddis you'd know he always gets a designated driver"—might imply that at least one juror was aware of the defendant's reputation within the community. However, although notions of "extraneous information" may encompass "a juror's personal knowledge of the defendant's prior criminal record or arrest," we are unwilling to extend that principle so far as to encompass a juror's personal knowledge of a defendant's general reputation in the community, especially in absence of any allegation that the juror concealed the information during voir dire. If "mere exposure to news accounts of [an] incident [is] insufficient to establish bias," and "jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury," then a mere allegation that a juror may have possessed prior awareness of the defendant's general reputation in the community, without more, is insufficient to provide a basis for maintaining a juror bias challenge.

*Id.* (internal citations and footnote omitted).

In this case, Juror Bennett's statement appears to have come from her general knowledge of the Defendant and his family before trial. It does not qualify as "extraneous information" warranting a new trial. Moreover, there is no indication that a third party imparted this knowledge to Juror Bennett during the course of the trial. Instead, it appears that Juror Bennett brought this information with her into voir dire, and the Defendant accepted her as a juror. Accordingly, he is not entitled to relief. *See State v. Crenshaw*, 64 S.W3d 374, 393-94 (Tenn. Crim. App. 2001).

### XIII. Cumulative Error

Finally, the Defendant contends that cumulative error deprived him of due process and a fair trial and necessitates reversal. We have already concluded that the Defendant is entitled to a new trial. However, we will discuss this issue because we also conclude that the cumulative effect of the errors in this trial require reversal.

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation but "have a cumulative effect on the proceedings so great at to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn.

2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77.

"Reversals for cumulative error are rare." *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). For cases that warrant assessment under the cumulative error doctrine, our supreme court explained:

> Of necessity, claims under the cumulative error doctrine are sui generis. A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*Hester*, 324 S.W.3d at 76 (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)).

In this case, we have identified five errors that occurred during the course of the Defendant's trial, specifically: (1) the trial court's exclusion of the Defendant's testimony about Mr. Hill's threat to him the morning after the murders as hearsay; (2) the trial court's prohibiting the Defendant's expert witness, Ms. Johnson, from testifying that the crime scene was consistent with multiple perpetrators under Rule 702 and 703; (3) a constitutional violation of the Defendant's right to present a defense by excluding Ms. Johnson's testimony on this issue; (4) the State's improper interference with the Defendant's gang expert, Lieutenant Carter; and (5) prosecutorial misconduct in closing argument based on General Bivens' statement that defense counsel and his staff had made up the Defendant's story in the four years between the offenses and trial.

At trial, the defense theory was that Mr. Hill and the "three Mexicans" committed the murders and that the Defendant was acting under duress when he drove Mr. Hill and the "three Mexicans" to and from the victims' residence and when he sold the victims' stolen property after the murders. In order to establish the defense of duress, the Defendant needed to testify about the threats made to him, including those made by Mr. Hill the day after the murders which, according to the Defendant, caused him to sell the victims' property. Ms. Johnson's expert testimony would have established that the crime did not occur in the manner asserted by the State and would have supported the Defendant's claim that multiple assailants killed the victims. Following the exclusion of Ms. Johnson's testimony, the State argued repeatedly during closing argument that there

- 133 -

was no evidence corroborating the Defendant's testimony. Then, when the prosecutor improperly commented that defense counsel and his staff made up the Defendant's story, there were no remedial measures provided by the trial court. Finally, the State's interference with the Defendant's gang expert, Lieutenant Carter, who had agreed to testify that the manner in which the victims were killed was consistent with the modus operandi of the Mexikanemi, was inexplicable and improper. His testimony would have offered further support for the Defendant's testimony that he did not kill the victims.

We have considered these claims against the background of the case as a whole, we note that in many aspects the State's case against the Defendant was strong: the Defendant was found with the victims' stolen property after the murders; a knife containing the victims' blood was found in the Defendant's car; Mr. Shell's blood was found on the Defendant's shirt; and upon his arrest, the Defendant was able to describe details of the crime scene not publically known. However, the excluded testimony would have corroborated the Defendant's testimony, further established his defense of duress, and challenged many aspects of the State's proof. Therefore, we conclude that, even if the Defendant's convictions were not reversed on the basis of any one error, the sum of these errors calls into question the reliability of the verdict and necessitates a new trial.

## Conclusion

For the aforementioned reasons, the judgments of the trial court are reversed, and the case is remanded for a new trial.

_____
ROBERT L. HOLLOWAY, JR., JUDGE